U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
APR 0 8 2022
AT ___ O'CLOCK
John M. Domurad, Clerk - Utica



# UNITED STATES DISTRICT COURT
for the
Northern District of New York
Utica Division

WILLIAM PAUL BENNETT
*Plaintiff*

-V-

NEW YORK STATE THRUWAY AUTHORITY
JOANNE M. MAHONEY, MARY BOEHM
MATTHEW DRISCOLL, JOHN BARR
JAMES KONSTALID, FRANK MULTARI
CARLOS MILLAN, DAVID NAPLES,
KEVIN POST, MICHEAL BLAIS,
ROBERT DRESSING, TODD P. SUMMERSON,
PATRICK K. HOEHN, BARRY OAKSFORD
*Defendants*

Case No. 6:22-CV-0337 (GLS/ML)
*(to be filled in by the Clerk's Office)*
Jury Trial: *(check one)* _X_ Yes ___No

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff, hereinafter Complaintant

| | |
|---|---|
| Name: | William Paul Bennett |
| Street: | 1610 North George Street |
| City and County: | Rome, County of Oneida |
| State and Zip Code | NY 13440 |
| Telephone Number | 928-227-7410 |
| E-mail Address | wpb9.57@gmail.com |

#### B. The Defendants

Defendant Number One

| | |
|---|---|
| Name | New York State Thruway Authority |
| Street | 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | |

Defendant Number Two

| | |
|---|---|
| Name | Joanne M. Mahoney |
| Job Title | NYSTA Chairman, Board of Directors |
| Street | c/o 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | joanne.mahoney@thruway.ny.gov |

Defendant Number Three

| | |
|---|---|
| Name | Matthew Driscoll |
| Job Title | NYSTA Executive Director |
| Street | c/o 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | matt.driscoll@thruway.ny.gov |

Defendant Number Four

| | |
|---|---|
| Name | James Konstalid |
| Job Title | NYSTA Director of Maintenance and Operations |
| Street | c/o 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | jim.konstalid@thruway.ny.gov |

Defendant Number Five

| | |
|---|---|
| Name | John Barr |
| Job Title | NYSTA Director of Administrative Services |
| Street | c/o 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | john.barr@thruway.ny.gov |

Defendant Number Six

| | |
|---|---|
| Name | Frank Multari |
| Job Title | NYSTA Director of Personnel |
| Street | c/o 200 Southern Boulevard, P.O. Box 200 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12201-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | frank.multari@thruway.ny.gov |

Defendant Number Seven

| | |
|---|---|
| Name | Mary Boehm |
| Job Title | NYSTA Acting Director for the Department of Audit and Management Services |
| Street | c/o 200 Southern Boulevard, P.O. Box 189 |
| City and County | Albany, County of Albany |
| State and Zip Code | NY 12001-0189 |
| Telephone Number | 800-847-8929 |
| E-mail Address | mary.boehm@thruway.ny.gov |

Defendant Number Eight

| | |
|---|---|
| Name | Carlos Millan |
| Job Title | NYSTA Director Bureau of Labor Relations and Employee Safety |
| Street | 737 Columbia Turnpike, Apt D24 |
| City and County | East Greenbush, County of Rensselaer |
| State and Zip Code | NY 12061 |
| Telephone Number | 800-847-8929 |
| E-mail Address | carlos.millan@thruway.ny.gov |

Defendant Number Nine

| | |
|---|---|
| Name | David Naples |
| Job Title | NYSTA EEOC Specialist 1 |
| Street | 286 Miller Rd |
| City and County | Castleton-on-Hudson, County of Rensselaer |
| State and Zip Code | NY 12033 |
| Telephone Number | 518-436-3002 |
| E-mail Address | david.naples@thruway.ny.gov |

Defendant Number Ten

| | |
|---|---|
| Name | Patrick Hoehn |
| Job Title | NYSTA Acting Director Syracuse Division |
| Street | 7496 Rome Oriskany Road |
| City and County | Rome, County of Oneida |
| State and Zip Code | NY 13440 |
| Telephone Number | |
| E-mail Address | patrick.hoehn@thruway.ny.gov |

Defendant Number Eleven

| | |
|---|---|
| Name | Kevin Post |
| Job Title | NYSTA MS-3, Facilities |
| Street | 7748 Roberts Street |
| City and County | Canastota, County of Oneida |
| State and Zip Code | NY 13032 |
| Telephone Number | 315-382-0953 |
| E-mail Address | kevin.post@thruway.ny.gov |

Defendant Number Twelve

| | |
|---|---|
| Name | Robert Dressing |
| Job Title | NYSTA MS-3, Highway Maintenance |
| Street | 110 Charing Avenue |
| City and County | Syracuse, County of Onadonga |
| State and Zip Code | NY 13214 |
| Telephone Number | |
| E-mail Address | robert.dressing@thruway.ny.gov |

Defendant Number Thirteen

| | |
|---|---|
| Name | Barry Oaksford |
| Job Title | MS-2, Facilities |
| Street | 6416 Kimball Road |
| City and County | Oriskany Falls, County of Oneida |
| State and Zip Code | NY 13425 |
| Telephone Number | 315-952-2159 |
| E-mail Address | barry.oaksford@thruway.ny.gov |

Defendant Number Fourteen

| | |
|---|---|
| Name | Michael Blais |
| Job Title | MS-2, Maintenance |
| Street | 212 Oldfield Dr |
| City and County | Herkimer, County of Herkimer |
| State and Zip Code | NY. 13350 |
| Telephone Number | |
| E-mail Address | michael.blais@thruway.ny.gov |

Defendant Number Fifteen

| | |
|---|---|
| Name | Todd Summerson |
| Job Title | |
| Street | 107 Cleveland Ave |
| City and County | Liverpool, County of Onadonga |
| State and Zip Code | NY 13088 |
| Telephone Number | |
| E-mail Address | todd.summerson@thruway.ny.gov |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 USC Sec 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 USC Sec 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any Plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

_X_ Federal question ____ Diversity of citizenship

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statues, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1. U.S. Constitution Article 1, Section 9, Clause 3
2. U.S. Constitution, Amendment Four
3. U.S. Constitution, Amendment Six
4. Americans with Disability Act of 1990, as amended, 29 CFR 1630
5. Civil Rights Act of 1964, Title 42, Section 2000e, Sexual Harassment
6. Civil Rights Act of 1964, Title 42, Section 2000e, Hostile Work Environment
7. Title 18 Section 351(e), Assault
8. Title 18 Section 241, Conspiracy to Deprive Rights
9. Title 18 Section 242, Deprivation of Rights Under Color of Law
10. Title 18 Section 1983, Civil Action for Deprivation of Rights
11. Title 28 USC, Part VI, Chapter 181, Section 4101 Defamation of Character

**B. The amount in Controversy.**

The amount in controversy – the amount the Complainant claims the various Defendants owes or the amount at stake – is more than $75,000, not counting the interest and costs of the court, because: the Complainant is seeking damages totaling thirty nine million three hundred twelve thousand six hundred fifty five dollars and sixty five cents ($39,312,655.65).

1. The Complainant seeks actual and punitive monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from the New York State Thruway for its liability in the responsibilities in this complaint.

2. The Complainant seeks actual and punitive monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from Joanne Mahoney for personal liability in the responsibilities in this claim.

3. The Complainant seeks actual and punitive monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from Matthew Driscoll for personal liability in the responsibilities listed in this claim.

4. The Complainant moves that this Honorable Court award monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from James Konstalid for

personal liability in the responsibilities listed in this claim.

5. The Complaintant moves that this Honorable Court award monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from John Barr for personal liability in the responsibilities listed in this claim.

6. The Complaintant seeks actual and punitive monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from Frank Multari for personal liability in the responsibilities listed in this claim.

7. The Complaintant seeks actual and punitive monetary damages in the amount of two million seven hundred seventy thousand one hundred twenty three dollars and eighty cents ($2,770,123.80) from Mary Boehm for personal liability in the responsibilities listed in this claim.

8. The Complaintant seeks actual and punitive monetary damages in the amount of two million eight hundred thirty thousand one hundred twenty three dollars and eighty cents ($2,830,123.80) from Carlos Millan for personal liability in the responsibilities listed in this claim.

9. The Complaintant seeks actual and punitive monetary damages in the amount of nine hundred eighty eight thousand seven hundred ninety seven dollars and eighty cents ($988,797.80) from David Naples for personal liability in the

responsibilities listed in this claim.

10. The Complaintant seeks actual and punitive monetary damages in the amount of one million seven hundred eighty five thousand six hundred eighty four dollars and no cents ($1,785,684.00) from Patrick Hoehn for personal liability in the responsibilities listed in this claim.

11. The Complaintant seeks actual and punitive monetary damages in the amount of five million six hundred eighty six thousand nine hundred forty dollars and seventy cents ($5,686,940.70) from Kevin Post for personal liability in the responsibilities listed in this claim.

12. The Complaintant seeks actual and punitive monetary damages in the amount of nine hundred eleven thousand six hundred sixty dollars and five cents ($911,660.05) from Robert Dressing for personal liability in the responsibilities listed in this claim.

13. The Complaintant seeks actual and punitive monetary damages in the amount of four million two hundred nineteen thousand two hundred nineteen dollars and forty cents ($4,219,219.40) from Barry Oaksford for personal liability in the responsibilities listed in this claim.

14. The Complaintant seeks actual and punitive monetary damages in the amount of one million five hundred one thousand six hundred sixty dollars and five cents ($1,501,660.05) from Michael Blais for personal liability in the responsibilities

listed in this claim.

15. The Complainant seeks actual and punitive monetary damages in the amount of one million nine hundred ninety seven thousand seven hundred three dollars and twenty five cents ($1,997,703.25) from Todd Summerson for personal liability in the responsibilities listed in this claim.

16. The Complainant requests that this Honorable Court provide Declaratory Judgments to the settlement of the issues brought before this Honorable Court, through this action, to impose behaviors upon the NYSTA relative to employees of the NYSTA, that those employees might enjoy a Workplace free of the conditions which cause a Hostile Work Environment, as outlined in Section IV of this compliant, entitled "Relief".

17. The Complainant request that this Honorable Court provide Injunctive Relief to discourage and prevent retaliation by the Defendant(s) against the Complainant, during the duration of litigation of this matter as outlined in Section IV of this complaint, entitled "Relief".

**III. Statement of Claim:**

Now comes the Complaintant, seeking redress of the hereinafter detailed grievances by this Honorable Court, against the Defendants, individually and severally, for which evidence shall be presented, before a Jury, at Trial, in the form of written documentation, photographic evidence and witness testimony.

This Complaint was initiated due to the systemic failure of Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan ( herein after may be referred to as the NYSTA Executive Staff ) and Management Staff, as described, to operate within the requirements of the ADA Laws and Regulations, which was further exasperated by harassment, bullying tactics and retaliation ( including, but not limited to falsification of government instruments and defamation of character) which is not atypical within the management of the NYSTA. In addition to the direct violations of the named defendants against my person, the management culture at the NYSTA encourages similar actions on a regular basis, which has created a generally hostile work environment. The problems that are herein documented, are wide spread and common place.

As such, the management up to and including the Board of Directors, have, or should have knowledge of the common occurrences that are in direct violation of NY State and Federal Laws and Regulations and NYSTA Policies by which the named Defendants are bound by their capacities as Officials and/or Managers within the NYSTA. As such, Plaintiff alleges that the Corporate Entity known as the New York State Thruway Authority, together with the Board of Directors and Executive Staff, are equally culpable as the actual active participants named and described herein.

It should be noted that the Complainant has exhausted the Administrative Process by through the resources available through the NY State Department of Human Rights. Due to the complexity of the complaint, the NYS DHR was unable to reach a conclusive determination (see attached Determination of Charge and Notice of Your Right to Sue issued on 3/8/2022 by the U,S, Equal Opportunity Commission). Complainant certifies and attests that the specific itemized complaints, here in odd numbered 13 through 99 inclusive, are not in controversy. The Complainant intends to file Motions for Summary Judgment for all matters not in controversy. The Complainant seeks Jury Trial for all matters which remain in controversy and which may not be resolved by means of Summary Judgment.

In preparation for proceedings with the NY State Department of Human Rights, Complainant has served via USPS Certified Mail, Admissions on: David Naples on March 15, 2021 USPS Cert #70201290000225121741 and March 25, 2021 USPS Cert# 70201290000225123202; Michael Blais on March 17, 2021 USPS Cert # 70201290000225121802 and March 25, 2021 USPS Cert # 70201290000225123325; Kevin Post on March 15, 2021 USPS Cert# 70201290000225121819 and March 25, 2021 USPS Cert# 70201290000225123295; Todd Summerson on March 16, 2021 USPS Cert# 70201290000225121789 and March 24, 2021 USPS Cert #70201290000225123271; Robert Dressing on March 15, 2021 USPS Cert # 70201290000225121758 and March 25, 2021 USPS Cert# 70201290000225123332; Barry Oaksford on March 15, 2021 USPS Cert #7020000225121796; Patrick Hoehn on March 15, 2021 USPS Cert# 70201290000225121826 and March 25, 2021 USPS Cert # 70201290000225123318; relative to all points of fact and in align with the scope of Rule 26(a)(1) and Rule 36.

To date of this filing, no ADMISSION has been refuted or denied, placing all ADMISSIONS as

agreed fact by the parties, by tacit acquiescence, per Federal Rules of Civil Procedure, Rule 36. The ADMISSIONS, together with their respective Proof of Service(s) will be entered into evidence per Rule 26, together with the respective Motions for Summary Judgment and, if applicable, at the appropriate time during the anticipated trail by Jury.

The matters in controversy involve the specified itemized complaints, here in numbered 1 through 12 inclusive and 101 through 113 inclusive.

**Historical Context**: Complaintant hereby offers this Honorable Court a brief historical context which gives pertinent information relevant to the events and situations which preceded the actual grievance(s) which have caused this action to be brought before this Honorable Court. On February 11, 2016 Complaintant (I, Me, My, Myself) commenced employment with the York State Thruway Authority (NYSTA) as a General Mechanic/HVAC (GM) at pay grade 12, entry level. Prior to employment, I had completed a normal and customary application and interview process. During the interview, which was conducted by Barry Oaksford, Maintenance Supervisor II and Bruce Chandler, Maintenance Supervisor I. At the time of the interview, I did have a full beard and mustache. There was no mention of requirement to shave, during the interview process. After some time had passed, I was informed by Barry Oaksford that I would be required to shave for a mandatory respirator fit test. Over the next short period of time, I learned that no employee of the NYSTA Facilities Maintenance Syracuse Division, except Bruce Chandler had used a respirator during the preceding ten (10) years. After seeking advise, I submitted a Request for Reasonable Accommodation that I be permitted to be excused from shaving and the subsequent fit test as respirators are not typically used by anyone in my job description and the presence of my facial hair was a part of my firmly held religious beliefs and practices. After submission of the request, additional documentation was

request from the NYSTA and was provided. The Reasonable Accommodation was granted.

Approximately one year later, I received notice that I would have to re-apply for the Reasonable Accommodation. Upon inquiring for the reason and necessity for a re-application, I was informed by various NYSTA management and EEOC personnel that such re-application is to make sure that no change in status existed. NYSTA EEOC personnel instructed me to fill out the appropriate form and to put wording to the effect that there were no changes to the previous annual application and that the documentation was in my personnel file. I completed the application as instructed and forwarded it to EEOC. Shortly after the application was submitted, I, along with all Syracuse Division Maintenance Facility Employees, were assigned to a training class which was held in the break area of the Syracuse Division Maintenance Facility office. Kevin Post, Maintenance Supervisor III was an instructor for at least part of the training. After we were dismissed from the training and while most of my co-workers (peers) were still in the room, Kevin Post approached me to tell me that he had seen my second application for Reasonable Accommodation and that it was incomplete. He told me that I had to present new documentation, specifically referring to a letter on Church letterhead from the parish priest. I responded that I had conversed with EEOC prior to forwarding the completed application and that I had followed their instructions, including adding a comment that if they needed anything else, I would do my best to comply upon receipt of a request. Kevin Post proceeded to raise his voice and chastise me in front of my peers with words that included 'This isn't a fight you want to take on'. I walked away. I did not pursue the issue at that time as I was unaware of the official grievance process, I did not know who to file a complaint with and it did not seem to be worth the bother as it was likely that nothing would come of such a complaint. About the time of the above described incident, I learned that one Chris Dulong, GM/Electrician of the Syracuse Division was also involved with disciplinary issues regarding facial hair and fit

testing requirements. He has been terminated since the above described series of events.

Bruce Chandler, Maintenance Supervisor I retired and William Bentley, Maintenance Supervisor I, was assigned to the Utica Maintenance Facility Satellite. William Bentley had an accident in which he broke one or both legs and was unable to travel to the office. During that time, I took a two week period of employment known as “Out of Title”. During that period, I learned and performed the basic duties of a Maintenance Supervisor I by performing those duties. During that rotation, the Utica Facilities staff was tasked with performing a task at the Herkimer Maintenance Facility. The task involved installation of overhead oil piping and required two people. The day that the task was scheduled arrived and four of the five available General Mechanics where not at work. I spoke to Michael Blais that morning and informed him that due to staffing shortage, the job would have to be rescheduled. Michael Blais lost his temper and started yelling at me, including shouting that 'You (meaning ME) don't care about taking care of matters at his facility'. I immediately called him on his demeanor, challenging him on both his point of fact and his behavior. He did apologize and revert to a civil tone. The foregoing is presented to establish patterns of behavior of some of the parties involved in this complaint. These patterns will be verified by witness testimony, at trial.

**Complaintant hereby alleges the following adverse actions by the identified participants as actionable and seeks recourse for same:**

1. NYSTA, together with the approval of Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff and as such knew of or should have known of the contents of said document,did publish and distribute SAFETY GRAM #192, dated April 17, 2020. This is the first official mention of requirement of use of masks or facial coverings and the proper use thereof. This SAFETY

GRAM is a Breech of Contract known as the "AGREEMENT BETWEEN NEW YORK STATE THRUWAY AUTHORITY AND LOCAL 72, NEW YORK STATE THRUWAY EMPLOYEES INTERNATIONAL BROTHERHOOD OF TEAMSTERS NEGOTIATING UNIT 1 dated November 29, 2017" (hereinafter called Contract) specifically paragraph 5.J. located on page 10 of said Contract, EXHIBIT 2. Due to the Contractual breech, the policy is void on its face and unenforceable. Publication and distribution of this document, in breech of the Contract and without specific instructions to the named Defendants, did serve as a direct venue for the respective Deprivation of Complaintant's Civil Rights be means of Creation of a Hostile Work Environment.

2. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

3. NYSTA's action in publishing and distributing the aforementioned SAFETY GRAM #192, together with the approval of Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff and as such knew of or should have known of the contents of said document, without proper and adequate instruction for implementation, was applied against Complaintant during the course of wrongful discipline and retaliation, by certain named Defendants, in part or in whole. As the NYSTA did publish this document in violation of the Contract with the obvious intent of changing working conditions, The NYSTA did violate My Civil Rights by not providing exceptions and clarifications to the Management Staff of the NYSTA, which stripped Me of the benefits which would otherwise be provided under 29 CFR 1630.9(a).

4. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

5. NYSTA SAFETY GRAM #192 is effectively a Contract of Adhesion, being binding on the NYSTA, together with the approval of Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff and as such knew of or should have known of the contents of said document, by its publication and distribution while having no affect on NYSTA employees that are covered by the Contract, which such publication and distribution is in breech. This document is the first official NYSTA mandate for use of mask or facial covering and on its face, serves to create a Hostile Work Environment.

6. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

7. According to Article 6 section (e) of the Contract,EXIHIBIT 3, NYSTA Management Responsibilities specifically state that Management is responsible for providing ... 'equipment'. Masks, as all Personal Protective Equipment (PPE) falls under the category of equipment. NYSTA Publications indicated that NYSTA employees MAY provide their own personal PPE in the form of masks or facial coverings. However, it is the responsibility of the NYSTA, together with Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff and as such knew of or should have known of the contents of said document, to provide employee PPE both contractually and traditionally. The NYSTA, together with Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff, failed to provide adequate PPE in the form of facial coverings prior to October 16, 2020. Mandating use of PPE while failing to provide adequate supplies to affected employees is both: negligent as demonstrated by failing to provide required and mandatory PPE; and contributing to a violation of the Civil Rights Act of 1964 by the creation of a

Hostile Work Environment by placing non-complying employees in a potential position to be disciplined for that non-compliance rather than to recognize and act on the possibility of the non-complying actions being an unwritten request for Reasonable Accommodation, in violation of 29 CFR 1630.9(a).

8. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

9. Failure of the NYSTA, together with Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff and as such knew of or should have and failed to to provide proper and adequate education and training to the Management Staff of the NYSTA and failing to intervene with NYSTA Management Staff upon notice of an unwritten Request for Reasonable Accommodation created a violation of Complaintant's Civil Rights under 29 CFR 1630.9(a).

10. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

11. On or about June, 2020, the NYSTA, together with Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari, Mary Boehm and Carlos Millan, all being of the NYSTA Executive Staff established a policy regarding a requirement that all NYSTA employees complete a 'Wellness Survey". This policy is a breech of Contract specifically paragraph 5.J. located on page 10 of said Contract. Due to the Contractual breech, the policy is void on its face and unenforceable. This Contractual Breech created a Hostile Work Environment.

12. The Defendants named in the preceding paragraph while employed in official capacity and negligent in respective fiduciary responsibilities relative to the matters included in this Complaint and should be stripped of Qualified Immunity under Title 18, Section 1983.

13. On or about June 1, 2020, Kevin Post was made aware that Complainant had a problem with filling out the computer form listed in Paragraph 6, at least in part because Complainant had a prior existing condition which intermittently caused side effects, from a properly prescribed and administered medication, included on said form, which preclude an affected Complainant from participating in the work schedule. On or about June 3, 2020 Kevin Post instructed William Bentley to have Complainant fill out a paper version of the Wellness Survey so that Complainant could write in amendments to the questions/answers which would allow Complainant to truthfully answer the Wellness Survey while not Falsifying a New York State Instrument. [New York State Penal Code 175]. On or about June 3, 2020, Kevin Post did demonstrate, by his actions, that he was aware that Complainant likely had a need for a Reasonable Accommodation through EEOC under the Americans with Disability Act (ADA) as addressed in 29 CFR 1630.9(a) as he did request that Complainant provide a Doctor's note verifying Complainant's claim.

14. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

15. On or about July 21, 2020, Complainant was assigned to attend a training module at the Vehicle Storage Building at the NYSTA Herkimer Maintenance Facility. David Naples, EEOC Specialist for the NYSTA was one of the Trainers. As Complainant had previous communication with David Naples concerning Complainant's Reasonable Accommodation for Complainant's Beard, Complainant approached him, after the training to discuss the information covered in Paragraph 6. At this point, the NYSTA EEOC Department, in the person of David Naples, did receive a non-written Request for Reasonable Accommodation by Complainant and failed to act on that request, thereby failing to preserve Complainant's Civil Rights under the 29 CFR 1630.9(a).

16. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

17. On October 1, 2020, Complainant was in the men's restroom relieving Complainant's bladder at the urinal closest to the outside wall. Michael Blais entered and while holding the door with his left hand, he ordered Complainant to put a mask on. Aside from the fact that Complainant was otherwise occupied, Complainant told Michael Blais that Complainant had two doctor's notes which allowed Complainant to not wear a mask as long as Complainant was social , distancing, thus putting Michael Blais on Notice under 29 CFR 1630.9(a) of the likelihood of the need for a Reasonable Accommodation. The fact that the NYSTA EEOC had not yet granted a formal Reasonable Accommodation until October 15, 2020 is no excuse or defense for the failure, as the Notice of having, on hand, two Notes from Physicians Licensed to Practice Medicine in the State of New York, relative to the matter at hand, combined with the management position of Michael Blais, is addressed in 29 CFR 1630.9(a) as to the unlawfulness of his failure to make a Reasonable Accommodation.

18. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

19. During the incident described in Paragraph 17, Michael Blais exhibited anger, postured in a threatening manner and charged at Complainant while yelling at Complainant that Complainant 'wasn't social distancing now' as he approached Complainant to less than 3 feet distance. Complainant wasn't sure what he was doing or if he intended to physically attack Complainant, in violation of Title 18 USC 351(E) 1610. He certainly violated NYSTA Published Policy on social distancing and on bullying and harassment and given the circumstances of Complainant being exposed and trapped from escape, the harassment was

sexual in nature. The entrapment of the Complainant constituted an illegal seizure of Complainant's person, in violation of the 4th Amendment of the U.S. Constitution.

20. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

21. The result of the action of Michael Blais, described in Paragraph 17, created a physical assault against Complainant in violating NYSTA Posted Occupancy Policy. Michael Blais has no reasonable excuse for not being aware of the occupancy status of the space involved as Michael Blais had sole and complete control of the implementation of the occupancy policy for the facility entrusted to him by the NYSTA. Michael Blais, acting as a MS-2, did cause an assault against Complainant, in violation of Complainant's Civil Rights as described in Title 18 USC 351(E) 1610, and attempted to force a his opinion as NYSTA actual Policy, upon Complainant's person.

22. Michael Blais was at his usual work site and in the normal performance of his NYSTA assigned duties as a Maintenance Supervisor II, at the time of the incident noted in paragraph 21 and attempted to deprive Complainant's rights against assault,which constitutes grounds for removal of his Qualified Immunity in accordance with Title 18 Section 1983.

23. The result of the actions including: puffing his chest, rushing the Complainant and raising his voice in an aggressive manner, of Michael Blais, described in Paragraph 12, created a physical assault against Complainant in his aggressive approach while Complainant was exposed at a urinal. Title 18 USC 351(E) 1610.

24. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

25. The result of the action of Michael Blais, described in Paragraph 12, created a sexual assault

against Complainant, due to the location and nature of the alleged assault, in violation of the Complainant's Civil Rights as protected under the Civil Rights Act of 1964.

26. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

27. On October 1, 2020 Michael Blais did report to his immediate supervisor, the events that occurred in the NYSTA Herkimer Maintenance Facility Men's Room in such a manner as to cause unsupported allegations to be transferred to Complainant's upper supervisory staff resulting in a series of adverse events against Complainant. This manner of reporting was defamatory in nature and slanderous in action. Michael Blais made the report to Robert Dressing while in his official capacity as a NYSTA employee and manager.

28. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

29. Michael Blais did make the report described in paragraph 21, while in the normal performance of his duties as a NYSTA MS-2, in a manner that was harmful to Complainant's reputation and in direct conflict with Complainant's need for a Reasonable Accommodation in relation to 29 CFR 1630.9(a).

30. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

31. On October 1, 2020, Robert Dressing, having no personal knowledge of any of the events described in paragraphs 16-20, above and not having investigated any of the allegations, did report his understanding of the interaction between Michael Blais and Complainant, on October 1, 2020 to Kevin Post. This reporting did cause action to Complainant's detriment,

therefore was slanderous in nature and complicit in attempting to shift responsibility from Michael Blais to Complainant.

32. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

33. Robert Dressing in reporting and Kevin Post in hearing, hearsay rumors in an attempt resulting in subsequent action to cause harm to the Complainant without evidence or confirmation, for the benefit of Michael Blais brought cause of prima facia evidence of violation of Title 18, Part 1, Chapter 13 Section 241 and 242, conspiracy for deprivation of rights, specifically Complainant's right to unharassed employment.

34. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

35. On October 1, 2020, Kevin Post, having no first hand knowledge of any of the events involved and without investigating any of the facts of the matter described in paragraphs 17, 19, 21, 23,25,27 and 29 above, did order William Bentley, to deliver to Complainant, a Job Counseling Memo (JCM), EXHIBIT 4, under threat of disciplinary action by Kevin Post should William Bentley fail to deliver said JCM. It is recognized and understood throughout the NYSTA that a JCM is documentation of a Job Counseling Meeting. No Job Counseling meeting was held on October 1, 2020, which elevates the physical JCM to the level of Libel.

36. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

37. Kevin Post was acting in his capacity as a MS-3 for the NYSTA when he ordered William Bentley, MS-1 to deliver the JCM. This action by Kevin Post places Kevin Post in the position

of Principle and William Bentley in the position of Agent. Kevin Post had previously be made known that I had reasonable need of a Reasonable Accommodation and did not protect Complaintant's rights under 29 CFR 1630.9(a).

38. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

39. The JCM described in paragraphs 35 and 37 of this document is purported to describe and event which did not occur, that being a Job Counseling Meeting, making the JCM dated October 1, 2020 a Falsified Government Instrument in violation of NYS Penal Code 175, created a Hostile Work Environment.

40. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

41. Kevin Post causing the presentment of a JCM without a Job Counseling meeting within four hours of an alleged violation of acceptable conduct by the Complaintant is a Breech of the Contract, on its face in that I was deprived of Contractually guaranteed right of Union Representation, Article 15.A.2.a of the Contract, EXHIBIT 5 a Hostile Work Environment.

42. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

43. On October 1, 2020, prior to formally serving the aforementioned JCM, Kevin Post ordered William Bentley to send the JCM described in Paragraph 26, to Todd Summerson for editing and clarification. Todd Summerson, having no first hand knowledge of the events being documented and having done nothing to investigate the facts of the matter, materially altered the document, in violation of NYS Penal Code 175, by removing all reference to the actual

place of occurrence and the allegation of the alleged physical and sexual assault of Complainant by Michael Blais. The Altered JCM, EXHIBIT 6, made the false and unsubstantiated allegation, in further violation of NYS Penal Code 175, that Complainant had initiated the encounter with Michael Blais by entering the office of Michael Blais without permission. The falsified New York State Document, being a JCM was returned to William Bentley, for service to Complainant on or about October 2, 2020. The Falsified document is self actuating evidence of Libel.

44. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

45. This action described in Paragraph 43, above, between Kevin Post and Todd Summerson constitutes a Conspiracy to Deprive Rights under Color of Law, Title 18 USC Part 1 Chapter 13, Section 241.

46. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

47. Todd Summerson was acting in his official Capacity, in creating the fiction described in Paragraphs 43 and 45 inclusive, above. The document is in violation of Complainant's need for a Reasonable Accommodation under 29 CFR 1630.9(a) and is evidence of action to deprive Complainant of Complainant's rights relative to an EEOC Reasonable Accommodation.

48. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

49. The alteration of wording in the document from October 1, 2020 and October 2, 2020, as described in paragraph 31-33 inclusive, above is: prima facia evidence collusion by Kevin Post

and Todd Summerson of violation of NYS Penal Code 175, falsification of a Government Instrument, for the sole purpose of depriving Complaintant of Civil Rights by Creation of a Hostile Work Environment.

50. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

51. On about September 29, 2020 Kevin Post did cause a Memorandum, EXHIBIT 7, to be developed. Said memorandum was distributed on or about October 6, 2020. Said memorandum is in breech of the Contract, paragraph 5.J. Therefore void on its face and serving to create a Hostile Work Environment.

52. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

53. Wording in the memorandum described in Paragraph 51 above, was incorporated into the JCM fabricated by Todd Summerson on or about October 1, 2020 and delivered to Complaintant by means of William Bentley on or about October 2, 2020. The specific wording selected by Todd Summerson was Libelous in nature and used ex post facto and in violation of the US Constitution Article 1, Section 9, Clause 3 Complaintant alleges said Libel to be in an attempt to make Complaintant appear to be the aggressor in the events at hand.

54. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

55. That Kevin Post is the author of said Memorandum described in Paragraph 51 and that Todd Summerson was provided access to said Memorandum's publication, is prima facia evidence of conspiracy in violation of Title 18, Part 1, Chapter 13, Section 241 and 242, Conspiracy to

Deprive Rights while Acting under Color of Law (NYSTA Policy).

56. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

57. On or about October 1, 2020, Complaintant contacted David Naples of the NYSTA EEOC office relative to the series of events that transpired between Michael Blais and Complaintant, earlier that morning. During that conversation, David Naples conceded that he should have done something with the information he received in July, relative to our discussion, He instructed me to file a written request for a Reasonable Accommodation. David Naples failure to properly handle my unwritten request for a Reasonable Accommodation was nothing less than negligent and resulted in being contributory in nature to the violation of my Civil Rights pursuant to 29 CFR 1630.9(a) and the ensuing retaliation by the various named NYSTA management Employees.

58. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

59. On or about October 7, 2020 Complaintant officially notified by means of email: Patrick Hoehn, NYSTA Acting Director Syracuse Division; Kevin Post, MS3; Barry Oaksford, MS2; William Bentley, MS1; Robert Dressing, MS3; Michael Blais, MS2; Todd Summerson; David Naples, NYSTA EEOC Specialist and Ronald Kozak, Local 72 Business Agent, that the events of October 1, 2020 and following amounted to physical harassment (assault) and bullying and sexual harassment (assault) by Michael Blais relative to the altercation. According to NYSTA Policy Number 25-2-25 dated November 26, 2018 specifically describes sexual harassment as 'A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, *intimidation* or *physical violence which are of a sexual nature* ...' Said policy

describes retaliation as including any action that could discourage an individual from making or supporting a sexual harassment claim. Further on page 6, paragraph IX of NYSTA Policy Number 25-2-25, 'Supervisors and managers are held to a higher standard of conduct and are expected to model appropriate workplace behavior'. Further in that section, 'supervisors and managers will be subject to discipline for failing to report suspected sexual harassment'. While William Bentley did discuss the matter with Barry Oaksford and Ronald Kozak has attempted to assist with my complaint, not one other listed NYSTA manager or supervisor or notified personnel has made any investigation into the allegations, involving any of the matters herein documented. To the contrary, the named parties as this complaint will outline in detail, have worked in concert to cover up any record of the occurrence and have expended effort to treat Complaintant in a retaliatory nature in order to coerce Complaintant into silence. Complaintant charges that all of the named parties in this paragraph are equally culpable of sexual and physical harassment because of their tacit compliance in failure to take appropriate action in violation of Civil Rights by creation of a Hostile Work Environment, except William Bentley and Ronald Kozak. Reference EXHIBIT 1.

60. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

61. On October 29, Barry Oaksford chaired a disciplinary Job Counseling Meeting. During the Job Counseling Meeting, Barry Oaksford alleged that Complaintant had violated NYSTA Policy by not wearing a mask while in a NYSTA building on October 15, 2020. Persons present at the Job Counseling Meeting were Barry Oaksford, William Bentley, Ronald Kozak and Complaintant. No one at the Job Counseling meeting had any first hand knowledge of the actual events, as alleged, except Complaintant. Barry Oaksford alleged that Complaintant had violated sections NYSTA Policies 2020-1 through 2020-4, inclusive. Complaintant read each of

the above Policies, out loud and in the presence of all present and asked for the specific line item for which Complainant was accused of violating. Complainant received no response and Barry Oaksford continued the Job Counseling Meeting. [The allegations centered around Complainant's momentary presence in the garage of the NYSTA Verona Maintenance Section on October 15, 2020. Complainant was seen by Andrew Dawes, NYSTA Maintenance Supervisor II, leaving the building through a wide open (approximately 14' wide X 16' high) truck garage door. No one else was in the garage section of the building, at the time (40' deep X 80' wide X 18.5' high). Andrew Dawes questioned my presence in the building without a mask. Complainant referred him to my doctor's notes, which he requested to see and Complainant complied, Andrew Dawes had no problem with the matter. His actions and behavior exhibited a basic understanding and respect for 29 CFR 1630.9(a)]. The unsupported accusations by Barry Oaksford against Complainant, at this meeting, being made in front of William Bentley and Ronald Kozak, with the intent to bring adverse action concerning Complainant's employment, constitutes Slander.

62. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

63. During the Job Counseling Meeting, held on October 29, as described in paragraph 45, in the presence of William Bentley, Ronald Kozak and Complainant, Barry Oaksford did tell Complainant that he 'did not care if you (Complainant) had a Reasonable Accommodation (issued by NYSTA EEOC) you (Complainant) are to do what you (Complainant) are told and if you (Complainant) don't like it you (Complainant) can grieve it later. That statement is prima facia evidence that Barry Oaksford had no intention of compliance with Federal and State protections afforded under the ADA and that he was personally and intentionally violating Complainant's Civil Rights as defined in 29 CFR 1630.9(a) and not acting with fiduciary

responsibility as agent for the NYSTA, which has written Policy stating otherwise.

64. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

65. On October 29, 2020, during the Job Counseling Meeting, as described in paragraph 61, at which time Barry Oaksford charged Complaintant with violating NYSTA Policies. Complaintant was not afforded the opportunity to face the accuser, nor to cross examine the accuser, nor to even know the identity of the accuser which had brought accusations forward that were worthy of disciplinary action, including fines and/or termination Failure of allowing Complaintant to face the accuser is in violation of the 6th Amendment of the US Constitution.

66. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

67. On November 16, 2020, Barry Oaksford did sign and caused a copy to be delivered to Complaintant a JCM, EXHIBIT 8, concerning the allegations of NYSTA Policy violation on October 15, 2020, as described in paragraph 45-48 The written JCM constitutes Libel as it alleges wrong doing on Complaintant's part without substantiation. The existence of the document in question contributes as evidence of a pattern of behavior which subsequently resulted in formal disciplinary action, which resulted in loss of wages.

68. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

69. On November 16, 2020, Barry Oaksford did sign a JCM, with the full knowledge and consent of Kevin Post, which is alleged to have documented the Job Counseling Meeting sited in paragraph 67, above. Complaintant alleges that the said document is prima facia evidence that

Barry Oaksford and Kevin Post were actively engaged in a Conspiracy to Deprive Complaintant of Rights under Color of Law, in violation of Title 18 USC Part 1 Chapter 13 Section 241.

70. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

71. On November 16, 2020, Barry Oaksford did sign a JCM, with full knowledge and consent of Kevin Post, which is alleged to document the Job Counseling Meeting sited in Paragraph 67, above. Complaintant alleges that the accusations and determinations are false and that there is no evidence that any NYSTA Policy(ies) were violated by Complaintant. The allegations are in complete disregard of the Reasonable Accommodation which was assigned to Me by the NYSTA EEOC on October 15, 2020 and is in violation of 29 CFR 1630.9(a).

72. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

73. On November 16, 2020, Barry Oaksford did sign a JCM, with full knowledge and consent of Kevin Post, which is alleged to document the Job Counseling Meeting sited in Paragraph 49, above. Complaintant alleges that the physical document is prima facia evidence that it is a Falsified NY State Instrument, in violation of NYS Penal Code 175,there by depriving Complaintant of Civil Rights by creation of a Hostile Work Environment.

74. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

75. That the JCM signed on November 16, 2020 was executed by Barry Oaksford with the full knowledge and consent of Kevin Post is evidence of conspiracy to deprive rights of Complaintant under color of law and is in violation of Title 18 USC Part 1 Chapter 13 Section

241.

76. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

77. On December 7, 2020, Barry Oaksford convened a third Job Counseling Meeting, for which Barry Oaksford was not present, in violation of the 6th Amendment of the U.S. Constitution, right to confront an accuser. The stated reason for the expedited Job Counseling Meeting was to 'get it over with'. The meeting was moderated by William Bentley, acting as Agent for Barry Oaksford. The purpose of this meeting was to counsel Complaintant in regard to Complaintant's failure to wear a mask and allegation of violation of social distancing policy(ies) during the Job Counseling Meeting which was held on October 29, 2020. During that meeting, William Bentley, Ronald Kozak and Complaintant were present and all were present at the meeting dated October 29, 2020. William Bentley, Ronald Kozak and Complaintant all denied the validity of the claim by Barry Oaksford relative to the violation of Social Distancing Policy(ies).

78. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

79. The premise of the charges for this Job Counseling Meeting were Slanderous. Complaintant alleges that Barry Oaksford brought the charges described in this paragraph, with the full knowledge and consent of Kevin Post.

80. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

81. As both Kevin Post and Barry Oaksford were acting together and in conspiracy to deprive

Complaintant of Civil Rights by creating a Hostile Work Environment and bring a wrongful disciplinary job action against Complaintant they are guilty of violation of Title 18, Part 1, Chapter 13, Section 242.

82. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

83. On or before November 30, 2020, Barry Oaksford did prepare a JCM, EXHIBIT 9, to document the results of a Job Counseling Meeting that actually took place on December 7, 2020. The document in question is prima facia evidence of falsification of a NY State Instrument in violation of NYS Penal Code 175. This falsification of a NY State Instrument is self evident that the purpose was prosecute the Complaintant with the desired results of violating the Civil Rights of the Complaintant by creation of a Hostile Work Environment.

84. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

85. Complainant requested that the JCM be dismissed, on the JCM form in the block for accused response, for purposes of disciplinary action. The request was not responded to and the subsequent JCM was signed by Barry Oaksford as a falsified NYS Government Instrument, in violation of NYS Penal Code 175. Said document was entered into evidence in formal disciplinary action which resulted in personal economic loss by Complaintant, by means of Libel.

86. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

87. On or about January 20, 2021, Carlos Millan did cause a proposed "Stipulation" to be delivered

to Complainant relative to a proposed settlement for formal disciplinary action against Complainant for having been presented with three JCMs in less than one year. Carlos Millan drafted and/or approved the Stipulation, EXHIBIT 10, at the request of and approval of Patrick Hoehn, Kevin Post, Barry Oaksford and (presumably) NYSTA General Council and NYSTA Executive Staff. Part of the Stipulation is contingent on Complainant admitting that " I had been in NYSTA Buildings without a mask and that Complainant would refrain from future such action". While there is no controversy relative to Complainant having been in NYSTA Buildings without a mask, there was no such policy, and therefore no violation to prosecute, at that time. This action created a disciplinary action resulting in direct financial loss by the Complainant, where no violation occurred in violation of Title 18 Section 241 and 242.

**88.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**89.** The nature of the Stipulation referenced in Paragraph 87,which was created by Carlos Millan and with the knowledge and approval of Patrick Hoehn, Kevin Post, Barry Oaksford and (presumably) NYSTA General Council and NYSTA Executive Staff, was to effectively eliminate Complainant's ability to practice social distancing, as was allowed by every other NYSTA employee. This is purely retaliatory. Furthermore, the Stipulation wording deprived me of Complainant Reasonable Accommodation in violation of 29 CFR 1630.9(a), as a further act of retaliation.

**90.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**91.** The Stipulation described in paragraph 87 was delivered to Complainant by Carlos Millan and was made available to Patrick Hoehn, Kevin Post, Barry Oaksford and (presumably) NYSTA

General Council and NYSTA Executive Staff by means of cc. None of the named or implied Defendants responded in controversy to the Stipulation, in whole or in part, providing prima facia evidence of agreement by means of Tacit Acquiescence, thus making the document known as the Stipulation to be self proving evidence of being and instrument of fraud and used for the purpose of forwarding a conspiracy to deprive rights in violation of Title 18, Part 1, Chapter 13, Section 242.

**92.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**93.** The Stipulation referred to in Paragraph 87 is alleged to be false on its face and therefore Libelous in nature, having the direct effect of causing the Complaintant lose of three days wages. The direct loss was ($26.45 X 8 hours/Day X 3 Days = $634.80). The Complaintant is seeking actual and punitive damages from each Defendant, individually and severally.

**94.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**95.** The Stipulation referred to in Paragraph 65, specifically stated " the penalty as herein set forth shall be considered as fully satisfying this proceeding". On February 8, 2021, Patrick Hoehn, together with Kevin Post and Barry Oaksford, did cause a 'Report of Unsatisfactory Performance' to be brought, relative to the fact that Complaintant had been assigned three JCMs in a one year period, for the same or similar Policy infractions. The Report of Unsatisfactory Performance had the effect of removing an fifth year step pay raise, from $26.45/hour to $28.24/hour. The resultant loss of $1.79/hour has a direct value of $3,723.20 for a standard work year of 2080 hours. The Report of Unsatisfactory Performance was a direct violation of the Stipulation and is prima facia evidence, on its face, of Falsification of a NYS Government

Instrument NYS Penal Code 175. The Complainant is seeking damages from Defendants (Patrick Hoehn, Kevin Post, Barry Oaksford), individually and severally. See EXHIBIT 11.

96. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

97. The aforementioned Report of Unsatisfactory Performance as described in Paragraph 95, is prima facia evidence of violation of Title 18 USC Part 1, Chapter 13, Section 241 and 242, between Patrick Hoehn, Kevin Post and Barry Oaksford .

98. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

99. The Report of Unsatisfactory Performance, described in Paragraph 95, to deprive Complaintant of a contractually agreed wage increase and is alleged to have had the affect of retaliation in violation of Complaintant's Civil Rights by the Creation of a Hostile Work Environment.

100. The Defendant(s) named in the paragraph 95, while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

101. On or about March 3, 2020, Carlos Millan did cause NYSTA Safety Directive 2020-1 to be published and distributed in breech of the Contract section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights, in violation of Title 18 Part 1 Chapter 13, Section 241 and 242 by false and malicious prosecution. Improper creation and presentment of this document has contributed to a Hostile Work Environment.

102. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**103.** On or about April 7, 2020, Carlos Millan did cause NYSTA Safety Directive 2020-2 to be published and distributed in violation of the Contract section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights, in violation of Title 18 Section Section 241 and 242 by false and malicious prosecution.

**104.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**105.** On or about April 16, 2020, Carlos Millan did cause NYSTA Bureau of Labor Relations Safety and Employee Safety SAFETY GRAM #192 (UPDAT #2) to be published and distributed in violation of the Contract section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights, in violation of Title 18 Section 241 and 242, by false and malicious prosecution.

**106.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**107.** On or about May 28 2020, Carlos Millan did cause NYSTA Safety Directive 2020-3 to be published and distributed in violation of the Contract, section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights, in violation of Title 18 Section 241 and 242 by false and malicious prosecution.

**108.** The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

**109.** On or about November 30, 2020, Carlos Millan did cause NYSTA Safety Directive 2020-5 to be published and distributed in violation of the Contract section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights,

in violation of Title 18 Section 241 and 242 by false and malicious prosecution.

110. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

111. On or about December 4, 2020, Carlos Millan did cause NYSTA Safety Directive 2020-6 to be published and distributed in violation of the Contract section 5.J. This document has been used on multiple occasions by the Defendants to deprive Complaintant's Civil Rights, in violation of Title 18 Section242 and 242 by false and malicious prosecution. See EXHIBIT 12 for all referenced Policies and SafetyGram.

112. The Defendant(s) named in the preceding paragraph while employed in official capacity and improperly applied the cited Statute, Regulation or Law, to the matters included in this section and should be stripped of Qualified Immunity under Title 18, Section 1983.

113. Complaintant alleges that Joanne Mahoney, Matthew Driscoll, James Konstalid, John Barr, Frank Multari and Mary Boehm are individually and severally liable for all charges included in this complaint. This allegation arises from the fact the the above named Defendants, by their individual positions of employment with the NYSTA are tasked with managing and oversight of the other Defendants in this action. Further that each of the above named Defendants received or should have received notification of incidents involved in this Complaint. Having been presented with certain details surrounding this complaint, all of the Defendants named above have neglected their fiduciary duties to reasonable and proper oversight of their subordinate managers, of the NYSTA, resulting in actual damages to Complaintant, both real and emotional. As such, claims to Qualified Immunity under Title 18 Section 1983 should be denied.

## IV. Relief

Now comes the Complaintant, with the Petition for Relief from Damages, per Defendant and per incident, as follows:

A) For each violation of 29 CFR 1630.9(a) as allowed by Law $75,000.00

B) For each instance of Sexual Harassment, as allowed by Law $300,000.00

C) For each Violation of Civil Rights resulting in the creation of a Hostile Work Environment (calculated as wages and benefits from June 2020 through February 2028 and forward through anticipated retirement of Complaintant, Detail in Appendix A) $838,163.00

D) Violation of Complaintant's 4th Amendment Protected Right $100,000.00

E) Violation of Complaintant's 6th Amendment Protected Right $100,000.00

F) Violation of Title 18 Section 241 and 242, as allowed by Law $ 10,000.00

G) Violation of Title 18 Section 351(E), assault $ 25,000.00

H) Violation of Civil Rights by failure to report Sexual Harassment $ 30,000.00 as calculated as ten percent of the actual Sexual Harassment Penalty.

I) Defamation of Character by means of Slander $ 62,862.25 as calculated as seven and one half percent of the Creation of a Hostile Work Environment penalty.

J) Defamation of Character by means of Libel $125,742.45 as calculated as fifteen percent of the Creation of a Hostile Work Environment penalty.

K) That the above listed amounts be assigned to each Defendant, individually and severally, relative to the number and type of offenses for which each Defendant is found responsible, by this Honorable Court, relative to the allegations described herein and as alleged in the associated counts, above.

L) That a Court Order a Declaratory Judgment that the NYSTA is responsible for oversight in the area of Training the Management Staff of the NYSTA relative to recognition of unwritten requests for Reasonable Accommodation as required by the ADA.

M) That a Court Order a Declaratory Judgment that NYSTA is responsible for oversight in the area of Training the Management Staff of the NYSTA relative to word, tone of voice, body language and actions that contribute to a Hostile Work Environment.

N) That a Court Order a Declaratory Judgment that the NYSTA is responsible for oversight in the area of Training the Management Staff relative to the responsibilities surrounding reports of physical, sexual and emotional abuse, together with corrective steps for reports of repeat offenders, up to and including termination.

O) That a Court Order a Declaratory Judgment that the NYSTA is responsible for oversight in the area of Training the Management Staff concerning proper disciplinary procedures, including , but not limited to: Verbal warning for first offense; Job Counseling Meeting with Union Representation present for repeat offense(s); Review of all Job Counseling Memos by a Personnel/HR Professional, within five (5) business days of the issuance of said JCM and that any disputed item on the JCM be reviewed for completeness and accuracy including but not limited to an investigation of facts presented by said Personnel/HR professional; Upon finding that a JCM was issued with no factual basis, expungment of the JCM from the involved employee's file and retraining of the prosecuting Manager(s); Penalty of any Manager found to improperly issue a JCM a second time for any given class of offense with a fine of one day loss of pay, to be paid to the offended employee; Penalty of any Manager found to improperly issue a third or subsequent time for any given class of offense with a fine of five (5) days loss of pay for that manager and three (3) days loss of pay for his/her immediate Supervisor and a flat $10,000 fine to be paid by the NYSTA, with all fines collected being paid to the offended employee.

P) That a Court Order Enjoining the NYSTA, its Executive Staff and/or Management Staff from presenting any retaliatory action against the Complaintant for the duration of the action initiated by this Complaint. The Complaintant has, to date, used reasonable effort and diligence in the performance of his duties of employment since the commencement of events which have resulted in this Action. That if the NYSTA, its Executive Staff and/or Management Staff desire to dissolve the employment relationship, that the only option allowed be Administrative Leave with full pay and benefits, including Accruals, for the duration of Litigation of this matter, including time required for any appeals by any party.

**The following is an itemized list, by Count Number, Cause of Action, Defendant involved and relief sought.**

1. Count 1: Deprivation of Civil Rights by Creation of a Hostile Work Environment by Breech of Contractual Obligation.

| | | |
|---|---|---|
| 1. | NYSTA | $838,163.00 |
| 2. | Joanne Mahoney | $838,163.00 |
| 3. | Matthew Driscoll | $838,163.00 |
| 4. | James Konstalid | $838,163.00 |
| 5. | John Barr | $838,163.00 |
| 6. | Frank Multari | $838,163.00 |
| 7. | Mary Boehm | $838,163.00 |
| 8. | Carlos Millan | $838,163.00 |
| 9. | Sub-Total | $6,705,304.00 |

2. Count 3: Deprivation of Civil Rights by failure to comply with 29CFR 1630.9(a), specifically failing to provide front line management staff with the training and knowledge to follow the directive and intent of 29 CFR 1630.9(a)

| | |
|---|---|
| 1. NYSTA | $ 75,000.00 |
| 2. Joanne Mahoney | $ 75,000.00 |
| 3. Matthew Driscoll | $ 75,000.00 |
| 4. James Konstalid | $ 75,000.00 |
| 5. John Barr | $ 75,000.00 |
| 6. Frank Multari | $ 75,000.00 |
| 7. Mary Boehm | $ 75,000.00 |
| 8. Carlos Millan | $ 75,000.00 |
| 9. Sub-Total | $600,000.00 |
| 10. Running Sub-Total | $7,305,304.00 |

3. Count 5: Breech of Contractual Obligation relative to adequate supplies of Personal Protective Equipment.

| | |
|---|---|
| 1. NYSTA | $ 10,000.00 |
| 2. Joanne Mahoney | $ 10,000.00 |
| 3. Matthew Driscoll | $ 10,000.00 |
| 4. James Konstalid | $ 10,000.00 |
| 5. John Barr | $ 10,000.00 |
| 6. Frank Multari | $ 10,000.00 |
| 7. Mary Boehm | $ 10,000.00 |
| 8. Carlos Millan | $ 10,000.00 |
| 9. Sub-Total | $ 60,000.00 |
| 10. Running Sub-Total | $7,365,304.00 |

4. Count 7: Gross negligence on the part of the NYSTA and the Executive Staff to provide proper and adequate training to the front line management staff, resulting in violation of Civil Rights by the creation of a Hostile Work Environment by failure to recognize

unwritten Requests for Reasonable Accommodations, as required by The American with Disabilities Act per 29 CFR 1630.9(a).

| | | |
|---|---|---|
| 1. | NYSTA | $838,163.00 |
| 2. | Joanne Mahoney | $838,163.00 |
| 3. | Matthew Driscoll | $838,163.00 |
| 4. | James Konstalid | $838,163.00 |
| 5. | John Barr | $838,163.00 |
| 6. | Frank Multari | $838,163.00 |
| 7. | Mary Boehm | $838,163.00 |
| 8. | Carlos Millan | $838,163.00 |
| 9. | Sub-Total | $6,705,304.00 |
| 10. | Running Sub-Total | $14,070,608.00 |

5. Count 9: Gross negligence on the part of the NYSTA and the Executive Staff to provide proper and adequate training to the front line management staff for failure to recognize unwritten Requests for Reasonable Accommodations making the process of receiving and therefore, granting Reasonable Accommodations unnecessarily burdensome for NYSTA employees, as required by The American with Disabilities Act per 29 CFR 1630.9(a).

| | | |
|---|---|---|
| 1. | NYSTA | $ 75,000.00 |
| 2. | Joanne Mahoney | $ 75,000.00 |
| 3. | Matthew Driscoll | $ 75,000.00 |
| 4. | James Konstalid | $ 75,000.00 |
| 5. | John Barr | $ 75,000.00 |
| 6. | Frank Multari | $ 75,000.00 |
| 7. | Mary Boehm | $ 75,000.00 |
| 8. | Carlos Millan | $ 75,000.00 |

| | |
|---|---|
| 9. Sub-Total | $600,000.00 |
| 10. Running Sub-Total | $14,670,608.00 |

6. Count 11: Deprivation of Civil Rights by Creation of a Hostile Work Environment by Breech of Contractual Obligation.

| | |
|---|---|
| 1. NYSTA | $838,163.00 |
| 2. Joanne Mahoney | $838,163.00 |
| 3. Matthew Driscoll | $838,163.00 |
| 4. James Konstalid | $838,163.00 |
| 5. John Barr | $838,163.00 |
| 6. Frank Multari | $838,163.00 |
| 7. Mary Boehm | $838,163.00 |
| 8. Carlos Millan | $838,163.00 |
| 9. Sub-Total | $6,705,304.00 |
| 10. Running Sub-Total | $21,375,912.00 |

7. Count 13: Failure to act on unwritten Request for Reasonable Accommodation per 29 CFR 1630.9(a), resulting in damages to Complainant.

| | |
|---|---|
| 1. Kevin Post | $ 75,000.00 |
| 2. Sub-Total | $ 75,000.00 |
| 3. Running Sub-Total | $21,450,912.00 |

8. Count 15: Failure to act on unwritten Request for Reasonable Accommodation per 29 CFR 1630.9(a), resulting in damages to Complainant.

| | |
|---|---|
| 1. David Naples | $ 75,000.00 |
| 2. Sub-Total | $ 75,000.00 |
| 3. Running Sub-Total | $21,525,912.00 |

**9.** Count 17: Failure to act on unwritten Request for Reasonable Accommodation per 29 CFR 1630.9(a), resulting in damages to Complaintant.

| | | |
|---|---|---|
| 1. | Michael Blais | $ 75,000.00 |
| 2. | Sub-Total | $ 75,000.00 |
| 3. | Running Sub-Total | $21,600.912.00 |

**10.** Count 19: Violation of 4th Amendment of the U.S. Constitution by means of unlawful seizure of Complainant, by forceful prevention of allowing Complaintant to leave the area.

| | | |
|---|---|---|
| 1. | Michael Blais, U.S. Constitution, 4th Amendment | $100,000.00 |
| 2. | Sub-Total | $100,000.00 |
| 3. | Running Sub-Total | $21,700,912.00 |

**11.** Count 21: Violation of Title 18 USC 351(E), physical assault upon Complaintant, by means of overcrowding an occupancy controlled space during a declared pandemic.

| | | |
|---|---|---|
| 1. | Michael Blais, 18 USC 351(E) | $ 25,000.00 |
| 2. | Sub-Total | $ 25,000.00 |
| 3. | Running Sub-Total | $21,725,912.00 |

**12.** Count 23: Violation of Title 18 USC 351(E), physical assault upon Complaintant, by means of physical aggression.

| | | |
|---|---|---|
| 1. | Michael Blais, 18 USC 351(E) | $ 25,000.00 |
| 2. | Sub-Total | $ 25,000.00 |
| 3. | Running Sub-Total | $21,750,912.00 |

**13.** Count 25: Violation of Civil Rights by means of Sexual Harassment

| | | |
|---|---|---|
| 1. | Michael Blais, | $ 300,000.00 |
| 2. | Sub-Total | $ 300,000.00 |
| 3. | Running Sub-Total | $22,050,912.00 |

**14.** Count 27: Defamation of Character by means of Slander.

1. Michael Blais, $ 62,862.25
2. Sub-Total $ 62,682.25
3. Running Sub-Total $22,113,594.25

15. Count 29: Falsification of reporting of events resulting in denial of unwritten Request for Reasonable Accommodation per 29 CFR 1630.9(a), resulting in damages to Complaintant.

1. Michael Blais $ 75,000.00
2. Sub-Total $ 75,000.00
3. Running Sub-Total $22,188,594.25

16. Count 31: Defamation of Character, slanderous statements to cause disciplinary action

1. Robert Dressing $62,862.25
2. Sub-Total $ 62,862.25
3. Running Sub-Total $22,251,456.50

17. Count 33: Title 18 Section 241 & 242, Conspiracy to Deprive Rights

1. Robert Dressing $ 10,000.00
2. Kevin Post $ 10,000.00
3. Sub-Total $ 20,000.00
4. Running Sub-Total $22,271,456.50

18. Count 35: Defamation of Character, Libel

1. Kevin Post $ 125,742.45
2. Sub-Total $ 125,742.45
3. Running Sub-Total $22,397,198.95

19. Count 37: Denial of Reasonable Accommodation per 29 CFR 1630.9(a)

1. Kevin Post $ 75,000.00
2. Sub-Total $ 75,000.00
3. Running Sub-Total $22,472,198.95

20. Count 39: Denial of Reasonable Accommodation per 29 CFR 1630.9(a)

1. Kevin Post $ 75,000.00
2. Sub-Total $ 75,000.00
3. Running Sub-Total $22,547,198.95

21. Count 41: Violation of Civil Rights, Breech of Contractually protected Process resulting in Hostile Work Environment,

1. Kevin Post $838,163.00
2. Sub-Total $838,163.00
3. Running Sub-Total $23,385,361.95

22. Count 43: Count 35: Defamation of Character, Libel

1. Todd Summerson $ 125,742.45
2. Sub-Total $ 125,742.45
3. Running Sub-Total $23,511,104.40

23. Count 45: Conspiracy to Deprive Rights, in violation of Title 18 Section 241 & 242.

1. Todd Summerson $ 10,000.00
2. Kevin Post, $ 10,000.00
2. Sub-Total $ 20,000.00
3. Running Sub-Total $23,531,104.40

24. Count 47: Denial of Reasonable Accommodation per 29 CFR 1630.9(a)

1. Todd Summerson $ 75,000.00
2. Sub-Total $ 75,000.00
3. Running Sub-Total $23,606,104.40

25. Count 49: Creation of a fraudulent charge to Deprive Rights, creating a Hostile Work Environment

1. Todd Summerson $838,163.00

2. Kevin Post, $838,163.00

3. Sub-Total $1,780,000.00

4. Running Sub-Total $25,282,430.40

**26.** Count 51: Violation of Civil Rights, Breech of Contractually protected Process resulting in Hostile Work Environment.

1. Kevin Post $838,163.00

2. Sub-Total $838,163.00

3. Running Sub-Total $26,120,593.40

**27.** Count 53: US Constitution Article 1, Section 9, Clause 3; use of Policy in an ex post facto matter to cause harm to Complainant

1. Todd Summerson $100,000.00

2. Sub-Total $100,000.00

3. Running Sub-Total $26,220,593.40

**28.** Count 55: Conspiracy to Deprive Rights, in violation of Title 18 Section 241 & 242.

1. Todd Summerson $ 10,000.00

2. Kevin Post, $ 10,000.00

3. Sub-Total $ 20,000.00

4. Running Sub-Total $26,240,593.40

**29.** Count 57: Failure to act on unwritten request for Reasonable Accommodation per 29 CFR 1630.9(a)

1. David Naples $ 75,000.00

2. Sub-Total $ 75,000.00

3. Running Sub-Total $26,315,593.40

**30.** Count 59: Negligent failure to act on a Report of Physical Harassment and Sexual Harassment, resulting in a Hostile Work Environment.

| | |
|---|---|
| 1. Patrick Hoehn | $838,163.00 |
| 2. Kevin Post | $838,163.00 |
| 3. Barry Oaksford | $838,163.00 |
| 4. Robert Dressing | $838,163.00 |
| 5. Michael Blais | $838,163.00 |
| 6. Todd Summerson | $838,163.00 |
| 7. David Naples | $838,163.00 |
| 8. Sub-Total | $5,867,141.00 |
| 9. Running Sub-Total | $32,182,734.40 |

**31.** Count 61: Defamation of Character by means of Slander.

| | |
|---|---|
| 1. Barry Oaksford | $ 62,862.25 |
| 2. Sub-Total | $ 62,862.25 |
| 3. Running Sub-Total | $35,245,596.65 |

**32.** Count 63: Failure to provide Reasonable Accommodation per 29 CFR 1630.9(a)

| | |
|---|---|
| 1. Barry Oaksford | $ 75,000.00 |
| 2. Sub-Total | $ 75,000.00 |
| 3. Running Sub-Total | $32,320,596.65 |

**33.** Count 65: U.S. Constitution 6th Amendment violation

| | |
|---|---|
| 1. Barry Oaksford | $ 100,000.00 |
| 2. Sub-Total | $ 100,000.00 |
| 3. Running Sub-Total | $32,420,596.65 |

**34.** Count 67: Defamation of Character by means of Libel

| | |
|---|---|
| 1. Barry Oaksford | $ 125,742.45 |
| 2. Sub-Total | $ 125,742.25 |
| 3. Running Sub-Total | $32,546,338.90 |

**35.** Count 69: Title 18 USC Sections 241 & 242

| | |
|---|---|
| 1. Barry Oaksford | $ 10,000.00 |
| 2. Kevin Post | $ 10,000.00 |
| 2. Sub-Total | $ 20,000.00 |
| 3. Running Sub-Total | $32,566,338.90 |

**36.** Count 71: 29 CFR 1630.9(a)

| | |
|---|---|
| 1. Barry Oaksford | $ 75,000.00 |
| 2. Kevin Post | $ 75,000.00 |
| 2. Sub-Total | $ 150,000.00 |
| 3. Running Sub-Total | $32,716,338.90 |

**37.** Count 73: Violation of Civil Rights by Creation of a Hostile Work Environment

| | |
|---|---|
| 1. Barry Oaksford | $838,163.00 |
| 2. Kevin Post | $838,163.00 |
| 2. Sub-Total | $ 1,676,326.00 |
| 3. Running Sub-Total | $34,392,664.90 |

**38.** Count 75: Title 18 USC Sections 241 & 242

| | |
|---|---|
| 1. Barry Oaksford | $ 10,000.00 |
| 2. Kevin Post | $ 10,000.00 |
| 3. Sub-Total | $ 20,000.00 |
| 4. Running Sub-Total | $34,412,664.90 |

**39.** Count 77: U.S. Constitution, 6th Amendment

| | |
|---|---|
| 1. Barry Oaksford | $ 100,000.00 |
| 2. Sub-Total | $ 100,000.00 |
| 3. Running Sub-Total | $34,512,664.90 |

**40.** Count 79: Defamation of Character by Slander

| | | |
|---|---|---|
| 1. | Barry Oaksford | $ 62,862.25 |
| 2. | Kevin Post | $ 62,862.25 |
| 3. | Sub-Total | $ 125,724.50 |
| 4. | Running Sub-Total | $34,638,389.40 |

**41.** Count 81: Title 18 USC Sections 241 & 242

| | | |
|---|---|---|
| 1. | Barry Oaksford | $ 10,000.00 |
| 2. | Kevin Post | $ 10,000.00 |
| 3. | Sub-Total | $ 20,000.00 |
| 4. | Running Sub-Total | $34,658,389.40 |

**42.** Count 83: Violation of Civil Right by production of fraudulent document creating a Hostile Work Environment.

| | | |
|---|---|---|
| 1. | Barry Oaksford | $838,163.00 |
| 2. | Sub-Total | $838,163.00 |
| 3. | Running Sub-Total | $35,496,552.40 |

**43.** Count 85: Libel

| | | |
|---|---|---|
| 1. | Barry Oaksford | $125,742.45 |
| 2. | Sub-Total | $125,742.45 |
| 3. | Running Sub-Total | $35,622,294.85 |

**44.** Count 87:Conspiracy to Deprive Rights Title 18 Sections 241 & 242

| | | |
|---|---|---|
| 1. | NYSTA | $ 10,000.00 |
| 2. | Joanne Mahoney | $ 10,000.00 |
| 3. | Matthew Driscoll | $ 10,000.00 |
| 4. | James Konstalid | $ 10,000.00 |
| 5. | John Barr | $ 10,000.00 |
| 6. | Frank Multari | $ 10,000.00 |

| | |
|---|---|
| 7. Mary Boehm | $ 10,000.00 |
| 8. Carlos Millan | $ 10,000.00 |
| 9. Patrick Hoehn | $ 10,000.00 |
| 10. Kevin Post | $ 10,000.00 |
| 11. Barry Oaksford | $ 10,000.00 |
| 12. Sub-Total | $ 110,000.00 |
| 10. Running Sub-Total | $35,732,294.85 |

45. Count 89: 29 CFR 1630.9(a)

| | |
|---|---|
| 1. NYSTA | $ 75,000.00 |
| 2. Joanne Mahoney | $ 75,000.00 |
| 3. Matthew Driscoll | $ 75,000.00 |
| 4. James Konstalid | $ 75,000.00 |
| 5. John Barr | $ 75,000.00 |
| 6. Frank Multari | $ 75,000.00 |
| 7. Mary Boehm | $ 75,000.00 |
| 8. Carlos Millan | $ 75,000.00 |
| 9. Patrick Hoehn | $ 75,000.00 |
| 10. Kevin Post | $ 75,000.00 |
| 11. Barry Oaksford | $ 75,000.00 |
| 12. Sub-Total | $ 825,000.00 |
| 13. Running Sub-Total | $36,557,294.85 |

46. Count 91:Conspiracy to Deprive Rights Title 18 Sections 241 & 242

| | |
|---|---|
| 1. NYSTA | $ 10,000.00 |
| 2. Joanne Mahoney | $ 10,000.00 |
| 3. Matthew Driscoll | $ 10,000.00 |

| | |
|---|---|
| 4. James Konstalid | $ 10,000.00 |
| 5. John Barr | $ 10,000.00 |
| 6. Frank Multari | $ 10,000.00 |
| 7. Mary Boehm | $ 10,000.00 |
| 8. Carlos Millan | $ 10,000.00 |
| 9. Patrick Hoehn | $ 10,000.00 |
| 10. Kevin Post | $ 10,000.00 |
| 11. Barry Oaksford | $ 10,000.00 |
| 12. Sub-Total | $ 110,000.00 |
| 13. Running Sub-Total | $36,667,294.85 |

47. Count 93: Libel, Actual Damages listed herein Conspiracy to Deprive Rights Title 18 Sections 241 & 242

| | |
|---|---|
| 1. NYSTA | $ 634.80 |
| 2. Joanne Mahoney | $ 634.80 |
| 3. Matthew Driscoll | $ 634.80 |
| 4. James Konstalid | $ 634.80 |
| 5. John Barr | $ 634.80 |
| 6. Frank Multari | $ 634.80 |
| 7. Mary Boehm | $ 634.80 |
| 8. Carlos Millan | $ 634.80 |
| 9. Patrick Hoehn | $ 634.80 |
| 10. Kevin Post | $ 634.80 |
| 11. Barry Oaksford | $ 634.80 |
| 12. Sub-Total | $ 6,982.80 |
| 10. Running Sub-Total | $36,674,277.65 |

**48.** Count 95: Libel, Actual Damages

| | |
|---|---|
| 1. Barry Oaksford | $ 3,723.20 |
| 2. Kevin Post | $ 3,723.20 |
| 3. Patrick Hoehn | $ 3,723.20 |
| 3. Sub-Total | $ 11,169.60 |
| 4. Running Sub-Total | $36,685,447.20 |

**49.** Count 97: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Barry Oaksford | $ 10,000.00 |
| 2. Kevin Post | $ 10,000.00 |
| 3. Patrick Hoehn | $ 10,000.00 |
| 3. Sub-Total | $ 30,000.00 |
| 4. Running Sub-Total | $36,715,447.25 |

**50.** Count 99: Violation of Civil Rights by creation of a Hostile Work Environment

| | |
|---|---|
| 1. Barry Oaksford | $838,163.00 |
| 2. Kevin Post | $838,163.00 |
| 3. Patrick Hoehn | $838,163.00 |
| 3. Sub-Total | $2,514,489.00 |
| 4. Running Sub-Total | $39,229,936.25 |

**51.** Count 101: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |
| 3. Running Sub-Total | $39,239,936.25 |

**52.** Count 103: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |

| | |
|---|---|
| 3. Running Sub-Total | $39,249,936.25 |

53. Count 105: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |
| 3. Running Sub-Total | $39,259,936.25 |

54. Count 107: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |
| 3. Running Sub-Total | $39,269,936.25 |

55. Count 109: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |
| 3. Running Sub-Total | $39,279,936.25 |

56. Count 111: Title 18 Section 241 & 242

| | |
|---|---|
| 1. Carlos Millan | $ 10,000.00 |
| 2. Sub-Total | $ 10,000.00 |
| 3. Running Sub-Total | $39,289,936.25 |

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing the below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: 3 - 29 - 2022

Signature of Plaintiff: William P Bennett

Printed Name of Plaintiff: William P Bennett

# APPENDIX

# A

Calculations for Values for Punitive Damages Sought

The following estimate is based on my prior plan to work until I am 70 years old, during that time frame, I was to buy back 3 years of military time which would result in eligibility for a 15 year pension
Add $221.52 for each day of Accrual on the books when I leave.
Deduct $195.60 for each day I am on payroll, after February 11, 2021

| | | |
|---|---|---|
| Estimated Damages | | |
| Health Insurance 2018 | $17,187.16 | |
| Est Health Ins 2019 | $18,630.88 | 7.75% |
| Health Insurance 2020 | $20,074.60 | 7.19% |
| | | |
| Aver Health Ins Cost Increase | | 7.47% |
| | | |
| 2021 | $21,580.20 | 107.5% |
| 2022 | $23,198.71 | 107.5% |
| 2023 | $24,938.61 | 107.5% |
| 2024 | $26,809.01 | 107.5% |
| 2025 | $28,819.68 | 107.5% |
| 2026 | $30,981.16 | 107.5% |
| 2027 | $33,304.75 | 107.5% |
| 1/1/2028 - 2/11/2028 [42 days] | $4,119.75 | 107.5% |
| | | |
| 3 day loss of pay STIPULATION | $634.80 | |
| | | |
| Breach of Contract raise 7/20 | $478.40 | |
| Lost raise 1/1/21 - 2/11/21 | $110.40 | |
| | | |
| UNSAT lost Step Raise | $3,723.20 | |
| | | |
| Lost Income 2/11 - 7/1/21 | $1,415.68 | |
| Lost Income 7/1/21 - 2/11/22 | $36,147.20 | |
| Lost Income 2/11 - 7/1/22 | $18,195.28 | |
| Lost Income 7/22 - 7/23 | $59,633.60 | |
| Lost income 7/23 - 7/24 | $60,826.27 | |
| Lost Income 7/24 - 7/25 | $62,042.80 | |
| Lost Income 7/25 - 7/26 | $63,283.65 | |
| Lost income 7/26 - 7/27 | $64,549.33 | |
| Lost Income 7/27 - 2/11/28 | $27,602.29 | |
| | | |
| Total Lost wages & health | $648,287.41 | |
| | | |
| Lost retirement/yr | $12,658.39 | |
| Lost retirement w/age 85 | $189,875.78 | |
| | | |
| Total Lost wage & retirement | $838,163.18 | |

# APPENDIX B

**Accountability Matrix**

**Count Number on Y Axis**

**Defendant on X Axis**

Sheet2

| Count # | NYSTA | JM | MD | JK | JB | FM | MB | CM |
|---|---|---|---|---|---|---|---|---|
| 1 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 |
| 3 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 |
| 5 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| 7 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 |
| 9 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 |
| 11 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 |
| 13 | | | | | | | | |
| 15 | | | | | | | | |
| 17 | | | | | | | | |
| 19 | | | | | | | | |
| 21 | | | | | | | | |
| 23 | | | | | | | | |
| 25 | | | | | | | | |
| 27 | | | | | | | | |
| 29 | | | | | | | | |
| 31 | | | | | | | | |
| 33 | | | | | | | | |
| 35 | | | | | | | | |
| 37 | | | | | | | | |
| 39 | | | | | | | | |
| 41 | | | | | | | | |
| 43 | | | | | | | | |
| 45 | | | | | | | | |
| 47 | | | | | | | | |
| 49 | | | | | | | | |
| 51 | | | | | | | | |
| 53 | | | | | | | | |
| 55 | | | | | | | | |
| 57 | | | | | | | | |
| 59 | | | | | | | | |
| 61 | | | | | | | | |
| 63 | | | | | | | | |
| 65 | | | | | | | | |
| 67 | | | | | | | | |

Sheet2

| Count # | NYSTA | JM | MD | JK | JB | FM | MB | CM |
|---|---|---|---|---|---|---|---|---|
| 69 | | | | | | | | |
| 71 | | | | | | | | |
| 73 | | | | | | | | |
| 75 | | | | | | | | |
| 77 | | | | | | | | |
| 79 | | | | | | | | |
| 81 | | | | | | | | |
| 83 | | | | | | | | |
| 85 | | | | | | | | |
| 87 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| 89 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 |
| 91 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| 93 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 |
| 95 | | | | | | | | |
| 97 | | | | | | | | |
| 99 | | | | | | | | |
| 101 | | | | | | | | $10,000.00 |
| 103 | | | | | | | | $10,000.00 |
| 105 | | | | | | | | $10,000.00 |
| 107 | | | | | | | | $10,000.00 |
| 109 | | | | | | | | $10,000.00 |
| 111 | | | | | | | | $10,000.00 |
| 113 | | | | | | | | |
| | $2,770,123.80 | $2,770,123.80 | $2,770,123.80 | $2,770,123.80 | $2,770,123.80 | $2,770,123.80 | $2,770,123.80 | $2,830,123.80 |
| | | $39,312,655.65 | | | | | | |

Sheet2

| Count # | KP | DN | M BL | RD | TS | BO | PH |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 3 | | | | | | | |
| 5 | | | | | | | |
| 7 | | | | | | | |
| 9 | | | | | | | |
| 11 | | | | | | | |
| 13 | $75,000.00 | | | | | | |
| 15 | | $75,000.00 | | | | | |
| 17 | | | $75,000.00 | | | | |
| 19 | | | $100,000.00 | | | | |
| 21 | | | $25,000.00 | | | | |
| 23 | | | $25,000.00 | | | | |
| 25 | | | $300,000.00 | | | | |
| 27 | | | $62,862.25 | | | | |
| 29 | | | $75,000.00 | | | | |
| 31 | | | | $62,862.25 | | | |
| 33 | $10,000.00 | | | $10,000.00 | | | |
| 35 | $125,742.45 | | | | | | |
| 37 | $75,000.00 | | | | | | |
| 39 | $75,000.00 | | | | | | |
| 41 | $838,163.00 | | | | | | |
| 43 | | | | | $125,742.45 | | |
| 45 | $10,000.00 | | | | $10,000.00 | | |
| 47 | | | | | $75,000.00 | | |
| 49 | $838,163.00 | | | | $838,163.00 | | |
| 51 | $838,163.00 | | | | | | |
| 53 | | | | | $100,000.00 | | |
| 55 | $10,000.00 | | | | $10,000.00 | | |
| 57 | | $75,000.00 | | | | | |
| 59 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 | $838,163.00 |
| 61 | | | | | | $62,862.25 | |
| 63 | | | | | | $75,000.00 | |
| 65 | | | | | | $100,000.00 | |
| 67 | | | | | | $125,742.45 | |

Sheet2

| Count # | KP | DN | M BL | RD | TS | BO | PH |
|---|---|---|---|---|---|---|---|
| 69 | $10,000.00 | | | | | $10,000.00 | |
| 71 | $75,000.00 | | | | | $75,000.00 | |
| 73 | $838,163.00 | | | | | $838,163.00 | |
| 75 | $10,000.00 | | | | | $10,000.00 | |
| 77 | | | | | | $100,000.00 | |
| 79 | $62,862.25 | | | | | $62,862.25 | |
| 81 | $10,000.00 | | | | | $10,000.00 | |
| 83 | | | | | | $838,163.00 | |
| 85 | | | | | | $125,742.45 | |
| 87 | $10,000.00 | | | | | $10,000.00 | $10,000.00 |
| 89 | $75,000.00 | | | | | $75,000.00 | $75,000.00 |
| 91 | $10,000.00 | | | | | $10,000.00 | $10,000.00 |
| 93 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 | $634.80 |
| 95 | $3,723.20 | | | | | $3,723.20 | $3,723.20 |
| 97 | $10,000.00 | | | | | $10,000.00 | $10,000.00 |
| 99 | $838,163.00 | | | | | $838,163.00 | $838,163.00 |
| 101 | | | | | | | |
| 103 | | | | | | | |
| 105 | | | | | | | |
| 107 | | | | | | | |
| 109 | | | | | | | |
| 111 | | | | | | | |
| 113 | | | | | | | |
| | $5,686,940.70 | $988,797.80 | $1,501,660.05 | $911,660.05 | $1,997,703.25 | $4,219,219.40 | $1,785,684.00 |

# APPENDIX C

**EEOC Determination and Notice of Rights**

**Determination of Charge**

**Notice of Your Right to Sue**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

New York District Office
33 Whitehall St ,5th Floor
New York ,New York ,10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 03/08/2022

**To:** William Bennett
1610 N George Street
Rome NY 13440

Charge No: 16G-2021-02727

EEOC Representative and email: Holly Shabazz
S/L Program Manager
Holly.Shabazz@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 16G-2021-02727.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St ,5th Floor
New York ,New York ,10004
(929) 506-5270
Website: www.eeoc.gov

On Behalf of the Commission:

Digitally Signed By:Judy Keenan
03/08/2022

Judy Keenan
District Director

Cc:

NYS Thruway Authority
Attn: Legal Unit
200 Southern Boulevard
P.O. Box 189
Albany NY 12201

Please retain this notice for your records.

# Exhibit 1

**email Notice to Management Parties listed as Defendants**

Gmail

Bill Bennett <wpb9.57@gmail.con>

## Notice of Grievance

1 message

Bill Bennett <wpb9.57@gmail.com>

Wed, Oct 7, 2020 at 3:09 P

To: patrick.hoehn@thruway.ny.gov, "Post, Kevin J" <Kevin.Post@thruway.ny.gov>, Barry Oaksford <barry.oaksford@thruway.ny.gov>, Bill Bentley <william.bentley@thruway.ny.gov robert.dressing@thruway.ny.gov, michael.blais@thruway.ny.gov, todd.summerson@thruway.ny.gov, david.naples@thruway.ny.gov, Ron Cosack <specialk1791@gmail.com>

Please review the attached for disposition. Please note that this Notice of Grievance was initiated on Thursday October 1, 2020 in the early morning at the NYSTA building identified as M3435. I was given a written JCM by William Bentley on Friday October 2, 2020, to which I replied, in writing, on that date. Mr. Bentley told me that he intended to put my remarks in typed format and that he would get it back to me. Due to a family emergency, I had to take a day off on Tuesday October 6, and I had scheduled a day off for today, Wednesday October 7th. As of the time of this communication the JCM process has not been completed nor have I been presented with a copy of the completed form, as I have been away from the work place.

William Bennett, GM/HVAC wpb9.57@gmail.com

Utica Facilities Maintenance

Patrick Hoen, Syracuse Division Director, patrick.hoehn@thruway.ny.gov

Kevin Post, Syracuse Facilities Director kevin.post@thruway.ny.gov

Barry Oaksford, Syracuse Facilities Supervisor 2 barry.oaksford@thruway.ny.gov

William Bentley, Utica Facilities Supervisor william.bentley@thruway.ny.gov

Robert Dressing, robert.dressing@thruway.ny.gov

Michael Blais, Herkimer Maintenance Supervisor 2 michael.blais@thruway.ny.gov

Todd Summerson, Personnel todd.summerson@thruway.ny.gov

David Naples, EEOC Specialist 1 david.naples@thruway.ny.gov

Ron Kosak, Business Agent Local 72 specialk1791@gmail.com

## NOTICE of GRIEVANCE

This NOTICE of GRIEVANCE is to inform the above listed parties of the events which occurred on or about October 1, 2020, at the Herkimer Maintenance Facility Building, known as M3435, as I perceived them and as I recall.

While engaged in activity related to maintenance of the building main air compressor, William Bennett (I, ME, MYSELF) had the need to use the rest room. I entered said space and was in the process of relieving MYSELF when Mr. Blais entered the space and told ME that I was required to wear a mask when in any building on the Herkimer facility.

While I understand that Mr. Blais, being the Supervisor 2 at this facility, may feel ultimately (and may indeed be) responsible for all issues involving and/or remotely related to safety, at this facility, I feel it was entirely inappropriate for him to follow ME into a restroom and addtionally, to attempt to confront ME with what he apparently felt was a correction to MY behavior, while I was standing at a urinal. Such behavior is, in my opinion, intimidating, unprofessional, totally inappropriate and in some cases could be construed as sexual harassment.

I replied to the effect that I had a doctor's note which stated that as long as I was following CDC guidelines and using appropriate social distancing and/or working alone, I was not required to wear a mask. Mr. Blais once again commented to the point that he expected that a mask would be worn. He also commented that I was not social distancing (at that moment in time), to which I commented that I wasn't social distancing because he had approached ME (at the urinal). For clarity, Mr. Blais was positioned between me and the exit door, in such manner as to make it impossible for me to leave without encroaching on his six feet of safe space. It should also be noted that Mr. Blais encroached upon my six feet of safe space (I estimate he was within 3-1/2 to 4 feet of me during the brief discussion. I also stated that I believe a doctor's note/advice trump's his opinion. At that time, Mr. Blais turned and left.

It should be noted that the men's room has an posted occupancy limit of two people. When Mr. Blais entered the room, he was the third person in the space, and was in direct violation of the policy which he stated he was attempting to enforce. Further, he approached ME, while I was still at the urinal and he stood between ME and the exit door, effectively blocking ME from removing MYSELF from the situation without violating the social distance rules. He did unnecessarily violate the social distancing rules, as he could have said his peace without encroaching upon MY person. The only apparent reason for Mr. Blais to have entered the men's room was to assert his authority upon me, as he did not attempt to use any of the sanitary facilities, nor wash his hands at one of the sinks. His only activity was an attempt to dress me down.

Further, whether or not I agree with any given policy of the NYSTA is irrelevant. I understand that while performing my duties as an employee of the NYSTA, I am obligated to follow said policies to the best of my ability. As far as I was aware, at the time of the incident and even to the time of this writing, I was indeed in full compliance with the policy of the NYSTA relative to the use of CDC Guidelines involving the use of Social Distancing and/or Facial Covering.

I thought it a little strange that very shortly after the incident, while walking through the garage area of M3435, another NYSTA emplyee let me know that he was aware of the confrontation involved. A while later, while at M3436, the employee that was in a stall, during the incident, self identified as being the one in the men's room at the time of the incident. This self identification was made to ME, in front of a third NYSTA employee.

Under NY State Penal Law § 240.21 – 240.32. the action of Mr. Blais, in following ME into the restroom could be construed as Harassment. The initial following into the restroom would be a minor offense, however, once I stated that I had a doctor's note and he persisted in engaging, I believe he changed the nature of the offense to the equivalent of Aggravated Harassment in the First Degree, due to his immediate acquisition of the reasonable knowledge that his continued action could be construed as Harassment directly related to a possible Disability. Aggravated Harassment in the First Degree is a Class E Felony.

Upon completion of my business in the restroom and prior to resuming work on the air compressor, I notified MY direct supervisor, William Bentley, of the situation. Shortly after I notified Mr. Bentley, he replied that Kevin Post was aware of the situation. I later learned that Mr. Blais had contacted Mr. Dresing, who in turn contacted Mr. Post, who in turn contacted Mr. Bently. Mr. Bentley informed me that Mr. Post had ordered him to write a JCM over the situation. Neither Mr Dressing nor Mr. Post spoke with me, nor contact me in any manner, prior to this point. Mr. Bentley had no first hand knowledge of any of the events and, to the best of my knowledge, had not discussed the matter with Mr. Blais. Mr. Bentley wrote the JCM, as ordered and sent same to Mr. Summers for review and editing. According to Mr. Bentley, the original JCM contained information relative to the confrontation in the men's room. The edited version struck the mention of the men's room and added the reference to the supervisor's office.

As a side note, during my time at the Herkimer Maintenance Facility, on October 1, 2020, I noted several other people inside various buildings and/or vehicles, who where not wearing facial coverings some working alone, others not maintaining social distance guidelines. I did manage to capture 5 individuals on video, but will retain same to prevent retaliation against them. This is being mentioned to show that the policy, which I have not been able to find, is not being applied consistently which would bring this matter into the realm of specific prosecution, which adds to the complaint of hostile work environment.

Again, upon checking with Mr. Bentley relative to the wording of the JCM, I was informed that he had written the text and forwarded same to one Todd Summerson for review, who had 'tweeked it just a bit'. Again, Mr Summerson has no first hand knowledge of any of the events involved in this matter, nor did he contact me to determine the validity of the initial complaint, nor of my response.

In MY opinion, it is unprofessional, at best, for Mr. Post to order a subordinate to initiate a corrective/disciplinary action against another, under the circumstances (a complaint based on hearsay). Mr. Blaise is a Supervisor 2 and presumably capable of initiating a JCM, should he feel the action is justified. Further I find it not only unprofessional, but defamatory for any party without first hand knowledge of the facts of the matter to cause a disciplinary document to be altered, relative to factual matters of the incident.

That being said, I strongly protest and deny the validity of the specific wording of the JCM. In the section alleging my wrong doing, there is a comment that I went into the Supervisor's Office. I categorically deny having gone into the Supervisor's office at any time on the day in question. Given the nature of that specific accusation and the potential implication of the accusation, together with the potential consequences of disciplinary action relative to an action which may be percieved as aggressive, on MY part, I demand STRICT PROOF of the legitimacy of the accusation. I made it a point to avoid any further contact with Mr. Blais as I was aware that he was less than pleased with me and I did not want to give cause to provoke him. That comment, contained in the JCM is an outright lie and the only reason that I can conceive for its inclusion is to attempt to show that I was somehow provoking and/or exasperating the situation. As such, I find the comment to be of a defamatory nature. As a part of the resolution to this Grievance, I demand to be made aware of exactly who added that comment to the JCM. Should this Grievance not be resolved to my satisfaction, I will consider a Tort for the Libel.

On October 1, 2020, I did contact David Naples of EEOC and informed him of the situation. He recommended that I file a Request for Accommodation relative the note from my Doctor. I had not done so previously as the note does not exempt me from wearing a mask at all times, rather from those times that are not required per CDC Guidelines, that is: being able to maintain social distancing or; working alone. I was, and have been, at all appropriate times, while engaged in activity for the NYSTA, in compliance with those CDC Guidelines and was of the opinion that such a Request for Reasonable Accommodation was unnecessary as the NYSTA Policy, as I understand it, was being completely complied with, by ME.

To the best of my knowledge, I have retained all NYSTA Policy Memos issued. Since the incident in question I have reviewed all in my possession. It is my understanding that the NYSTA requires the use of masks when social distancing can not be maintained. I have no issue with that policy, especially on NYSTA property, while employed by the NYSTA, while carrying out the duties of a NYSTA employee, nor at all other times in my private life. While on NYSTA property and while on duty as a NYSTA employee, I carry an issued surgical mask, typically in MY back left pants pocket, so that it is immediately available, should the need arise. I had a mask, so located, at the time of the involved incident. By the time I was able to don the mask, after washing MY hands, Mr Blais had left the space.

As of this point in time, I stand by the premise that I have not violated any NYSTA policy, and in fact, have made it a point to comply to my fullest ability. Should the NYSTA, or any of it's subordinate managers, require that I wear a mask when ever in any particular building(s), in

excess of the CDC Guidelines, then I shall require an ample supply of masks, such that I can have a new/clean one, as required, at such times as when then mask in use becomes soiled, relative to the condition(s) covered by the doctor's note.

It is my opinion that I have been aggrieved by NYSTA Management as follows:

1. Mr Blais did cause an action that amounts to Criminal Harassment and possibly at a Felony level.
2. Someone involved in this process has attempted to cause ME damage by means of Defamation of Character.
3. Mr. Blais actions were in violation of NYSTA policy, upon over crowding of an occupied space.
4. Mr Blais has created a Hostile Work Environment, through his unprofessional actions
5. Mr Blais has acted in a manner that could be construed as Sexually Harassing, by confronting ME while I was relieving MYSELF at a urinal.
6. Mr Post has acted unprofessionally by actively inserting himself into a matter based on hearsay, and in so doing, without consulting the accused, has initiated a disciplinary measure.
7. Mr Summerson has conducted and unethical behavior in altering material facts in a disciplinary action while having no first hand knowledge of any of the facts in question.

Had Mr Blais followed through to confirm the factual existence of a Doctor's Note with Instructions for ME, which would have been a reasonable action and had the JCM not contained an outright lie concerning MY actions relative to this matter, this GRIEVANCE would not exist. I do not feel at all comfortable having to have anything to do with Mr Blai, from this point forward as I feel that there is a strong likelihood of attempted retaliation for this complaint. As Mr Blaise initiated this entire situation, I feel that, at the very least, he should be re-assigned to a section that will not involve my employment. As I am one of two HVAC technically qualified people in the Syracuse Division, such re-assignment would be in another Division. Given the nature of the alleged Felonious action of Aggravated Harassment in the First Degree, and the totally inappropriate activity in a restroom, termination would not be an unreasonable resolution.

Further, I insist on a determination being made as to who, exactly, made the Defamatory accusation that I entered the supervisor's office, as well as identification of all parties involved in the development and forwarding of that fabrication and that matter be addressed. At the very least, I would expect a letter of apology from the offending party(ies), be placed in MY personnel file.

Finally, as Mr Post has, in MY opinion, provided improper direction relative to this matter, at a minimum, a letter of apology concerning his inappropriate direction relative to the initiation of a JCM be an uninvolved party, who had no first hand knowledge of the allegations, should be placed in MY personnel file.

Given the nature of the accusation(s) by Mr Blais, against ME, I must demand that I have the contractually required Union Representation at all future discussions, relative to this matter.

Sincerely,

William P. Bennett 10/7/2020

# Exhibit 2

**Contract, Article 5 Section J [page 10]**

### 5.J. Copy of Publications

The final version of all Procedures, Bulletins, Instructions, Directives and Policy Statements which affect employees in this Negotiating Unit and which are created to implement this Agreement shall be given to the Union eight (8) work days prior to publication. The Union shall have eight (8) work days in which to make a written response. If the Authority has not received a written comment from the Union by the end of the eight (8) work day period, the document will be published as written.

### 5.K. Bulletin Boards

The Authority agrees to provide locked bulletin boards for the exclusive use of the Union at each permanent work location to which employees are assigned. The Union agrees that postings will be limited to official notices, pamphlets and bulletins. The Union further agrees not to post on such bulletin boards any material which in the opinion of the Authority, is defamatory, obscene, scandalous or scurrilous.

## ARTICLE 6
## Management Responsibilities

The parties agree that the customary and usual rights, powers, functions and authority of management are vested in management officials of the Authority. These rights include, but are not limited to, the right (a) to determine the mission, purposes, objectives and policies of the Authority, and to direct employees of the Authority; (b) to select, recruit, appraise, train, deploy, utilize, hire, promote, transfer, assign and retain employees in positions and to suspend, demote, discharge or take disciplinary action against such employees; (c) to relieve employees from duties because of lack of work or for other legitimate purposes in accordance with the appropriate provisions of the New York State Civil Service Law (principally Section 80 and following), and Rules and Regulations applicable to the Authority and promulgated by the Department of Civil Service; (d) to maintain the discipline and efficiency of the employees and the operation of the Thruway system; (e) to determine the methods, means (including size and type of equipment), schedules, procedures and personnel by which such operations are to be conducted; and (f) to take whatever actions may be necessary to carry out the mission of the Authority.

These rights shall be exercised consistent with the contract and legal requirements. The Union or the employee, as the case may be, may question the exercise of such management rights through the mechanisms provided by law and the provisions of this Agreement.

# Exhibit 3

**Contract Article 6 Section (e) [page 10]**

**5.J. Copy of Publications**

The final version of all Procedures, Bulletins, Instructions, Directives and Policy Statements which affect employees in this Negotiating Unit and which are created to implement this Agreement shall be given to the Union eight (8) work days prior to publication. The Union shall have eight (8) work days in which to make a written response. If the Authority has not received a written comment from the Union by the end of the eight (8) work day period, the document will be published as written.

**5.K. Bulletin Boards**

The Authority agrees to provide locked bulletin boards for the exclusive use of the Union at each permanent work location to which employees are assigned. The Union agrees that postings will be limited to official notices, pamphlets and bulletins. The Union further agrees not to post on such bulletin boards any material which in the opinion of the Authority, is defamatory, obscene, scandalous or scurrilous.

## ARTICLE 6
## Management Responsibilities

The parties agree that the customary and usual rights, powers, functions and authority of management are vested in management officials of the Authority. These rights include, but are not limited to, the right (a) to determine the mission, purposes, objectives and policies of the Authority, and to direct employees of the Authority; (b) to select, recruit, appraise, train, deploy, utilize, hire, promote, transfer, assign and retain employees in positions and to suspend, demote, discharge or take disciplinary action against such employees; (c) to relieve employees from duties because of lack of work or for other legitimate purposes in accordance with the appropriate provisions of the New York State Civil Service Law (principally Section 80 and following), and Rules and Regulations applicable to the Authority and promulgated by the Department of Civil Service; (d) to maintain the discipline and efficiency of the employees and the operation of the Thruway system; (e) to determine the methods, means (including size and type of equipment), schedules, procedures and personnel by which such operations are to be conducted; and (f) to take whatever actions may be necessary to carry out the mission of the Authority.

These rights shall be exercised consistent with the contract and legal requirements. The Union or the employee, as the case may be, may question the exercise of such management rights through the mechanisms provided by law and the provisions of this Agreement.

# Exhibit 4

**JCM #1 Dated October 1, 2020**

TA-N31333 (07/2003)
Page 1 of 2

# JOB COUNSELING MEMO

New York State Thruway Authority

INSTRUCTIONS:
- Please print or type.
- Include a complete description of the problem or deficiency (attendance, attitude, productivity, etc.).
- Complete all numbered items below.

DISTRIBUTE COPIES AS FOLLOWS:
- EMPLOYEE
- BUREAU OF PERSONNEL - ADMINISTRATIVE H
- SUPERVISOR

To: BILL BENNETT

From: BILL BENTLEY

1. This confirms our conversation on 10/01/2020 (Date) concerning:

After speaking with Kevin Post this morning who was called by Mike Blaise that you were in Herkimer Maintenance this morning using the restroom and were seen not wearing a mask in a occupied building and were not keeping social distance. Then walked into the Supervisors office still not wearing a mask. When confronted by Mr. Blaise you told him that you have a Doctors note stating you cant wear a mask.

2. Supervisor's recommendations for corrective action: Continuation Page Used ☐

If you need to use the restroom for any reason we should still be going into the TUB's for this. Nothing has changed there. Anytime when entering a occupied building you need to be wearing a mask. And or anytime outside you can not maintain six feet separation a mask is required to be worn. At no time should we be in the Maintenance Facility unless scheduled to be by myself or invited in by Maintenance Personnel. I have also provided you with a copy of the COVID-19 and keeping safe in the workplace Safety Directive from Mr. Millan. Failure to comply with this direction may result in disciplinary action up to and possible termination. EAP is available for you. A copy of this Memo will be placed in your personal history file.

3. Employee's position or comments: Continuation Page Used ☐

Continuation Page Used ☐

4. Supervisor will follow-up with employee on ______ (Date)

It is expected that the above problems will be cleared up immediately. Similar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action (temporary employees may face dismissal). This memo will be included in your personal history file. If you choose, you may submit an additional response to also be placed in your file.

5. ______ Supervisor's Signature ______ Date

I acknowledge receipt of this document, but, may not necessarily agree with its content.

______ Employee's Signature ______ Date

75

# Exhibit 5

**Contract Article 15.A. Section 2 Paragraph (a) [page 61]**

## ARTICLE 15
## Discipline

### 15.A. Informal Proceedings

1. When an employee is charged orally with any act of misconduct or incompetence by their supervisor, in any discussion or conference concerning the incident, no evidence concerning such discussion or conference will be offered or admitted in any subsequent disciplinary step or proceeding except that either party may offer only the fact that such discussion or conference was held.

2. A permanent employee who is requested to resign shall be given a written statement, pre-signed by the Authority and the Union, that the employee has the following rights:

   a. representation at every stage of the proceedings;

   b. to refuse to give any statement, and that any statement the employee gives may be used against the employee in subsequent proceedings;

   c. written charges setting forth specific claims of incompetency or misconduct;

   d. a hearing before an independent Hearing Officer regarding those charges;

   e. appeal, under certain circumstances, of any adverse determination.

### 15.B. Formal Proceedings

1. An employee (other than a temporary employee) against whom removal or other disciplinary action is proposed shall have written notice thereof and of the reasons therefore; shall be furnished a copy of the charges preferred; and shall be allowed at least eight days for answering the same in writing. The notice containing such charges shall include the statement that "the employee is innocent until proven guilty and the burden of proof is on the Authority." The Authority will simultaneously furnish the Union a copy of the charges by registered or certified mail.

   Any permanent employee who is on probation in a higher level position in this Unit shall be subject to disciplinary proceedings in accordance with this Article; however, this shall in no way impair the right of the Authority to return the employee to the

# Exhibit 6

**JCM #1 Dated October2, 2020**

TA-N31333 (07/2003)
Page 1 of 2

# JOB COUNSELING MEMO

New York State Thruway Authority

AS EDITED BY [illegible]
SOMMERSON 1/24/20[illegible]

**DISTRIBUTE COPIES AS FOLLOWS:**
- EMPLOYEE
- BUREAU OF PERSONNEL - ADMINISTRATIVE I
- SUPERVISOR

**INSTRUCTIONS:**
- Please print or type.
- Include a complete description of the problem or deficiency (attendance, attitude, productivity, etc.).
- Complete all numbered items below.

To: BILL BENNETT

From: BILL BENTLEY

1. This confirms our conversation on 10/01/2020 (Date) concerning:

We received a report that you were seen in Herkimer Maintenance Building this morning without wearing a mask or facial covering and were not following the established social distancing guidelines. You also walked into the Supervisors office still not wearing a mask. When confronted by Mr. Blaise you told him that you hav a Doctors note stating you cannot wear a mask.

WHO IS "WE"

→ MISUNDERSTANDING, MISCOMMUNICATION. THE NOTE EXEMPTS ME FROM WEARING A MASK WHEN I CAN MAINTAIN SOCIAL DISTANCING

Continuation Page Used ☐

2. Supervisor's recommendations for corrective action:

If you need to use the restroom for any reason we should still be going into the TUB's for this. Anytime when entering a occupied building you need to be wearing a mask. Also anytime outside you can not maintain six feet separation a mask is required to be worn. These are executive orders from the Governor's office that we must abide by.
At no time should we be in the Maintenance Facility unless scheduled to be there by myself or invited in by Maintenance Supervisor. I have also provided you with a copy of the COVID-19 and keeping safe in the workplace Safety Directive from Mr. Millan.
Failure to comply with this direction may result in disciplinary action up to and possible termination. EAP is available for you. A copy of this Memo will be placed in your personal history file.

Continuation Page Used ☐

3. Employee's position or comments:

WHILE AT THE URINAL IN THE M3435 MEN'S LOCKER ROOM, MR. BLAISE APPROACHED ME. PRIOR TO HIS ENTERING THE LOCKER ROOM, I THOUGHT I WAS THE ONLY ONE IN THE SPACE. I SINCE LEARNED THAT ANOTHER EMPLOYEE WAS IN ~~THE~~ A STALL. AS SUCH, I WAS IN COMPLIANCE WITH THE CDC SOCIAL DISTANCING GUIDELINES, UNTIL SUCH TIME AS I WAS APPROACHED AT AN UNREASONABLY CLOSE DISTANCE, BY MR. BLAISE. [IS IT NOT AN ASSAULT TO SO BREAK SOCIAL DISTANCING?]. I DID HAVE AN OLD MASK IN

Continuation Page Used ☐

4. Supervisor will follow-up with employee on 11/02/2020 (Date)

It is expected that the above problems will be cleared up immediately. Similar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action (temporary employees may face dismissal). This memo will be included in your personal history file. If you choose, you may submit an additional response to also be placed in your file.

[signature] 10/2/2020
Supervisor's Signature — Date

I acknowledge receipt of this document, but, may not necessarily agree with its content.

Employee's Signature — Date

# JOB COUNSELING MEMO - Continuation Page

To: ______________________ From: ______________________

MY POCKET WHICH I CAN (AND DO) USE FOR TIMES WHEN APPROACHING SOMEONE (SUCH AS IN A CORRIDOR) WHERE 6 FEET CAN NOT BE MAINTAINED. [* INSERT PARA FROM END]

* IT SHOULD BE NOTED THAT RE USE OF A DISPOSABLE SURGICAL MASK IS NOT RECOMMENDED, NOR CONDONED BY CDC GUIDELINES, YET IT IS THE ACTUAL REQUIRED PRACTICE OF THE NYSTA.

I CATEGORICALLY DENY WALKING INTO THE SUPERVISOR'S OFFICE AT ANY TIME TODAY (OCT 1, 2020). I DEMAND THAT THE SOURCE OF THIS LIE BE ESTABLISHED AND THAT CORRECTIVE ACTION BE TAKEN. THIS IS A BLATANT DEFAMATION OF CHARACTER AND HAS RESULTED IN DAMAGES THAT CAN BE MEASURED.

I CATEGORICALLY DENY TELLING MR. BLAISE THAT I HAVE A DOCTOR'S NOTE STATING THAT I CAN NOT WEAR A MASK. I TOLD HIM THAT I HAVE A DOCTOR'S NOTE EXEMPTING ME FROM WEARING A MASK WHEN WORKING/DRIVING ALONE AND/OR ABLE TO MAINTAIN THE CDC GUIDELINES FOR SOCIAL DISTANCING.

THIS CONVERSATION HAPPENED IN THE MEN'S LOCKER ROOM AT M3435. MR BLAISE SAID FACIAL COVERINGS ARE REQUIRED UPON ENTERING ANY HERKIMER FACILITY (OR BUILDING). I RESTATED THAT MY DOCTOR'S ADVICE IS NOT OVERRIDEN BY A POLICY. (I DO NOT REMEMBER MY EXACT WORDS ON THIS POINT).

Supervisor's Initials | Date | Employee's Initials | Date

# JOB COUNSELING MEMO - Continuation Page

To: ______________________ From: ______________________

I HAVE NOT, AT ANY TIME, NOR UNDER ANY CIRCUMSTANCE REFUSED TO COMPLY WITH ANY NYSTA SAFETY DIRECTIVE(S) AND/OR POLICY(IES).

DURING THE TIME FRAME THAT I WAS IN M3435, I TOOK PICTURES OF NO LESS THAN 5 EMPLOYEES WORKING INSIDE HERKIMER FACILITIES, WITHOUT OBSERVING CDC GUIDELINES FOR EITHER SOCIAL DISTANCING NOR FACIAL COVERING, WHICH MAKES THE ACTIONS OF MR BLAISE, RELATIVE TO THIS AFFAIR, ARBITRARY AND CAPRICIOUS.

PLEASE NOTE COPY OF NOTE FROM MY DOCTOR, DATED 8/10/20

[* PARAGRAPH TO INSERT ABOVE: IT SHOULD BE NOTED THAT THE NYSTA HAS DESIGNATED OCCUPANCY LIMITS TO VARIOUS SPACES. THE POSTED OCCUPANCY LIMIT FOR THE MEN'S LOCKER ROOM AT M3435 IS (2) TWO. AT THE TIME THAT MR. BLAISE FELT IT NESSECARY TO CONFRONT ME, THE LIMIT FOR THAT SPACE WAS FILLED. MR. BLAISE MADE NO APPROACH TO USING THE SANITARY FACILITY, NOR A SINK FOR WASHING HIS HANDS. MR. BLAISE VIOLATED POSTED THRUWAY OCCUPANCY LIMITS IN ORDER TO ATTEMPT TO REPREMAND ME. IN SO DOING, HIS BEHAVIOR WAS RECKLESS AND CONSTITUTES ~~AN~~ THE CREATION OF BULLYING. HIS OPENLY HOSTILE ATTITUDE CONTRIBUTED TO NOTHING LESS THAN WORKPLACE VIOLENCE. IF HE WAS CONCERNED ABOUT MY ACTION, HE COULD HAVE CONTACTED MY SUPERVISOR AS THERE WAS NO CLEAR AND PRESENT DANGER TO MYSELF OR ANY OTHER EMPLOYEE, UNTIL MR BLAIS INSERTED HIMSELF INTO A VIOLATION OF SOCIAL DISTANCING GUIDELINES]

Supervisor's Initials ______ Date ______ Employee's Initials ______ Date ______

# JOB COUNSELING MEMO

New York State Thruway Authority

**DISTRIBUTE COPIES AS FOLLOWS:**
- EMPLOYEE
- BUREAU OF PERSONNEL - ADMINISTRATIVE F
- SUPERVISOR

**INSTRUCTIONS:**
- Please print or type.
- Include a complete description of the problem or deficiency (attendance, attitude, productivity, etc.).
- Complete all numbered items below.

To: BILL BENNETT From: BILL BENTLEY

1. This confirms our conversation on 10/01/2020 (Date) concerning:

We received a report that you were seen in Herkimer Maintenance Building this morning without wearing a mask or facial covering and were not following the established social distancing guidelines. You also walked into the Supervisors office still not wearing a mask. When confronted by Mr. Blaise you told him that you have a Doctors note stating you cannot wear a mask.

Continuation Page Used ☐

2. Supervisor's recommendations for corrective action:

If you need to use the restroom for any reason we should still be going into the TUB's for this. Anytime when entering a occupied building you need to be wearing a mask. Also anytime outside you can not maintain six feet separation a mask is required to be worn. These are executive orders from the Governor's office that we must abide by.
At no time should we be in the Maintenance Facility unless scheduled to be there by myself or invited in by Maintenance Supervisor. I have also provided you with a copy of the COVID-19 and keeping safe in the workplace Safety Directive from Mr. Millan.
Failure to comply with this direction may result in disciplinary action up to and possible termination. EAP is available for you. A copy of this Memo will be placed in your personal history file.

Continuation Page Used ☐

3. Employee's position or comments:

WHILE AT THE URINAL IN THE M3435 MEN'S LOCKER ROOM, MR. BLAISE APPROACHED ME. PRIOR TO HIS ENTERING THE LOCKER ROOM, I THOUGHT I WAS THE ONLY ONE IN THE SPACE. I SINCE LEARNED THAT ANOTHER EMPLOYEE WAS IN ~~THE~~ A STALL. AS SUCH, I WAS IN COMPLIANCE WITH THE CDC SOCIAL DISTANCING GUIDELINES, UNTIL SUCH TIME AS I WAS APPROACHED AT AN UNREASONABLY CLOSE DISTANCE, BY MR. BLAISE. [IS IT NOT AN ASSAULT TO SO BREAK SOCIAL DISTANCING?]. I DID HAVE AN OLD MASK IN

Continuation Page Used ☐

4. Supervisor will follow-up with employee on 11/02/2020 (Date)

It is expected that the above problems will be cleared up immediately. Similar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action (temporary employees may face dismissal). This memo will be included in your personal history file. If you choose, you may submit an additional response to also be placed in your file.

[signature] 10/2/2020
Supervisor's Signature Date

I acknowledge receipt of this document, but, may not necessarily agree with its content.

W. P Bennett 10/2/20
Employee's Signature Date

TA-N31333 (07/2003)
Page 2 of 2

# JOB COUNSELING MEMO - Continuation Page

To: ____________ From: ____________

MY POCKET WHICH I CAN (AND DO) USE FOR TIMES WHEN APPROACHING SOMEONE (SUCH AS IN A CORREDOR) WHERE 6 FEET CAN NOT BE MAINTAINED. [* INSERT PARA FROM END]

* IT SHOULD BE NOTED THAT REUSE OF A DISPOSABLE SURGICAL MASK IS NOT RECOMMENDED, NOR CONDONED BY CDC GUIDELINES, YET IT IS THE ACTUAL REQUIRED PRACTICE OF THE NYSTA.

I CATEGORICALLY DENY WALKING INTO THE SUPERVISOR'S OFFICE AT ANY TIME TODAY (OCT 1, 2020). I DEMAND THAT THE SOURCE OF THIS LIE BE ESTABLISHED AND THAT CORRECTIVE ACTION BE TAKEN. THIS IS A BLATANT DEFAMATION OF CHARACTER AND HAS RESULTED IN DAMAGES THAT CAN BE MEASURED.

I CATEGORICALLY DENY TELLING MR. BLAISE THAT I HAVE A DOCTOR'S NOTE STATING THAT I CAN NOT WEAR A MASK. I TOLD HIM THAT I HAVE A DOCTOR'S NOTE EXEMPTING ME FROM WEARING A MASK WHEN WORKING/DRIVING ALONE AND/OR ABLE TO MAINTAIN THE CDC GUIDELINES FOR SOCIAL DISTANCING.

THIS CONVERSATION HAPPENED IN THE MEN'S LOCKER ROOM AT M3435. MR BLAISE SAID FACIAL COVERINGS ARE REQUIRED UPON ENTERING ANY HERKIMER FACILITY (OR BUILDING). I RESTATED THAT MY DOCTOR'S ADVICE IS NOT OVERRIDEN BY A POLICY. (I DO NOT REMEMBER MY EXACT WORDS ON THIS POINT).

[initials] Supervisor's Initials 10/15/2020 Date | MPB Employee's Initials 10/2/20 Date

# JOB COUNSELING MEMO - Continuation Page

To: ______________________ From: ______________________

I HAVE NOT, AT ANY TIME, NOR UNDER ANY CIRCUMSTANCE REFUSED TO COMPLY WITH ANY NYSTA SAFETY DIRECTIVE(S) AND/OR POLICY(IES).

DURING THE TIME FRAME THAT I WAS IN M3435, I TOOK PICTURES OF NO LESS THAN 5 EMPLOYEES WORKING INSIDE HERKIMER FACILITIES, WITHOUT OBSERVING CDC GUIDELINES FOR EITHER SOCIAL DISTANCING NOR FACIAL COVERING, WHICH MAKES THE ACTIONS OF MR BLAISE, RELATIVE TO THIS AFFAIR, ARBITRARY AND CAPRICIOUS.

PLEASE NOTE COPY OF NOTE FROM MY DOCTOR, DATED 8/10/20

[* PARAGRAPH TO INSERT ABOVE: IT SHOULD BE NOTED THAT THE NYSTA HAS DESIGNATED OCCUPANCY LIMITS TO VARIOUS SPACES. THE POSTED OCCUPANCY LIMIT FOR THE MEN'S LOCKER ROOM AT M3435 IS (2) TWO. AT THE TIME THAT MR. BLAISE FELT IT NESSECARY TO CONFRONT ME, THE LIMIT FOR THAT SPACE WAS FILLED. MR. BLAISE MADE NO APPROACH TO USING THE SANITARY FACILITY, NOR A SINK FOR WASHING HIS HANDS. MR. BLAISE VIOLATED ^POSTED THRUWAY OCCUPANCY LIMITS IN ORDER TO ATTEMPT TO REPREMAND ME. IN SO DOING, HIS BEHAVIOR WAS RECKLESS AND CONSTITUTES ~~AN~~ THE CREATION OF BULLYING. HIS OPENLY HOSTILE ATTITUDE CONTRIBUTED TO NOTHING LESS THAN WORKPLACE VIOLENCE. IF HE WAS CONCERNED ABOUT MY ACTION, HE COULD HAVE CONTACTED MY SUPERVISOR AS THERE WAS NO CLEAR AND PRESENT DANGER TO MYSELF OR ANY OTHER EMPLOYEE, UNTIL MR BLAISE INSERTED HIMSELF INTO A VIOLATION OF SOCIAL DISTANCING GUIDELINES ]

Supervisor's Initials: [initials] Date: 10/6/2020 Employee's Initials: WPB Date: 10/2/20

# Exhibit 7

**Kevin Post Memorandum Dated September 29, 2020**

NEW YORK STATE OF OPPORTUNITY. | Thruway Authority

# Memorandum

**To: Syracuse Facilities Supervisors** **Date: 9/30/2020**

**From: Kevin Post** **Subject: Personal Health Practices COVID – 19**

It is projected that there will be a large increase of the number of COVID-19 cases this fall and winter. This coincides with much of our work moving inside. In order for us to minimize COVID-19 exposures and keep our staff healthy and safe we all need to remain diligent in adhering to health protocols. Specifically, all employees must adhere to the following:

1. Masks are always to be worn when indoors in all public/ common areas.

2. There is no entry into the supervisor offices without permission.

3. Contact with others must be limited to less than 10 minutes. This includes both "close contact" (closer than 6ft., indoors) and "proximate contact" (being in the same indoor space, including locker rooms, break rooms etc.)

4. Hand hygiene must be maintained. (Proper hand washing and use of hand sanitizer.)

5. Limit to one person per vehicle unless two are absolutely needed.

6. Split crews into 2 person teams as much as possible. Utilize the same 2 people together for assignments that require more than 1 person.

7. Personnel are to punch in / out and leave the break rooms in less than 10 minutes. They are report to their vehicles after punching in.

8. All work performed in buildings under another departments control is to be scheduled to avoid contact with the other department's personnel.

Please communicate this information with your crews. Be sure to stress that this is for everyone's safety and blatant disregard for the protocols will be addressed appropriately. You can support these protocols by consistently reminding all employees that adhering to them will improve everyone's chances of staying healthy and safe.

# Exhibit 8

**JCM #2**

TA-N31333 (07/2003)
Page 1 of 2

# JOB COUNSELING MEMO

New York State Thruway Authority

**DISTRIBUTE COPIES AS FOLLOWS:**
- EMPLOYEE
- BUREAU OF PERSONNEL - ADMINISTRATIVE
- SUPERVISOR

**INSTRUCTIONS:**
- Please print or type.
- Include a complete description of the problem or deficiency (attendance, attitude, productivity, etc.).
- Complete all numbered items below.

To: William Bennett

From: Barry Oaksford

1. This confirms our conversation on 10/29/2020 (Date) concerning:

Bill Bentley and Ron Cosack were present
Subject: Pattern of Insubordination and disregard for safety procedures. On October 1,2020 you entered Herkimer maintenance without a face mask and was counseled on that day for it . You were directed to wea a mask while entering an occupied building and issued a copy of Safety Directive 2020-2 COVID-19 and Keeping Safe in the Workplace and issued a JCM. On October 15,2020 you entered Verona maintenance without wearing a face mask as directed. When asked by Mr. Bentley you stated you where not wearing a mask. As I walked into the building today,I observed you and Mr. Cosack standing side by side and you wen not wearing a mask. I asked you to put your mask on and you refused. I REFUSED AS MY NOSE WAS RUNNING PROFUSELY, REQUIRING VERY FREQUENT CLEARING WHICH YOU OBSERVED. MR. BENTLEY'S ALLEGED STATEMENT IS IRRELEVANT AS IT WAS OBVIOUS THAT I WAS NOT WEARING A MASK. MR. RON WAS WEARING A MASK WHEN WE WERE IN PROXIMITY. AS HE TESTED COVID-19 POSITIVE AND I DID NOT, APPARENTLY THE SAFETY ISSUE WAS RESOLVED

Continuation Page Used [

2. Supervisor's recommendations for corrective action:

You failed to follow directives given to you during counseling and in writing, including Safety Directive 2020- that provides for your personal safety in the workplace. You are to wear a mask when entering an occupied building and follow orders given to you if written or verbal. A request for a reasonable accommodation does not relieve you of the requirement to wear a mask when required. The reasonable accommodation issued to you on October 15,2020 clearly states you are to wear a mask in common areas. I have issued copies of SD 2020-1 COVID-19 CORONAVIRUS, SD 2020-2 COVIC-19 and Keeping Safe in the Workplace, SD 2020-3 New York State Thruway Authority Site Safety Plan, Safety Gram # 192(Update #2) Surgical Masks & Face Covering For COVID-19.

Continuation Page Used [

3. Employee's position or comments:

I was the second person in the bathroom in Herkimer and the supervisor entered the bathroom making a violation. I was leaving the building in Verona when observed. I have requested a clarification to the reasonable accommodation from David Napples. I do not need to wear a mask if I can stay 6 feet apart. I have no problem following orders if they are written. EAP is worthless, they do nothing for you.

THE ABOVE, TYPE WRITTEN COMMENTS ARE NOT MY COMMENTS. THEY MAY BE SOMEONE ELSE'S RECOLLECTION, HOWEVER THEY ARE NOTHING LESS THAN A FORGERY AS STATED. I INSIST THAT THEY BE REMOVED AND PUT IN THE PROPER PLACE.

IT IS MY POSITION THAT I DID NOT VIOLATE POLICY, WITH OR WITHOUT COVERS

Continuation Page Used [

4. Supervisor will follow-up with employee on ______________ (Date)

It is expected that the above problems will be cleared up immediately. Similar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action (temporary employees may face dismissal). This memo will be included in your personal history file. If you choose, you may submit an additional response to also be placed in your file.

5. [signature] Supervisor's Signature — 11/16/2020 Date

I acknowledge receipt of this document, but, may not necessarily agree with its content.

Employee's Signature ______________ Date ______________

# JOB COUNSELING MEMO - Continuation Page

To: William Bennett

From: Barry Oaksford

You must comply with any directive and grieve later if you feel it violates the Contract. Insubordination w not be tolerated. Further insistences of insubordination may result in disciplinary actions up to and including termination. EAP is available to assist with any personal matters you may need help with.

A copy of this will be placed in your personal history folder.

( CONT.)

CONSIDERATION FOR THE ACCOMODATION AS I DID NOT VIOLATE SOCIAL DISTANCING GUIDELINES. ALSO, I WAS NOT ASKED TO

[ UNDER SECTION 175 OF NY PENAL LAW. IT IS A FELONY TO FALSIFY A GOVERNMENT INSTRUMENT. ]

PUT A MASK ON, IN VERONA. ANDY (SUPER 2) SPECIFICALLY ASKED ME IF I KNEW THAT I SHOULD HAVE A MASK ON IN THE BUILDING.

THE ACCOMODATION DOES NOT STATE A MASK MUST BE WORN ~~IN ALL COMMON AREAS~~. WHEN ENTERING AN OCCUPIED BUILDING, NOR DOES IT STATE THAT I AM TO WEAR A MASK IN COMMON AREAS, UNLESS SOCIAL DISTANCING CAN NOT BE MAINTAINED. THE ABOVE IS AN INTERPRETATION BY BARRY OAKSFORD, WHO IS NOT MY PHYSICIAN.

I UNDERSTOOD MR. OAKSFORD'S REFERRAL TO ME, FOR EAP COUNSELING TO BE HELPFUL FOR MY MENTAL HEALTH. (MY INTERPRETATION OF HIS WORDS AND TONE). AGAIN, I DO NOT BELIEVE MR. OAKSFORD IS COMPETENT TO MAKE SUCH A DETERMINATION.

I AM NOT APPRECIATIVE THAT THE APPARENT POSITION IS THAT MY SITUATION IS NOT PHYSICAL, BUT IS BEING DISMISSED AS "ALL IN MY HEAD".

ADDITIONALLY - THIS IS THE SECOND JCM FOR THE SAME INCIDENT. TOTALLY INAPPROPRIATE

Supervisor's Initials | Date | Employee's Initials WB | Date 11-18-21

William P Bennett

NYSTA Utica Maintenance Facilities Satellite

November 21, 2020

Answer to JCM Initiated by Barry Oaksford regarding a conversation held on 10/29/2020

First, I respectfully recommend that you review your original document and correct the obvious flaws. On opening, you state that Bill Bentley and Ron Cosack were present. To be correct, Barry Oaksford, William Bennett, William Bentley and Ron Koozak were present.

Secondly, you site a pattern of insubordination and disregard for safety procedures. I categorically deny the allegation of insubordination and you fail to present evidence relative to that charge. Your allegation is inflammatory, without foundation or basis and inaccurate.

Third, you state that I was directed to wear a face covering/mask, when entering an occupied building. You presented a copy of Safety Directive 2020-2 at the Counseling Meeting, which I read, in your presence and clearly stated that there was no such directive, rather that the CDC guidelines of wearing a facial covering or maintaining social distancing were required. I deny being directed to wear a face covering/mask when entering an occupied building. No one present objected to the factual accuracy of the reading and determination.

Fourth, you make an accusation concerning my entering Verona Maintenance, however, you have no first hand knowledge of any such activity. In fact, I was not approached by Andy, Supervisor 2 at Verona, until I was in my assigned vehicle, at the ready to leave.

Fifth, your statement concerning Mr Bentley's quoted statement is vague relative to the subject matter with which it refers.

Sixth, you have entered six sentences in Block 3, entitled "Employees's position or comments". While I presume that you did such with the understanding that the specified block is for elaboration of your iteration of your observations, it is in fact reserved for my iteration. As such, you have, I presume, unintentionally uttered a forged statement on an official NY State Instrument, in violation of NY State Penal Law 175. Aside from the fact that your commentary in this block involves a serious misquote, the fact that it was placed is incorrect. The fact that it could be used in an attempt to take my property shows intent and initiates potential damages.

On Friday, November 20, 2020, Mr. Bentley asked me to return to the shop and finish my rebuttal so he could return the JCM to you. I told him that I had intended to retain the JCM over the weekend so I could more completely offer my rebuttal. At that time, he informed me that you had made it known that I was to either sign it or not and return it, that I was not allowed to write anything on the form. I told Mr Bentley that I already had written on the form and that I wanted to make sure that everything

was correct and proper. I would return the form to him on Monday. I confirmed with Mr. Koosak that I did, indeed have the right to present a rebuttal and that Block 3 of said for was for that specific purpose.

Rebuttal

In Block 1 of said JCM, you stated "I asked you to put your mask in and you refused." While that is factually correct, you fail to mention that at that time, my nose was running profusely and I was blowing mucus every 30 to 60 seconds. I did decline for that reason, which is the fundamental basis for my Reasonable Accommodation, as granted by EEOC. This condition was pointed out, by me and witnessed by all present. When you chose to move the meeting to the shop area, I had no problem with compliance.

In Block 1, you further stated that when you walked into the building, Mr. Koozak and I were standing side by side and that I was not wearing a face covering. This is factually correct. I do not recall the specific details, however, Mr. Koozak was wearing a facial covering and I believe he had approached me in order to speak quietly. As previously stated, my nose was running profusely. I was not able to wear a facial covering at that time, due to the volume of mucus being generated. I did maintain appropriate distancing from everyone else in the space and the contact between Mr. Koozak and myself was brief and limited.

In Block 2, again, there is nothing in any of the quoted Directives which states that any NYSTA Employee is to wear a facial covering/mask when entering an occupied building. This has been my contention all along and a major factor in my request for reasonable accommodation. All involved parties have a copy of the Reasonable Accommodation, as issued by EEOC. It does not 'clearly states you are to wear a mask in common areas'. This is an interpretation which, I presume, you have taken upon yourself to make in complete disregard of the office of the EEOC. The Accommodation does state that I need to wear a mask in hallways, restrooms, etc.

In Block 3, which I allege you have no place to write anything, you mention the incident that occurred in Herkimer on October 1st, 2020. I am still waiting to hear a response relative to my charges the Mike Blaze did violate social distancing guidelines, that he did exceed the space capacity and that he made me uncomfortable by aggressively approaching me while I was at the urinal. In most States, his actions are described as Assault. In NY, the charge is Harassment. The approach at the urinal is Sexual Harassment. I intend to give the NYSTA a reasonable time to investigate, during which time, I am gathering documentation through the Freedom of Information Act, as well as other sources. If the NYSTA does not address these felonies, I will seek redress through the appropriate District Attorney. I will, if necessary, consider retaining an Attorney to seek damages from the NYSTA for not investigating and dealing with these serious charges. Additionally, relative to that incident, are ancillary factors involving falsification of points of fact on the actual JCM relative to where the incident took place, which is another felony violation under NYS Penal Law.

Secondly, I did not state that EAP is worthless, they do nothing for you. I do not doubt that is your recollection. However, I said that EAP is worthless for this matter, there is nothing they can do for me. I am rather beside myself that you would recommend EAP in this instance. As obvious as it is that, at the time of the Job Counselling Meeting, herein described, I had a very physical issue, apparently, it is

your opinion that my issue with non-compliance of facial covering/mask is induced by a condition which is best treated by some form of psychotherapy. I understand that a reminder that EAP is available may well be a standard offering in any unusual situation.

While I can appreciate the situation and the point that you, Mr. Oaksford, are attempting to find a reasonable resolution to this situation and that the referral to EAP was done with the best of intentions, it does not lessen the facts, which include: My personal physician and my pulmonary physician have both presented doctor's notes which have documented a physical condition which preclude me, at times, from being able to wear a mask. You witnessed one of those times on the date of this meeting. I do not believe that you are legally qualified to assess my psychological or emotional state, or my level of stress, nor to determine appropriate steps to correct a perceived deficiency in either of those areas. I fail to be able to find any appreciation for your apparent opinion that this matter is all in my head and that I do not, in fact have a physical issue, rather my doctors have falsified documents, I have bamboozled EEOC and that the evidence, which you personally witnessed was somehow fabricated.

To the best of my recollection, I was not asked to put a mask on, in Verona, on October 15th, 2020. Rather, I was in the garage area, briefly. After I was done and getting ready to leave, Andy asked me if I knew that I was supposed to be wearing a mask. I told him I had a Doctor's note. He asked if he could see it, to which I responded positively and produced it. He was fine with the situation. He later, in an unrelated phone call, with his supervisor, mentioned the situation. At that time, his supervisor recognized my name, from the earlier incident in Verona and, I presume, started the actions which lead to this JCM. As I was able to maintain social distancing in Verona on October 15, 202, I have not violated any NYSTA Policy and this JCM is entirely unjustified.

For the record, my personal beliefs relative to the effectiveness of masks/facial coverings, as well as to any other NYSTA Policy, are irrelevant between the hours of 6:30 AM – 3:00 PM Monday through Friday and at other times during which I may be actively serving the duties of employment of the NYSTA, except as such policies may present a serious and eminent danger, such as: causing foul mucus to be directed back into my person. Part of the employment agreement is that I will abide by the policies, as issued. I have complied, to the best of my abilities. Additionally, it should be noted that since I was issued a Reasonable Accommodation by EEOC, I have been provided with sufficient masks to effect more useable wear time, as apposed to the past practice of being issued one mask every few days to one every two weeks, as has been past practice.

I have scanned and retained a copy of the original JCM, as presented and including my had written remarks, which are iterated herein. I believe that this format is more clear and easier to read and as such it supersedes the handwritten material.

Respectfully,

W.P. Bennett

NEW YORK STATE OF OPPORTUNITY | Thruway Authority

ANDREW M. CUOMO
Governor

JOANNE M. MAHONEY
Chair

MATTHEW J. DRISCOLL
Executive Director

October 15, 2020

Mr. William Bennett
1610 North George Street
Rome, NY 13440

Dear Mr. Bennett:

We have received your Request for Reasonable Accommodation.

Consistent with your medical documentation and Thruway Authority's Safety Directive 2020-3 titled "Site Safety Plan" (policy), we are able to provide you with the following accommodations:

- You will be issued extra facemasks at the start of your day. You should adhere to the directive on face coverings as follows: "a face covering must be carried on your person at all times while on Authority property and worn when social distancing (i.e., less than 6 feet distance) cannot be achieved." You are permitted to remove your facemask as needed for medical reasons provided that you adhere to the above referenced policy and/or supervisor's directive. Please note that when in common areas (such as rest rooms, hallways, etc.) or approaching areas where employees may be gathered, masks are required to be worn.

- If you experience cough, shortness of breath, troubled breathing, muscle pain, headache, or sore throat due to preexisting conditions, you may indicate "No" when asked on your workplace screening if you have these symptoms. You should check "Yes" if these symptoms are new or worsening, contact your supervisor and not report to the workplace.

If you have any questions, please call David Naples at (518) 436-3002.

Sincerely,

Frances Rosales-Turner
Director, Bureau of Equal Employment Opportunity
and Diversity Development

Copy: William Bentley
Patricia Traver-Fleming

# Exhibit 9

**JCM #3**

TA-N31333 (07/2003)
Page 1 of 2

# JOB COUNSELING MEMO

New York State Thruway Authority

**DISTRIBUTE COPIES AS FOLLOWS:**
- EMPLOYEE
- BUREAU OF PERSONNEL - ADMINISTRATIVE H(
- SUPERVISOR

**INSTRUCTIONS:**
- Please print or type.
- Include a complete description of the problem or deficiency (attendance, attitude, productivity, etc.).
- Complete all numbered items below.

To: William Bennett

From: Bill Bentley in the absence of Barry Oaksford

1. This confirms our conversation on 11/30/2020 (Date) concerning:

Union rep. was present actual counseling took place on 12/7/2020.
Subject: Pattern of failure to follow directives and disregard for safety protocols and procedures. On October 1,2020 you entered Herkimer maintenance without a face mask and was counseled on that day for it . On October 15,2020 you entered into Verona Maintenance without a face mask on. On October 29, 2020, as I walked into Utica Facilities break room to conduct a job counseling with you about the Verona incident, I observed you and Mr. Cozak standing side by side and you were not wearing a mask. I asked you to put your mask on and you refused.

2. Supervisor's recommendations for corrective action: Continuation Page Used ☐

You continue to not follow both verbal and written directives given to you previous to and during counseling. Including Safety Directives 2020-1, 2020-2, 2020-3 that provides for your personal safety in the workplace. You are to wear a mask when entering an occupied building and follow orders given to you if written or verbal. A request for a reasonable accommodation does not relieve you of the requirement to wear a mask when required. The reasonable accommodation issued to you on October 15,2020 clearly states you are to wear a mask in common areas. You must comply with any directive and grieve later if you feel it violates the Contract. Insubordination will not be tolerated. I am requesting disciplinary action be taken. EAP is available to assist with any personal matters you may need help with.

A copy of this will be placed in your personal history folder

3. Employee's position or comments: Continuation Page Used ☐

BILL BENTLY, RON KOZAK AND BILL BENNETT PRESENT. ~~BARRY BOARSE~~ ALL WHERE PRESENT ON DATES OF ALLEGED INFRACTION DISCUSSED HEREIN. BILL BENTLEY STATED THAT HE DID NOT WITNESS ALLEGED INFRACTION, BILL BENNETT AND RON KOZAK STATED THAT NEITHER HAD ANY RECOLLECTION OF SOCIAL DISTANCING VIOLATION. WHILE I HAVE NO REASON TO BELIEVE THAT MR. OAKSFORD WOULD INTENTIONALLY FABRICATE SUCH AN ACCUSATION, HOWEVER THE EVIDENCE INDICATES THAT THE ACCUSATION IS WITHOUT MERIT.

Continuation Page Used ☒

4. Supervisor will follow-up with employee on ______ (Date)

It is expected that the above problems will be cleared up immediately. Similar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action (temporary employees may face dismissal). This memo will be included in your personal history file. If you choose, you may submit an additional response to also be placed in your file.

5. ______ Supervisor's Signature ______ Date

I acknowledge receipt of this document, but, may not necessarily agree with its content.

W. P. Bennett (Employee's Signature) 12/7/20 (Date)

TA-N31333 (07/2003)
Page 2 of 2

(2)

# JOB COUNSELING MEMO - Continuation Page

To: William Bennett

From: Barry Oaksford

ON 12/7/20 FOR THIS JOB COUNCILING MEETING, MY NOSE IS NOT RUNNING AND I DID WEAR A FACE MASK, EVEN THOUGH SOCIAL DISTANCING IS EASILY COMPLIED WITH.

ON 10/29, I DID NOT WEAR A MASK BECAUSE MY NOSE WAS RUNNING PROFUSELY, MR OAKSFORD HAS FAILED TO SHOW THAT I HAVE NOT COMPLIED WITH THE WORDING OF MY REASONABLE ACCOMODATION AND INFACT HE HAS ADDED WORDING "DOES NOT RELIEVE YOU OF THE REQUIREMENTS TO WEAR A MASK WHEN REQUIRED" AND "CLEARLY STATES YOU ARE TO WEAR A MASK IN COMMON AREAS". NIETHER OF THOSE PHRASES ARE IN THE ACCOMODATION, NOR IN THE LATER REQUESTED CLARIFICATION.

THIS ACTION IS A DIRECT RESULT OF IGNORING A PROPERLY UTILIZED REASONABLE ACCOMODATION, ISSUED BY EEOC, AFTER REVIEW OF 2 DOCTOR'S NOTES. AS SUCH IT IS A DOCUMENTED VIOLATION OF THRUWAY, AND N.Y. STATE POLICIES RELATIVE TO DISCRIMINATION BASED ON A DOCUMENTED PHYSICAL DISABILITY.

TO DATE, I HAVE BEEN ACCUSED OF VIOLATING THRUWAY POLICIES 2020-1, 2020-2 AND 2020-3. I HAVE READ ALL 3 POLICIES SEVERAL TIMES. I HAVE NOT FOUND ANYTHING STATING THAT A MASK MUST BE WORN AT ALL TIMES IN ALL OCCUPIED BUILDINGS. EVERY INSTANCE REFERS TO MASK OOR SOCIAL DISTANCING. I SPECIFICALLY ASKED MR. OAKFORD FOR CORRECTION ON 10/29/20, IF I MISSED IT. I RECIEVED NO RESPONSE.

Supervisor's Initials _____ Date _____ Employee's Initials WPB Date 12/7/20

TA-N31333 (07/2003)
Page 2 of 2

# JOB COUNSELING MEMO - Continuation Page

(3)

To: William Bennett

From: Barry Oaksford

MR. KOZZAK WAS DETERMINED TO BE COVID POSITIVE DURING THE 10/29 MEETING. NONE OF THE OTHER PARTIES PRESENT (TO THE BEST OF MY KNOWLEDGE) TESTED POSITIVE OR SHOWED SYMPTOMS (EVIDENCE THAT SOCIAL DISTANCING WAS NOT VIOLATED)

MR. OAKSFORD DID NOT SAY ANYTHING ON 10/29 CONCERNING A POSSIBLE SOCIAL DISTANCING VIOLATION.

I AM CONVINCED THAT THESE ACTIONS ARE STRICTLY A RETALIATION FOR THE INCIDENT WHICH OCCURED ON 10/1/20 IN HERKIMER AND MY CHARGES AGAINST MR. BLAISE, FOR WHICH, TO DATE, I HAVE NOT HAD ANY PROGRESS REPORT.

ADDITIONALLY, I FORMALLY REQUESTED A CORRECTED SCM FROM THE 10/15 INCIDENT. I HAVE NOT RECIEVED SAME.

Supervisor's Initials ____ Date ____ Employee's Initials W.P.B. Date 12/7/20

# Exhibit 10

**Stipulation**

RECEIVED
NEW YORK STATE THRUWAY AUTHORITY
MAR 05 2021
LABOR RELATIONS AND EMPLOYEE SAFETY
LABOR RELATIONS

NEW YORK STATE THRUWAY AUTHORITY

IN THE MATTER OF DISCIPLINARY
PROCEEDING AGAINST

WILLIAM P. BENNETT

**STIPULATION**

IT IS HEREBY STIPULATED by and between the parties hereto that the above entitled disciplinary proceeding be, and the same hereby is, resolved under the following terms and conditions:

1. (A) WILLIAM P. BENNETT, Trades Generalist, Syracuse Division, pleads guilty to the Charges and Specifications contained in the letter dated January 20, 2021, signed by Carlos Millán, Director of Labor Relations and Employee Safety, a copy of which is attached hereto and made a part hereof.

(B) WILLIAM P. BENNETT waives a hearing in the disciplinary proceeding commenced against him.

(C) WILLIAM P. BENNETT agrees to accept the determination of the disciplinary proceeding in accordance with this Stipulation.

(D) WILLIAM P. BENNETT agrees to refrain from the commission of the acts which formed the basis for this disciplinary action and from the commission of any similar acts in the future.

(E) WILLIAM P. BENNETT agrees to hold the International Brotherhood of Teamsters Local 72 harmless for any action regarding failure to properly represent him.

(F) WILLIAM P. BENNETT agrees that the above statements are made voluntarily, not under threat or coercion, after due consideration and full opportunity to consult with his Union representative.

2. The New York State Thruway Authority in view of Mr. Bennett's agreement as herein set forth, directs the penalty imposed upon WILLIAM P. BENNETT be a fine of six hundred ten dollars and eighty cents ($610.80) to be deducted from his bi-weekly paycheck in increments of thirty-four dollars ($34.00) for seventeen (17) consecutive pay periods and a final payment of thirty-two dollars and eighty cents ($32.80).

3. The penalty as herein set forth shall be considered as fully satisfying this disciplinary proceeding. This Stipulation and related documents will be made part of Mr. Bennett's personal history file.

W. P. Bennett
WILLIAM P. BENNETT

3-25-21
DATED

Ronald W. Kozal
For the Teamsters Local 72

2/25/2021
DATED

NEW YORK STATE THRUWAY AUTHORITY

By: ____________________
Director of Administrative Services

3.5.21
DATED

NEW YORK STATE OF OPPORTUNITY. | Thruway Authority

ANDREW M. CUOMO
Governor

JOANNE M. MAHONEY
Chair

MATTHEW J. DRISCOLL
Executive Director

January 20, 2021

CERTIFIED MAIL – 7020 2450 0001 6327 3073
RETURN RECEIPT REQUESTED

William P. Bennett
1610 North George Street
Rome, New York 13440

Mr. Bennett:

In accordance with the provisions of Article 15.B. of the Agreement between the New York State Thruway Authority and Local 72, New York State Thruway Employees International Brotherhood of Teamsters, the following Charges in connection with your employment by the New York State Thruway Authority as a Trades Generalist are preferred against you:

CHARGE I: YOU ARE CHARGED WITH MISCONDUCT AND/OR INCOMPETENCE IN THAT YOU FAILED TO FOLLOW AUTHORITY SAFETY POLICIES THAT REQUIRE A MASK TO BE WORN WHEN ENTERING AN OCCUPIED BUILDING.

Specification 1: On October 1, 2020, you entered the Herkimer Maintenance Building and were not wearing a mask or face covering.

Specification 2: On October 15, 2020, you entered the Verona Maintenance Building and were not wearing a mask or face covering.

Specification 3: On October 29, 2020, you entered the Utica Facilities Building and were not wearing a mask or face covering.

200 Southern Boulevard P.O. Box 189 Albany, NY 12201-0189 | (518) 436-2700 | www.thruway.ny.gov
Bureau of Labor Relations and Employee Safety
Carlos Millán, Director
Phone: (518) 436-2979
Fax: (518) 471-5076

| | |
|---|---|
| CHARGE II: | YOU ARE CHARGED WITH MISCONDUCT AND/OR INCOMPETENCE IN THAT YOU FAILED TO FOLLOW A SUPERVISORY DIRECTIVE. |
| Specification 1: | On October 1, 2020, you were present in the Herkimer Maintenance Building and were not wearing a mask or face covering. You subsequently failed to comply with Thruway Maintenance Supervisor 2 Michael Blais' directive to wear a mask. |
| Specification 2: | On October 15, 2020, you were present in the Verona Maintenance Building and were not wearing a mask or face covering. You subsequently failed to comply with Thruway Maintenance Supervisor 2 Andrew Dawes' directive to wear a mask. |
| Specification 3: | On October 29, 2020, you were present in the breakroom at the Utica Facilities Building occupied by Teamsters Business Agent Ronald Kozak, Building Maintenance Supervisor 1 William Bentley and Building Maintenance Supervisor 2 Barry Oaksford and were not wearing a mask or face covering. You subsequently failed to comply with Building Maintenance Supervisor 2 Barry Oaksford's directive to wear a mask. |

The employee is innocent until proven guilty and the burden of proof is on the Authority.

Your answer or reply to the Charges stated herein must be filed in my office at the New York State Thruway Authority, P.O. Box 189, Albany, New York 12201 within eight days following the service of these Charges.

In accordance with the provisions of Article 15.B. of the Agreement between the New York State Thruway Authority and Local 72, New York State Thruway Employees International Brotherhood of Teamsters, a hearing of these Charges will be held at which you are entitled to be represented by counsel or by a representative of Teamsters Local 72, which is the certified employee organization for your bargaining unit. You are to file a written statement with me, at the address set forth above, designating your representative in these proceedings or stating your intention to represent yourself. Such statement must be filed within eight days following service of these Charges. You must also notify me in writing of any change in your representation.

The date, time and place of the required hearing will be determined by the hearing officer, and you will be notified of same by mail.

If you are found guilty of the Charges stated herein, the penalty or punishment imposed upon you may consist of a reprimand, a fine not to exceed One Hundred ($100) dollars to be deducted from your salary or wages, a suspension without pay for a period not exceeding two months, a demotion in grade and title, or dismissal from your position in the New York State Thruway Authority.

Carlos Millán
Director, Bureau of
Labor Relations & Employee Safety

cc: Mr. J. Konstalid
Mr. P. Hoehn
Mr. J. Barr
Ms. K. Chupa
Mr. F. Multari
Mr. T. Summerson
Mr. K. Post
Ms. F. Rosales
Mr. H. Lennon
Ms. M. Boehm
Ms. G. Hines
Mr. R. Kozak
Mr. M. Jovanovic
Mr. D. Steinhilber

# Exhibit 11

**Report of Unsatisfactory Performance**

NEW YORK STATE OF OPPORTUNITY. | Thruway Authority

**ANDREW M. CUOMO**
Governor

**JOANNE M. MAHONEY**
Chair

**MATTHEW J. DRISCOLL**
Executive Director

February 8, 2021

Mr. William Bennett
1610 North George Street
Rome, New York 13440

Dear Mr. Bennett:

I am enclosing a REPORT OF UNSATISFACTORY PERFORMANCE filed by your supervisor for the rating period February 11, 2020 through February 11, 2021. This REPORT OF UNSATISFACTORY PERFORMANCE was prepared in accordance with the enclosed Administrative Services Bulletin.

As a result of receiving an unsatisfactory rating, you will not be entitled to receive any salary advancement otherwise due. An unsatisfactory rating also impacts your E-Z Pass privilege. If you have an unlimited E-Z Pass privilege, it will be revoked. If you commute to work on the Thruway, your unlimited E-Z Pass will be changed to a limited use tag.

If you wish, you may appeal your rating within 14 days of receiving this letter. Your appeal must be written and include substantiating information in support of your appeal. The appeal should be addressed to Teri Jarvis, New York State Thruway Authority, P.O. Box 189, Albany, NY 12201.

Unsubstantiated appeals will be returned, and no action will be taken.

If the Unsatisfactory Performance Rating Appeal Board overturns the unsatisfactory rating, you will be given any salary advancements due and you can apply to have your unlimited E-ZPass privilege restored.

Sincerely,

Patrick Hoehn
Division Director

Enclosures

cc: Teri Jarvis

TA-N31166 (04/2016)
Page 1 of 2

# REPORT OF UNSATISFACTORY PERFORMANCE

New York State Thruway Authority

RECEIVED
NEW YORK STATE THRUWAY AUTHORITY
JAN 26 2021
PERSONNEL

***Purpose:*** This form is completed for each employee whose performance is deemed unsatisfactory.

**INSTRUCTIONS:**

- *Rater:* Complete Section I and II and forward to appropriate Program Manager (Reviewer). The REPORT must include: (1) specific examples illustrating the nature of the unsatisfactory performance; (2) evidence that the performance is characterized by consistent weakness and deficiency; and (3) evidence the employee has failed to respond to counseling and/or training. Refer to the Administrative Services Bulletin entitled EMPLOYEE PERFORMANCE RATINGS for further guidance in completing this REPORT.
- *Reviewer:* Complete Section III and forward to Department Head/Division Director.
- *Department Head/Division Director:* Complete Section IV and forward to Director of Personnel.
- *Director of Personnel:* Complete Section V and forward to appropriate program area for processing.

**Note:** A single act by an employee may warrant an unsatisfactory performance rating.

| Rating Period | |
|---|---|
| From | 02/11/2020 |
| To | 02/11/2021 |

## Section I Rated Employee Information

| Name of Rated Employee (Last, First, MI) | Title | Employee ID No. |
|---|---|---|
| Bennett William , | Trades Generalist | 21743 |

| Department/Division | Work Location |
|---|---|
| Maintenance and Operations | Utica Facilities |

The performance of this employee is UNSATISFACTORY as of the date of this REPORT because:

Failure to follow directives and supervisors orders. Did not wear mask in common area's as directed. Mr. Bennett was observed not wearing a mask in the Herkimer Maintenance Building and was counseled on October 1,2020 for this. On October 15, 2020 he was observed exiting the Verona Maintenance Building without wearing a mask and counseled again On October 29, 2020. He was observed on October 29, 2020 not wearing a mask standing right next to the union rep. in Utica Facilities and was counseled again on November 30, 2020 requesting disciplinary action.

## Section II Rater Information

This is my best judgment of this employee's performance during the Rating Period, based on personal observation and knowledge of the employee's work.

Barry Oaksford
Rater Name (print or type)

MSZ
Title

[signature]
Rater Signature

1/19/21
Report Date

106

TA-N31166 (04/2016)
Page 2 of 2

# REPORT OF UNSATISFACTORY PERFORMANCE

## Section III Program Manager (Reviewer) Approval

I have reviewed this REPORT. To my best knowledge and belief, it states the facts. I believe the employee's performance was:

☐ Satisfactory ☑ Unsatisfactory

Comments

THE EMPLOYEE IS CURRENTLY THE SUBJECT OF DISCIPLINARY ACTION FOR INSUBORDINATION. HE HAS BEEN COUNSELED MULTIPLE TIMES FOR HIS CONTINUED FAILURE TO FOLLOW SUPERVISORS ORDERS IN REGARDS TO COVID-19 PROTOCOLS AND SAFETY DIRECTIVES

KEVIN POST
Reviewer Name (please print)

DFE
Title

[signature]
Rater Signature

1/22/2021
Date

## Section IV Department Head/Division Director Approval

This REPORT ☑ Conforms ☐ Does not conform to the Authority's Work Performance Rating policy and procedures; therefore the Unsatisfactory Performance Rating is: ☑ Approved ☐ Disapproved

Comments

PATRICK HOEHN
Depart. Head/Div. Director Name (please print)

[signature]
Depart. Head/Div. Director Signature

1/22/2021
Date

## Section V Director of Personnel Approval

I have reviewed this REPORT. To my best knowledge and belief, it states the facts. I believe the employee's performance was:

☐ Satisfactory ☑ Unsatisfactory

Comments

Frank Moltari
Director of Personnel Name (please print)

[signature]
Director of Personnel Signature

2/8/2021
Date

William Bennett
N George St
Rome, NY 13440

Teri Jarvis
NY State Thruway Authority
P.O. Box 189
Albany, NY 12201

February 21, 2021

**APPEAL**

Dear Ms Jarvis,

Please be advised that I am in receipt of NOTICE of REPORT OF UNSATISFACTORY PERFORMANCE dated February 8, 2021 and signed by Mr. Patrick Hoehn.

I assume you are in possession of the referred JCMs, relative to this matter, including copies with my responses. With that in mind, I shall keep this brief. If you require further documentation, I would be happy to provide same. Full copies are also available through my front line Supervisor, Mr. William Bentley.

The stated document is blatantly inaccurate and misleading. As I have pointed out, there is no NYSTA Policy requiring the wearing of masks and/or facial coverings at all times. All NYSTA Policies follow CDC guidelines which require use of masks when social distancing can not be maintained.

The incident which occurred on October 1st took place in the Men's Locker Room, at the Herkimer facility. I was standing at a Urinal when Mr. Blaise confronted me for not wearing a mask. At that specific moment, I did have a mask in my pocket, but my hands were occupied. Not only was Mr Blaise in violation of NYSTA Policy, in that he was the third person in an area designated for a maximum occupancy of 2, he encroached upon me with full knowledge that I did not have a mask on and that I had no where to retreat. I have filed a complaint against Mr. Blaise for these violations, including physical and sexual assault. To date, as far as I know, there has been no action involving these complaints. Should this status remain, I fully intend to press criminal charges. I believe I have 2 year and I have a witness. Further, Mr. Bentley did hand me a JCM on October 2, 2020. There was no Job Counselling Meeting. The JCM was dictated by Kevin Post, who had no firsthand knowledge of any of the particulars. It was edited by Mr. Summerson, who also had no firsthand knowledge of any of the particulars. I was not questioned relative to the events and I believe that the information that I provided has been ignored. To clarify, on October 1st, I had notes from 2 licensed physicians that explained that I was taking a medication that could cause an issue with mask wearing. I did inform Mr. Blaise of this fact. He threw a temper tantrum.

On October 15th, I was in a garage, which has the dimensions of approximately 80' X 48' X18', I entered and left through a garage door designed to allow passage of dump trucks. I was at no time closer than 20 feet from any other employee. Mr. Dawes saw me when I was leaving. He said something, I referenced my doctor's notes, which he asked to see (and although HIPPA Policy allows me to refuse) I showed them to him. He did not tell me to put on a mask, he asked me if I knew that I was supposed to have one on. I did not refuse his order, he never gave an order. Also, I have a Reasonable Accommodation that is effective as of October 15th 2020. When I brought this up to Mr Oaksford, at the Job Counselling meeting, he told me (and he wrote it in the JCM) that he didn't care if I had a Reasonable Accommodation from EEOC, I was to do what I was told and to file a grievance at a later time.

It should be noted that prior to the Reasonable Accommodation, I was provided with one mask every three or four days. My medical problem involves sudden onset of profuse nasal discharge.

Mr. Oaksford has made the accusation that on October 29th, I was standing 'right next to the union rep'. There were four people present at that meeting. The other three people have stated that they did not see that happen. I have yet to see the tribunal that takes the word of one man over that of 3 men. Apparently the NYSTA is the exception. As further evidence that the accusation is false, either through interpretation of events or through outright fabrication are the facts that Mr. Oaksford did not make any verbal statement at the time of the alleged occurrence, rather, the allegation came some two or three weeks after the alleged event and that while William Bennett was involved in a Job Counselling Meeting and a subsequent JCM, with a recommendation for Disciplinary Action, the Union Rep, also an alleged party to the alleged violation, was not Counselled for his failure to comply with NYSTA Policy, which is prima facia evidence of Selective Enforcement and is a discriminatory practice which is, in my opinion, indicative of malfeasance on the part of NYSTA Management.

This exposure to how the NYSTA discipline process functions and considering my wife's current medical condition, and the fact that the NYSTA is not bound by the arbitrator's decision, I have, against my desire for the truth to be brought to light, at this point, have decided to accept the NYSTA offer of a three day loss of pay to be taken over a period of some 18 pay periods. It appears that an additional penalty, as herein discussed, is being levied outside the NYSTA proposal, which for the sake of my wife's best interest, I am being forced to accept. If the penalty being requested was a fixed penalty, specifically, three days loss of pay, if the outcome of the hearing was not in my favor, I would opt for a full hearing, on the record, with full questioning of all parties and witnesses, on the record. But, as this issue has nothing to do with seeking the truth, but rather is concerning forced compliance with arbitrary and capricious application of NYSTA Policy, real and imagined, I am put in a position in which I must do what is best for my family rather than what is right and true.

In all honesty, I do not expect you to do anything with this APPEAL. I have witnesses and statements to prove my points, none of which have been investigated by an independent NYSTA Investigator. NYSTA has relied on hearsay and presumption, such presumption having been immediately and forcefully rebutted. Apparently, it is more important to protect a Supervisor 2 from allegations of serious misconduct, including but not limited to Physical Harassment (Assault), Sexual harassment (Assault) and creating a False Detention by blocking egress and violation of published NYSTA Policies relevant to the previous accusations as well as violation of NYSTA Published Policies concerning Maximum Occupancy and Behavior of Management Personnel, than to look for the truth. I am facing discipline for not violating NYSTA Policy, with an offer of 3 days pay penalty. Now NYSTA Management is trying to, and will likely succeed in taking well over $2000 in pay for a non-offense and no injured party. At this point, the NYSTA has not shown any reasonable evidence that I have, in fact or through intention, violated any specific NYSTA Policy, nor have I at any time or place, put anyone (myself or others) at risk through unsafe practices.

Sincerely,

W.P. Bennett

NEW YORK STATE OF OPPORTUNITY. | Thruway Authority

ANDREW M. CUOMO
Governor

JOANNE M. MAHONEY
Chair

MATTHEW J. DRISCOLL
Executive Director

March 31, 2021

Mr. William Bennett
1610 North George Street
Rome, New York 13440

Dear Mr. Bennett:

The Unit 1 Performance Rating Appeal Board has completed its review of your appeal pertaining to the Unsatisfactory Performance Rating for the period February 11, 2020 through February 11, 2021.

After careful consideration and a full discussion of your appeal and of the material submitted by you and your supervisors, the Board sustained the original rating. Accordingly, your rating for the period February 11, 2020 through February 11, 2021 is unsatisfactory.

Sincerely,

Frank Multari

Frank Multari
Director of Personnel

cc: PH File

# Exhibit 12

**Policies and Safety Gram**

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**SAFETY DIRECTIVE** | NUMBER: 2020-1<br>SUBJECT:<br>**COVID-19 CORONAVIRUS** |
|---|---|
| FROM:<br>[signature] 3/3/2020<br>DIRECTOR OF LABOR RELATIONS AND EMPLOYEE SAFETY — DATE | DISTRIBUTION:<br>All Employees |

It is likely that by now you have heard of or read about the novel coronavirus (COVID-19). As Governor Cuomo announced, there is no reason for undue anxiety and the general risk remains low in New York State at this time. Everyday preventative actions, however, can help stop the spread of this and other respiratory viruses.

**What is it?**

COVID-19 is a large family of viruses that can cause respiratory illness in humans. According to the Centers for Disease Control (CDC), patients with confirmed infections have reported mild to severe respiratory illnesses with symptoms including fever, cough and shortness of breath. CDC believes that symptoms of COVID-19 may appear in as few as 2 days or as long as 14 days after exposure. Those with compromised immune systems or preexisting respiratory conditions are likely to have more severe symptoms. COVID-19 is most commonly spread just like any other virus. Coughing and sneezing disperses it through the air within 6 feet of the infected person. It can also spread by close personal contact, such as touching, shaking hands, or contact with surfaces with the virus on it. You then can become infected by touching your eyes, nose or mouth after contact exposure.

**Who is at risk?**

As viruses go, you are less susceptible to contract COVID-19 than the regular flu. The current risk categories involve traveling to regions where significant outbreaks have occurred. These areas currently include China, Iran, Italy, South Korea, Japan and Hong Kong. If you have traveled to or come into contact with someone who has traveled to those areas, the potential for exposure is present. If you have not exhibited signs and symptoms after 14 days, the risk that you have been exposed is low. If you developed signs and symptoms and have not traveled or had contact with someone who has traveled to those areas, then the risk that you have contracted COVID-19 is negligible.

**How do we prevent the spread of viruses, including Coronavirus?**

New York State Thruway Authority (Authority) employees should use these simple personal preventative steps:

- **Wash your hands often** with soap and hot water for at least 20 seconds. If soap and water are not available, use an alcohol-based hand sanitizer (at least 60% alcohol based).
- **Avoid touching** your eyes, nose and mouth with unwashed hands.
- Avoid close contact with people who are sick.
- Stay home when you are sick.
- **Cover your cough or sneeze** with a tissue, then throw the tissue in the trash.
- Keep food covered or in closed containers.

- Clean and disinfect frequently as follows:
  - Clean your personal work space daily or per shift including:
    - toll drawers and toll machines;
    - desks and phones; and
    - vehicle operator compartments (e.g., steering wheel, controls, etc.).
  - Clean your kitchen and break areas daily.

**Illness reporting**

If you are experiencing a cough, shortness of breath, and a fever greater than 100°F, contact your supervisor prior to reporting to work. Individuals who are experiencing symptoms and may have traveled to areas of concern or have been in contact with somebody who has traveled to these areas should remain home and contact a health care provider.

**Moving forward**

Supervisors are responsible to share this important information with every employee. The Bureau of Labor Relations and Employee Safety is currently is working with the Governor's Office and other agencies to develop more detailed protocols for the Authority to help protect its employees and customers. Preventing the spread of viruses requires everyone to be vigilant and considerate of others by adhering to the preventative steps listed above. The Bureau of Labor Relations and Employee Safety is always available to assist and answer questions and can be reached at (518) 471-4495.

**References:**

https://www.cdc.gov/coronavirus/2019-ncov/
https://www.who.int/health-topics/coronavirus
https://www.cdc.gov/coronavirus/2019-ncov/
https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html
https://www.cdc.gov/coronavirus/about/transmission.html
https://www.cdc.gov/coronavirus/2019-ncov/about/prevention-treatment.html

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**SAFETY DIRECTIVE** | NUMBER: 2020-2<br>SUBJECT:<br>**COVID-19 AND KEEPING SAFE IN THE WORKPLACE** |
|---|---|
| FROM:<br>[signature] 4/7/2020<br>DIRECTOR OF LABOR RELATIONS AND EMPLOYEE SAFETY DATE | DISTRIBUTION:<br>All Employees |

As the COVID-19 pandemic continues, so does our collective resolve. The health and safety of our employees and motorists remains our top priority and the New York State Thruway is vital in the fight against this virus and to maintain the flow of goods for the economy. As such, our work at the Thruway Authority (Authority) to keep our highway safe and fully operational is essential. At the same time, it is equally important that we continually strive to perform those necessary functions as safely as possible. To that end, we are continuously reviewing the latest guidance from the New York State Department of Health (DOH) and Occupational Safety and Health Administration (OSHA) for information on dealing with COVID-19 in the workplace to protect both Authority staff and the public.

Based on current OSHA guidance and DOH recommendations, the Authority has taken a comprehensive approach to minimize workplace hazards related to COVID-19. This includes:

- enhanced cleaning guidelines for the workplace;
- enhanced cleaning guidelines for personal workspace and recommendations for personal hygiene;
- reducing staff density in the workplace through changes in reporting and attendance requirements such as adjusting reporting days and times, reducing elapsed time during shifts, splitting work units, flexible reporting locations etc.; and
- maintaining social distancing wherever operationally possible.

These measures place our work locations at an overall low risk for exposure to COVID-19. OSHA and DOH have no additional requirements for other actions or additional personal protective equipment at this time. The routine use of N95 type masks is prioritized for medical and health professionals, and for those positive for COVID-19. Currently, any Authority staff either positive for COVID-19 or under a precautionary or mandatory quarantine must not come in to work.

While there is limited evidence that shows that face coverings protect individuals from getting the virus, it is widely accepted that they can help slow the spread. The Center for Disease Control (CDC) recommends wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies), especially in areas of significant community-based transmission. CDC also advises the use of simple cloth face coverings to slow the spread of the virus and help people who may have the virus and do not know it from transmitting it to others. Cloth face coverings fashioned from household items or made at home from common materials at low cost can be used as an additional, voluntary public health measure.

Based on this guidance, staff is permitted to use a cloth to cover their mouths and noses while on duty provided it does not restrict breathing or interfere with the safe execution of their duties. Examples of acceptable coverings are scarfs, balaclavas, neck guards and bandanas. More information on how to make a face mask can be found on the CDC's website: www.cdc.gov.

April 7, 2020

We need everyone's cooperation to maximize the effectiveness of our COVID-19 related safety measures. At work, maintain social distancing wherever possible, including paying attention to the separation of shifts and work crews and limiting your presence at the workplace to strictly as scheduled and directed by your supervisor or manager. Whether at work or off duty, remember to practice good personal hygiene/good handwashing, cough/sneeze into your elbow and continue to practice social distancing. Finally, if you are ill, do not come to work. Notify your supervisor of your situation while away from the workplace.

If we do these simple acts, we can persevere through these times together. Thank you for everything you do.

References:
https://www.osha.gov/Publications/OSHA3990.pdf
Enhanced Cleaning Guidance

Bill

NEW YORK STATE OF OPPORTUNITY. | Thruway Authority

Bureau of Labor Relations and Employee Safety

***SAFETY GRAM # 192 (UPDATE – APR 17, 2020) – SURGICAL MASKS & FACE COVERING FOR COVID-19***

Executive Order 202.17 requires individuals to use "a mask or cloth face covering when in a public place and unable to maintain, or when not maintaining, social distance...." In compliance with E.O. 202.17, all staff physically reporting to work are to have a mask or cloth face covering of their own available and to wear such mask or face covering whenever maintaining appropriate social distancing may not be possible. For certain titles and situations only, and as indicated below, when available, the Authority will continue providing surgical style masks.

- The wearing of a surgical or cloth mask does not eliminate the requirements of social distancing or any other required COVID-19 precautions. Staff are to continue to follow all current Authority, DOH and CDC guidance on preventing the spread of COVID-19. Always maintain proper social distancing whenever possible.
- Masks or face coverings are not respirators like the N95, rather they are intended to prevent the individual from spreading the COVID-19 virus. These masks do not replace the use of a respirator for non-COVID-19 related tasks. No respiratory fit testing or medical clearance is required prior to use of a surgical masks, cloth mask, or face covering.
- In accordance with the criteria below and surgical mask availability, staff eligible for and choosing to wear the provided surgical mask will be issued one mask daily. Surgical masks when available will only be issued to staff described in Priority 1 and Priority 2 below. Use of provided surgical masks when available, or a personal cloth mask is required by Toll Collection staff working in a toll booth and by any other staff expected to have direct contact with the public. Available surgical masks will be issued in the following order:

  **Priority 1:** Toll Collectors and other staff expected to have direct contact with the public, staff in the Thruway Statewide Operations Center (TSOC), security staff at the GMMCB, and ITSM and other staff engaged in the installation or repair of equipment that requires two or more employees working together in close proximity or confined quarters.
  **Priority 2:** Any staff assigned to a task which requires two or more employees to work together at the same time in close proximity.

- **All staff must have a mask or cloth face covering available at all times while on duty and use such mask or cloth face covering whenever appropriate social distancing may not be possible.**

**How to use the masks:**

☑ Before putting on or removing a mask, clean hands with alcohol-based hand sanitizer or soap and water

☑ Cover mouth and nose with mask and make sure there are no gaps between your face and the mask

☑ Avoid touching the mask while using it

☑ Remove the mask whenever you break for meals or smoking

☑ Remove it from behind by the straps (do not touch the front of mask) to avoid touching your face

☑ Discard when no longer needed for the day or it becomes grossly contaminated

☑ Never cut or modify the mask in any way

**Additional resources can be found at: www.who.int**

**Contact: Bureau of Labor Relations and Employee Safety at (518) 471-4495 with any questions.**

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**SAFETY DIRECTIVE** | NUMBER: 2020-3<br>SUBJECT:<br>**NEW YORK STATE THRUWAY AUTHORITY SITE SAFETY PLAN** |
|---|---|
| FROM: [signature] 5/28/2020<br>DIRECTOR OF LABOR RELATIONS AND EMPLOYEE SAFETY — DATE | DISTRIBUTION:<br>All Employees and Bulletin Boards |

As we begin to return to the workplace from New York State on PAUSE, the safety of New York State Thruway Authority (Authority) employees is paramount. Pursuant to *Interim Guidance for State Agencies and Authorities During the COVID-19 Public Health Emergency*, the following protocols and policies have been put in place to protect the health and welfare of our employees and facilitate the resumption of in-person operations.

If employees are feeling sick or suspect COVID-19 exposure, they should remain at home and contact their supervisor. Employees who begin to exhibit symptoms during any part of their workday should notify their supervisor immediately.

## I. People

### A. Physical Distancing

- Staff must maintain at least 6 feet distance from each other at all times, unless a shorter distance is operationally necessary for completion of the task (e.g., moving equipment, guiderail repairs, toll collection).
- A face covering must be carried on your person at all times while on Authority property and worn when social distancing (i.e., less than 6 feet distance) cannot be achieved.
- Workspaces and seating areas should be modified to ensure employees are 6 feet apart in all directions. When distancing is not feasible between workstations or areas, the use of face coverings or placement of physical barriers such as partitions (in areas where they would not affect air flow, heating, cooling or ventilation) are required.
- Enclosed spaces such as elevators and conference rooms must never exceed 50% of maximum capacity.* If social distancing cannot be achieved, a face covering must be worn.
- Social distancing markers and directional signs will be posted in commonly used areas and any areas in which lines normally form (e.g., lobby, outside restrooms, etc.) to indicate 6 feet of spacing and, where practical, reduce bi-directional foot traffic.
- Signage reminding employees about social distancing, hand hygiene, personal protective equipment (PPE) and cleaning guidelines will be posted throughout the workplace.

*In locations where employees are in rental buildings, they must abide by rules set in place by the building owner.

B. Enclosed Spaces

- Phone and/or video conferencing should be used whenever possible to limit in-person gatherings. When necessary, in-person meetings must be held in the largest available conference room.

- Restrooms in Authority administrative offices are limited to occupancy by two people at a time.* Restrooms/locker rooms in field offices must never exceed 50% of maximum capacity.

- Authority vehicle occupancy is limited to one person where operationally possible. When more than one person is in the vehicle, all occupants must wear face coverings.

- Staff must not congregate in common areas such as hallways, stairwells, smoking areas, workstations, etc.

- Supervisors should revisit placement of work unit food preparation and storage areas in order to minimize or eliminate unnecessary traffic flow past particular workstations and congregation of staff.

C. Workplace Activity

- Travel for Authority work is limited to essential travel only (e.g., incident response, construction inspections, etc.).

- Essential Maintenance employees presently working staggered shifts of 3 days on, 3 days off will continue to do so until otherwise directed.

- Non-essential employees in administrative and office-based titles will return to the workplace 50% of the time and continue to work remotely the remaining 50% of the time until otherwise directed. When scheduled to work remotely, staff must check in with their supervisor by their start time to receive assignments. Staff must also report back to their supervisor at the end of their scheduled shift and provide a summary of the task(s) they worked on throughout the day.

- Toll Collectors will continue to use separate entrances/exits when relieving coworkers or being relieved. When cash collection of toll transactions resumes, plexiglass barriers will be installed in the tollbooths to limit person-to-person contact. Toll Collectors will also be required to wear a face covering while working in the tollbooth and gloves will be made available for use.

D. Movement and Commerce

- Non-essential visitors will not be permitted at Authority facilities to the greatest extent possible. As such, members of the public will be required to have an appointment prior to entering Authority buildings. They can contact staff via email addresses and phone numbers provided on the Authority's website.

- Vendors must call ahead for deliveries or call from their vehicles instead of coming up to Authority buildings. Signs to this effect will be posted at loading docks, mailrooms and other entrances used by such vendors.

- Hand sanitizer will be made available at loading docks. Employees must sanitize hands before and after transferring a delivery.

- Employees must receive food or other deliveries outside of Authority buildings.

## II. Resources

### A. Protective Equipment

- Staff may use either a face covering of their own or one provided by the Authority for use at work. When surgical-style face coverings are provided, they are for one day of use. When cloth face coverings are provided, they are washable and reusable. A replacement can be requested from your supervisor if soiled or damaged.

- The use of a face covering does not eliminate the need for different or additional PPE as may be required for certain tasks based on existing OSHA/PESH standards.

- Face coverings must be utilized in accordance with the following guidelines:
    - Before putting on or removing a face covering, clean hands with alcohol-based hand sanitizer or soap and water.
    - Cover your mouth and nose and make sure there are no gaps between your face and the face covering.
    - Avoid touching your face covering while using it.
    - Remove the face covering whenever you break for meals or smoking.
    - Remove it from behind by the straps to avoid touching your face and the face covering.
    - Never cut or modify the face covering in any way.

- Face coverings should be cleaned (cloth) or replaced when damaged or soiled; be properly stored or discarded after use; and never be shared.

- Limit the sharing of objects and touching of shared surfaces to the extent possible. When shared objects or surfaces are touched, employees should wear gloves or sanitize or wash hands before and after contact.

### B. Hygiene and Cleaning

- The Authority is following the hygiene and sanitation requirements provided by the Centers for Disease Control and Prevention (CDC) and New York State Department of Health (DOH). *Enhanced Cleaning Guidance* memorandum dated March 9, 2020 and *Enhanced Cleaning and Disinfecting Checklists*, available from the Coronavirus link on the Intranet homepage, for additional information.

May 28, 2020

- Division Directors are responsible for maintaining an overall cleaning log in the Divisions, and Office Services is responsible for maintaining an overall cleaning log for the Administrative Headquarters complex.
- A summary log for Divisions must be kept in the Division Administrative office, and the Administrative Headquarters complex log will be maintained in Offices Services.
- Space-specific cleaning logs must be posted in restrooms and locker rooms.
- Operators must clean Authority-owned vehicles at the end of their shift. Instructions will be available with supplies in each vehicle or distributed when keys are provided. Where practicable, pool vehicles will be assigned to one operator. Cleaning logs will be kept in each pool vehicle.

- Hand sanitizer will be placed in heavily used areas (e.g., each quadrant of the Administrative Headquarters, lunchrooms, etc.). Hand hygiene stations will be provided in certain Authority facilities (e.g., lobbies, garages, near elevators, etc.).

- Appropriate cleaning/disinfection supplies will be provided for employee use. Employees are responsible for cleaning and disinfecting shared objects before and after use, and for the daily cleaning of their workstations.

- The sharing of food and beverages is prohibited. Employees are encouraged to bring in lunch and observe social distancing while eating meals.

## III. Processes

A. <u>Screening and Testing</u>

- Employees reporting to the workplace must complete a daily wellness survey available at https://wellnesssurvey.thruway.ny.gov prior to their start time or immediately upon arrival. Supervisors must follow up with employees if they do not receive a completed survey.

- If any employee response requires follow up, Employee Safety will be notified and the employee will be contacted.

- Prior to meeting with Authority staff, visitors/routine vendors will be required to answer a WELLNESS SURVEY (TA-N3738). Until it is reviewed and the individual is cleared, the visitor/routine vendor will not be permitted entry.

B. <u>Tracing and Tracking</u>

- Employees must report to their Division Administration Officer or the Bureau of Personnel if they have contracted COVID-19 or are alerted that they have come into close or proximate contact with a person with COVID-19 outside of the workplace.

- The Authority will work with health authorities to trace all workplace contacts of any employees or visitors who test positive after interactions in the workplace and notify DOH in accordance with their procedures.

## IV. Implementation and Compliance

Every reporting location must designate a Site Safety Monitor who regularly checks to ensure this Plan is being followed.

Questions regarding this Plan should be directed to the Bureau of Labor Relations and Employee Safety at (518) 471-4495. Requests for a reasonable accommodation for any Plan requirements should be directed to Equal Employment Opportunity and Diversity Development at (518) 436-3002.

An employee's failure to follow this Plan may result in counseling and/or discipline.

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**SAFETY DIRECTIVE** | NUMBER: 2020-5<br>SUBJECT:<br>**NEW YORK STATE THRUWAY AUTHORITY SITE SAFETY PLAN** |
|---|---|
| FROM: [signature] 11/30/2020<br>DIRECTOR OF LABOR RELATIONS AND EMPLOYEE SAFETY — DATE | DISTRIBUTION:<br>All Employees and Bulletin Boards |

<u>THIS DIRECTIVE SUPERSEDES SAFETY DIRECTIVES 2020-2 AND 2020-3</u>

In returning to the workplace from New York State on PAUSE, the safety of New York State Thruway Authority (Authority) employees is paramount. Pursuant to *Interim Guidance for State Agencies and Authorities During the COVID-19 Public Health Emergency*, the following protocols and policies have been put in place to protect the health and welfare of our employees and facilitate the resumption of in-person operations.

If employees are feeling sick or suspect COVID-19 exposure, they should remain at home and contact their supervisor. Employees who begin to exhibit symptoms during any part of their workday should notify their supervisor immediately.

## I. People

### A. <u>Physical Distancing</u>

- Staff must maintain at least 6 feet distance from each other at all times, unless a shorter distance is operationally necessary for completion of the task (e.g., moving equipment, guiderail repairs).
- A face covering must be carried on your person at all times while on Authority property and worn when social distancing cannot be achieved (i.e., less than 6 feet distance).
- Workspaces and seating areas have been modified to ensure employees are 6 feet apart in all directions. Where distancing is not feasible between workstations or areas, the use of face coverings or placement of physical barriers such as partitions (in areas where they would not affect air flow, heating, cooling or ventilation) are required.
- Enclosed spaces such as elevators and conference rooms must never exceed 50% of maximum capacity.* A face covering must be worn when occupying any tightly confined space with another individual. When occupying a large, enclosed space with another individual, face coverings are optional if social distancing is observed.
- Signage reminding employees about social distancing, hand hygiene, personal protective equipment (PPE) and cleaning guidelines are posted throughout the workplace.

*In locations where employees are in rental buildings, they must abide by rules set in place by the building owner.

Laliberte, Shawn C
Trades Generalist
Syracuse Division
3412 Facilities - Syr

B. Enclosed Spaces

- Phone and/or video conferencing should be used whenever possible to limit in-person gatherings. When necessary, in-person meetings must be held in the largest available conference room.

- Restrooms in Authority administrative offices are limited to occupancy by two people at a time.* Restrooms/locker rooms in field offices must never exceed 50% of maximum capacity.

- Authority vehicle occupancy is limited to one person where operationally possible. When more than one person is in the vehicle, all occupants must wear face coverings.

- Staff must not congregate in common areas such as hallways, stairwells, smoking areas, workstations, etc.

- The placement of work unit food preparation and storage areas have been modified in order to minimize or eliminate unnecessary traffic flow past particular workstations and congregation of staff.

C. Workplace Activity

- Travel for Authority work is limited to essential travel only (e.g., incident response, construction inspections, etc.).

- For essential Maintenance employees, staggering 15 minutes between shifts has been implemented. Additionally, non-critical work activities where social distancing cannot be maintained may be suspended, unless operationally necessary.

- Non-essential employees in administrative and office-based titles have returned to the workplace at a 50% staffing level and will continue to work remotely the remainder of the time per their work unit schedule until otherwise directed. When scheduled to work remotely, staff must check in with their supervisor by their start time to receive assignments. Staff must also report back to their supervisor at the end of their scheduled shift and provide a summary of the task(s) they worked on throughout the day.

D. Movement and Commerce

- Non-essential visitors are not permitted at Authority facilities to the greatest extent possible. As such, members of the public are required to have an appointment prior to entering Authority buildings, when practicable. They can contact staff via email addresses and phone numbers provided on the Authority's website.

- Vendors must call ahead for deliveries or call from their vehicles instead of coming up to Authority buildings. Signs to this effect are posted at loading docks, mailrooms and other entrances used by such vendors.

- Hand sanitizer is available at loading docks. Employees must sanitize hands before and after transferring a delivery.

- Employees must receive food or other deliveries outside of Authority buildings.

## II. Resources

### A. Protective Equipment

- Staff may use either a face covering of their own or one provided by the Authority for use at work. When surgical-style face coverings are provided, they are for one day of use. When cloth face coverings are provided, they are washable and reusable. A replacement can be requested from your supervisor if soiled or damaged.

- The use of a face covering does not eliminate the need for different or additional PPE as may be required for certain tasks based on existing OSHA/PESH standards.

- Face coverings must be utilized in accordance with the following guidelines:
  - Before putting on or removing a face covering, clean hands with alcohol-based hand sanitizer or soap and water.
  - Cover your mouth and nose and make sure there are no gaps between your face and the face covering.
  - Avoid touching your face covering while using it.
  - Remove the face covering whenever you break for meals or smoking.
  - Remove it from behind by the straps to avoid touching your face and the face covering.
  - Never cut or modify the face covering in any way.

- Face coverings should be cleaned (cloth) or replaced when damaged or soiled; be properly stored or discarded after use; and never be shared.

- Limit the sharing of objects and touching of shared surfaces to the extent possible. When shared objects or surfaces are touched, employees should wear gloves or sanitize or wash hands before and after contact.

### B. Hygiene and Cleaning

- The Authority is following the hygiene and sanitation requirements provided by the Centers for Disease Control and Prevention (CDC) and New York State Department of Health (DOH). Refer to the *Enhanced Cleaning Guidance* memorandum dated March 9, 2020 and *Enhanced Cleaning and Disinfecting Checklists*, available from the COVID-19 Information link on the Intranet homepage, for additional information.
  - Division Directors are responsible for maintaining an overall cleaning log in the Divisions, and the Bureau of Office and Building Services (Office

Services) is responsible for maintaining an overall cleaning log for the Administrative Headquarters complex.
- A summary log for Divisions must be kept in the Division Administrative office, and the Administrative Headquarters complex log is maintained in Offices Services.
- Space-specific cleaning logs must be posted in each applicable space.
- Operators must clean Authority-owned vehicles at the end of their shift. Instructions are available with supplies in each vehicle or distributed when keys are provided. Where practicable, pool vehicles are assigned to one operator. The vehicle operator shall note the date(s)/time(s) the pool vehicle was cleaned in the additional comments section of the POOL VEHICLE REQUEST (TA-42134-9) prior to return of the pool vehicle.

- Hand sanitizer has been placed in heavily used areas (e.g., each quadrant of the Administrative Headquarters, lunchrooms, etc.). Hand hygiene stations are provided in certain Authority facilities (e.g., lobbies, garages, near elevators, etc.).

- Appropriate cleaning/disinfection supplies are provided for employee use. Employees are responsible for cleaning and disinfecting shared objects before and after use, and for the daily cleaning of their workstations.

- The sharing of food and beverages is prohibited. Employees are encouraged to bring in lunch and observe social distancing while eating meals.

## III. Processes

### A. Screening and Testing

- Employees reporting to the workplace must complete the New York State Office of Information Technology Services (ITS) Facility Entry Screening application available at https://screening.ny.gov prior to their start time or immediately upon arrival. Employees without an Authority email address should: select "I don't have a NYS Email Address"; choose "I work for NYS, but I do not have a work email address"; fill in their First and Last Name; and insert their supervisor's Authority email address in the Agency Contact Email field. To help stop any potential spread of COVID-19, employees are strongly encouraged to complete the screening electronically prior to coming to the workplace. However, employees without access to a device that allows electronic completion may complete the FACILITY ENTRY SCREENING (TA-N3739) and provide it to their immediate supervisor.

- If the employee has reservations with respect to how to answer any of the screening questions, they should immediately discuss them with their supervisor *prior* to arriving at the workplace.

- Supervisors must follow up with employees in a timely manner if they do not receive a PASS/FAIL email response from ITS Facility Entry Screener (noreply@its.ny.gov) or

a FACILITY ENTRY SCREENING (TA-N3739) for all employees scheduled to report to the work location for that shift.

- If any employee response requires follow up, Employee Safety is notified and the employee contacted.
- Prior to meeting with Authority staff, visitors/routine vendors are required to answer a FACILITY ENTRY SCREENING (TA-N3739). Until it is reviewed and the individual is cleared, the visitor/routine vendor are not permitted entry.

B. Tracing and Tracking

- Employees must report to their Division Administrative Officer or the Bureau of Personnel, Bureau of Labor Relations and Employee Safety, and/or Office of Human Resource Management if they have contracted COVID-19, are alerted that they have come into close or proximate contact with a person with COVID-19 outside of the workplace, or are getting tested for COVID-19.
- The Authority works with health authorities to trace all workplace contacts of any employees or visitors who test positive after interactions in the workplace and notifies DOH in accordance with their procedures.

## IV. Implementation and Compliance

Every reporting location has designated a Site Safety Monitor who regularly checks to ensure this Plan is being followed.

Questions regarding this Plan should be directed to the Bureau of Labor Relations and Employee Safety at (518) 471-4495. Requests for a reasonable accommodation for any Plan requirements should be directed to Equal Employment Opportunity and Diversity Development at (518) 436-3002.

An employee's failure to follow this Plan may result in counseling and/or discipline.

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**SAFETY DIRECTIVE** | NUMBER: 2020-6<br>SUBJECT:<br>**COVID-19 GUIDANCE FOR ESSENTIAL STAFF** |
|---|---|
| FROM: [signature] 12/4/2020<br>DIRECTOR OF LABOR RELATIONS AND EMPLOYEE SAFETY — DATE | DISTRIBUTION:<br>All Employees Rec'd 12/15/20 |

All New York State Thruway Authority (Authority) employees whose physical presence is critical to performing or supporting essential Authority activities may be subject to the following provisions, when operational needs demand.* The titles of essential employees are outlined in the OPERATIONS PLAN FOR PUBLIC HEALTH EMERGENCIES (TAP-126).

**Entry Screening & Assessment**

Employees are required to complete a daily facility entry screening and inform their direct supervisor, or the next available person in their chain of command, if they present any new or worsening COVID-19 related symptoms at the beginning of their shift or when being called-in. *Employees should not go to the workplace if they are exhibiting any new or worsening COVID-19 related symptoms unless they have been cleared to do so by their supervisor.*

Supervisors will assess the situation, conferring with the Division Administrative Office, Bureau of Labor Relations and Employee Safety, and/or Office of Human Resource Management. An employee who exhibits new or worsening COVID-19 symptoms will be deemed symptomatic, unless that essential employee has documentation that the symptoms are related to a previously diagnosed condition (e.g., seasonal allergies).

An employee with a previously diagnosed condition, with symptoms that may appear similar to COVID-19 symptoms (e.g., coughing, runny nose, trouble breathing, etc.), may be allowed to report to work. A symptomatic employee without suitable documentation, however, will be directed to stay home and consult with a healthcare professional prior to returning to work.

**Confirmed or Suspected Exposure**

In accordance with New York State Department of Health (DOH) guidance, essential employees who have been exposed to a confirmed or suspected case of COVID-19 can be permitted to work in the required workplace setting. Should quarantining impact the Authority's ability to maintain essential functions, asymptomatic employees may report to work provided the following conditions are met:

- Employees quarantine themselves when not at work.
- Employees self-monitor for a temperature greater than or equal to 100 degrees Fahrenheit and other symptoms consistent with COVID-19 upon arrival to work, at least every 12 hours while at work and twice a day when at home.

*These procedures and the titles associated with it are subject to change based on changes to DOH guidance as well as operational need to ensure public safety.

Laliberte,Shawn C
Trades Generalist
Syracuse Division
3412 Facilities - Syr

- Employees must wear a face covering at all times while in the workplace for 14 days after the last exposure and continue to practice social distancing including maintaining 6 feet of distance from others.
- Employees whose job duties permit a separation of greater than 6 feet implement environmental controls to ensure adequate separation is maintained.
- Employees who develop symptoms consistent with COVID-19 while working will immediately stop work and isolate at home until all medical clearances have been received.

| NEW YORK STATE OF OPPORTUNITY. Thruway Authority<br>**ADMINISTRATIVE SERVICES BULLETIN** | NUMBER: 2020-4<br>SUBJECT:<br>**COVID-19 LEAVE** |
|---|---|
| FROM:<br>8.13.2020<br>DIRECTOR OF ADMINISTRATIVE SERVICES DATE | DISTRIBUTION:<br>All Employees |

THIS BULLETIN SUPERSEDES ADMINISTRATIVE SERVICES BULLETIN 2020-2

In accordance with the recently enacted State Paid Sick Leave Law (Chapter 25 of the Laws of 2020), policy guidance issued by the Governor's Office of Employee Relations and the federal Families First Coronavirus Response Act, all New York State Thruway Authority employees, regardless of Attendance Rules coverage, may be eligible for paid sick leave or expanded family and medical leave for specified reasons related to COVID-19. These provisions are outlined in detail below.

**State Paid Sick Leave**

Effective March 11, 2020, New York State employees are provided with leave with pay, without charge to accruals, for all workdays within the 14 calendar day period for any mandatory or precautionary order of quarantine or isolation due to COVID-19. Executive Orders do not count as "mandatory or precautionary orders of quarantine or isolation". Part-time employees will be paid for the number of hours they were already scheduled to work. If an employee placed on mandatory or precautionary quarantine can work from home, arrangements shall be made to do so and they would not be eligible for this leave.

**Families First Coronavirus Response Act (FFCRA)**

The FFCRA offers paid sick leave under the Federal Emergency Paid Sick Leave Act and expanded family and medical leave under the Emergency Family Medical Leave Expansion Act, which apply to leaves from April 1, 2020 through December 31, 2020.

Federal Emergency Paid Sick Leave Act (FEPSLA)

FEPSLA provides up to two weeks of paid sick leave, without charge to accruals, to an employee who is unable to report to work or work from home because the employee:

1) is subject to a federal, State, or local quarantine or isolation order related to COVID-19;
2) has been advised by a health care provider to self-quarantine because of COVID-19;
3) is experiencing COVID-19 related symptoms and is seeking a medical diagnosis;
4) is caring for an individual subject to either an order as described above in 1, or self-quarantine as described above in 2;

Reinhardt,Kenneth M
Trades Generalist
Syracuse Division
3412 Facilities - Syr

5) is caring for their minor child whose school or place of care is closed, or whose child care provider is unavailable, due to COVID-19; or

6) is experiencing any other substantially similar condition specified by the federal government.

Eligible full-time employees may be entitled to up to 75 or 80 hours of leave for the two-week period, depending on their normal work week. Eligible part-time employees may be entitled to the number of hours that they work on average over a two-week period.

*Eligibility and Use*

There are no minimum service requirements for the FEPSLA benefits.

Paid sick leave shall be available for immediate use by an employee for the qualifying events described above. Leave shall be used in full day increments, except for the first day.

*Rate of Pay*

An employee's pay is subject to specific monetary caps and calculated as follows:

- Leave for qualifying events 1, 2 and 3 above will be paid at 100% of an employee's regular rate of pay, up to $511.00 daily or $5,110.00 for the two-week period.
- Leave for qualifying events 4, 5 and 6 above will be paid at two-thirds of the employee's regular rate of pay, up to $200.00 daily or $2,000.00 for the two-week period.

*Notification and Documentation*

Employees must notify their supervisor of the need for leave as soon as practicable under the circumstances and subsequently provide their Division Administrative Office or Bureau of Personnel with either:

- an order of quarantine or isolation due to COVID-19 or medical documentation from a licensed medical provider for qualifying events 1-4 and 6; or
- a notification of school or child care closure due to COVID-19 for qualifying event 5.

Supervisors should contact their Division Administrative Office or Bureau of Personnel for further direction.

*Impact on Benefits*

Employees on leave for qualifying events 4, 5 and 6 above are receiving two-thirds of their regular rate of pay up to a cap and not in full pay status. An employee will not earn leave credits for any biweekly pay period during which they are in less than full pay status for more than five workdays. In addition, their service credit with the New York State and Local Retirement System may also be impacted.

Emergency Family Medical Leave Expansion Act (EFMLEA)

EFMLEA provides 12 weeks of public health emergency leave, without charge to accruals, to eligible employees who are unable to report to work or telework because the employee must care for their minor child(ren) because the school or place of care has been closed, or their child care provider is unavailable due to the COVID-19 public health emergency. Employees who have a child age 18 or older, who is incapable of self-care due to a mental or physical disability, may also be eligible for public health emergency leave.

Any previously approved FMLA used, for reasons other than those related to COVID-19, will be subtracted from this 12 weeks of public health emergency leave. EFMLEA provides a new qualifying reason for which leave can be taken not an additional 12 weeks of leave entitlement.

*Eligibility and Use*

To qualify for the EFMLEA benefits, employees are required to have worked for New York State for a period of 30 calendar days.

Leave shall be used continuously in full day increments.

*Rate of Pay*

The first 10 days of public health emergency leave are unpaid unless the employee chooses to charge accruals or take leave under qualifying event 5 of FEPSLA (see above). After the first 10 days, the employee is paid two-thirds of their regular rate of pay up to $200.00 daily or $10,000 for the remaining 10-week period.

*Application for Leave*

An employee must complete a REQUEST TO USE EMERGENCY EXPANDED FMLA (TA-N31125), available on the Intranet Human Resource Management page or Forms portal, and submit to the Bureau of Personnel along with notification of school or child care closure due to COVID-19.

*Impact on Benefits*

For the period of public health emergency leave that is unpaid or paid at two-thirds of an employee's regular rate of pay up to a cap, the employee is not in full pay status. An employee will not earn leave credits for any biweekly pay period during which they are in less than full pay status for more than five workdays. In addition, their service credit with the New York State and Local Retirement System may also be impacted.

**Consecutive Leave**

Qualifying leave may be taken consecutively under the State Paid Sick Leave and FFCRA.

**Travel Advisories**

Per the State Employee Travel Advisory Policy issued on July 1, 2020, employees that travel to a state designated by the Department of Health as having a significant degree of community-wide spread of COVID-19 must quarantine for 14 days after traveling. Before traveling out of state, employees should consult the Department of Health's guidance on quarantine restrictions. This information, including the current list of restricted states, is available at www.coronavirus.health.ny.gov/covid-19-travel-advisory.

Employees that commenced travel to a designated state on or before June 25, 2020 should communicate with their supervisor and determine if they can telework for the duration of their quarantine. Those who are unable to telework shall be covered by any quarantine leave applicable under any law, rule, regulation or policy. If no quarantine leave is available, the employee shall charge appropriate leave accruals for the quarantine period.

Employees that commenced travel to a designated state after June 25, 2020 should communicate with their supervisor and determine if they can telework for the duration of their quarantine. If the employee is unable to telework, the employee is eligible to charge appropriate leave accruals for the quarantine period but shall not be permitted access to quarantine leave under any law, rule, regulation or policy.

**Questions**

If you have any questions about the State and/or federal leave benefits, contact your Division Administrative Office or the Bureau of Personnel at Administrative Headquarters at (518) 436-3098 or (800) 525-3586.

Sexual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's sex when:

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment, even if the reporting individual is not the intended target of the sexual harassment;
- Such conduct is made, either explicitly or implicitly, a term or condition of employment; or
- Submission to such conduct or rejection of such conduct is used as the basis for employment decisions affecting an individual's employment.

A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an individual because of that individual's sex. Sexual harassment also consists of any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, or which interfere with the recipient's job performance.

Sexual harassment also occurs when a person in authority or perceived to be in authority tries to trade job benefits for sexual favors. This can include hiring, promotion, continued employment or any other terms, conditions or privileges of employment. This is also called "quid pro quo" harassment.

Any employee or non-employee who feels harassed should report the conduct so any violation of this Policy can be corrected promptly. Any harassing conduct, even a single incident, can be addressed under this Policy.

## IV. EXAMPLES OF SEXUAL HARASSMENT

The following types of acts may be sexual harassment and are strictly prohibited:

- Physical acts of a sexual nature, such as:
  - Touching, pinching, patting, kissing, hugging, grabbing, brushing against another individual's body or poking another individual's body; or
  - Rape, sexual battery, molestation or attempts to commit these assaults.

- Unwanted sexual advances or propositions, such as:
  - Requests for sexual favors accompanied by implied or overt threats concerning target's job performance evaluation, a promotion or other job benefits or detriments; or
  - Subtle or obvious pressure for unwelcome sexual activities.
- Sexually oriented gestures, noises, jokes or comments about an individual's sexuality or sexual experience, which create a hostile work environment.
- Sex stereotyping occurs when conduct or personality traits are considered inappropriate simply because they may not conform to other people's ideas or perceptions about how individuals of a particular sex should act or look.
- Derogatory comments directed at a person who has undergone sex reassignment surgery can be sexual harassment, just as comments about secondary sex characteristics of any person can be sexual harassment.
- Sexual or discriminatory displays or publications anywhere in the workplace, such as displaying pictures, posters, calendars, graffiti, objects, promotional material, reading materials or other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.
- Hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity and the status of being transgender, such as:
  - Interfering with, destroying or damaging a person's workstation, tools or equipment, or otherwise interfering with the individual's ability to perform their job;
  - Sabotaging an individual's work; or
  - Bullying, yelling or name-calling.

## V. WHO CAN BE A TARGET OF SEXUAL HARASSMENT?

Sexual harassment can occur between or among any individuals, regardless of their sex or gender. A harasser can be a superior, subordinate, coworker or anyone in the workplace including an independent contractor, contract worker, vendor, client, customer or visitor.

## VI. WHERE CAN SEXUAL HARASSMENT OCCUR?

Unlawful sexual harassment is not limited to the physical workplace itself. It can occur while employees or non-employees are traveling for business or at employer sponsored events or parties. Calls, texts, emails and social media usage by employees or non-employees can constitute unlawful workplace harassment, even if they occur away from the workplace premises, on personal devices or during non-work hours.

## VII. RETALIATION

Unlawful retaliation can be any action that could discourage an individual from making or supporting a sexual harassment claim. Adverse action need not be job-related or occur in the workplace to constitute unlawful retaliation (e.g., threats of physical violence outside of work hours).

Such retaliation is unlawful under federal, state and, where applicable, local law. The New York State Human Rights Law protects any individual who has engaged in "protected activity." Protected activity occurs when a person has:

- Made a complaint of sexual harassment, either internally or with any anti-discrimination agency;
- Testified or assisted in a proceeding involving sexual harassment under the Human Rights Law or other anti-discrimination law;
- Opposed sexual harassment by making a verbal or informal complaint to a supervisor, manager, EEODD or by simply informing a supervisor or manager of harassment;
- Reported that another individual has been sexually harassed; or
- Encouraged a fellow employee or individual to report harassment.

Even if the alleged harassment does not turn out to rise to the level of a violation of law, the individual is protected from retaliation if the person had a good faith belief that the practices were unlawful. However, the retaliation provision is not intended to protect persons making intentionally false charges of harassment or protect persons from any personnel action which otherwise would have been taken regardless of any participation in a protected activity.

## VIII. REPORTING SEXUAL HARASSMENT

**Preventing sexual harassment is everyone's responsibility.** The Authority cannot prevent or remedy sexual harassment unless it knows about it. Any employee or non-employee who has been subjected to behavior that may constitute sexual harassment is encouraged to report such behavior to a supervisor, manager or EEODD. Anyone who witnesses or becomes aware of potential instances of sexual harassment should report such behavior to a supervisor, manager or EEODD.

Reports of sexual harassment may be made verbally or in writing. A COMPLAINT form for submission of a written complaint is available on the Intranet or can be obtained by contacting EEODD. All employees are encouraged to use this COMPLAINT form. Employees who are reporting sexual harassment on behalf of other employees or non-employees should use the COMPLAINT form and note that it is on behalf of another employee or non-employee.

Employees or non-employees who believe they have been a target of sexual harassment may also seek assistance in other available forums as explained in the section on Legal Protections.

## IX. SUPERVISORY RESPONSIBILITIES

All supervisors and managers who receive a complaint or information about suspected sexual harassment, even if it is a rumor, observe what may be sexually harassing behavior or for any reason suspect that sexual harassment is occurring, **are required** to report such suspected sexual harassment to EEODD. Supervisors and managers are held to a higher standard of conduct and are expected to model appropriate workplace behavior. They are responsible for any harassment or discrimination they know of or which they should have known.

Supervisors should also document the circumstances of any allegation, observation or rumored sexual harassment, including what actions were taken by the supervisor or manager to ascertain the facts.

In addition to being subject to discipline if they engaged in sexually harassing conduct themselves, supervisors and managers will be subject to discipline for failing to report suspected sexual harassment or otherwise knowingly allowing sexual harassment to continue.

Supervisors and managers will also be subject to discipline for engaging in any retaliation.

## X. COMPLAINT AND INVESTIGATION OF SEXUAL HARASSMENT

*All* complaints or information about sexual harassment will be investigated, whether that information was reported in verbal or written form. An investigation of any complaint, information or knowledge of suspected sexual harassment will be prompt and thorough, commenced immediately and completed as soon as possible. The investigation will be kept confidential to the fullest extent possible. All persons involved, including complainants, witnesses and alleged harassers, will be afforded due process, as outlined below, to protect their rights to a fair and impartial investigation.

Any employee may be required to cooperate as needed in an investigation of suspected sexual harassment. The Authority will not tolerate an employee's retaliation against individuals who file complaints, support another's complaint or participate in an investigation regarding a violation of this Policy.

While the process may vary from case to case, investigations should be done in accordance with the following steps:

- Upon receipt of complaint, EEODD will conduct an immediate review of the allegations, and take any interim actions (e.g., instructing the respondent to refrain from communications with the complainant), as appropriate. If a complaint is verbal, the individual will be encouraged to complete the COMPLAINT form in writing. If he or she refuses, EEODD will prepare a COMPLAINT form based on the verbal reporting.
- If documents, emails or phone records are relevant to the investigation, take steps to obtain and preserve them.
- Request and review all relevant documents, including all electronic communications.
- Interview all parties involved, including any relevant witnesses.
- Create written documentation of the investigation (such as a letter, memo or email), which contains the following:
    - A list of all documents reviewed, along with a detailed summary of relevant documents;

- A list of names of those interviewed, along with a detailed summary of their statements;
- A timeline of events;
- A summary of prior relevant incidents, reported or unreported; and
- The basis for the decision and final resolution of the complaint, together with any corrective action(s).

- Keep the written documentation and associated documents in a secure and confidential location.
- Promptly notify the individual who reported and the individual(s) about whom the complaint was made of the final determination and implement any corrective actions identified in the written documentation.
- Inform the individual who reported of the right to file a complaint or charge externally as outlined in the next section.

## XI. LEGAL PROTECTIONS AND EXTERNAL REMEDIES

Sexual harassment is not only prohibited by the Authority but is also prohibited by federal, state and, where applicable, local law.

Aside from the Authority's internal process, employees may also choose to pursue legal remedies with the following governmental entities. While a private attorney is not required to file a complaint with a governmental agency, employees may seek the legal advice of an attorney.

In addition to those outlined below, employees in certain industries may have additional legal protections.

## XII. NEW YORK STATE HUMAN RIGHTS LAW (HRL)

The HRL, codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to all employers in New York State with regard to sexual harassment and protects employees and non-employees regardless of immigration status. A complaint alleging violation of the HRL may be filed either with the New York State Division of Human Rights (DHR) or in New York State Supreme Court.

Complaints with DHR may be filed any time **within one year** of the harassment. If an individual did not file with DHR, they can sue directly in state court under the HRL **within three years** of the alleged sexual harassment. An individual may not file with DHR if they have already filed a HRL complaint in state court.

Complaining internally to the Authority does not extend the time to file with DHR or state court. The one year or three years is counted from the date of the most recent incident of harassment.

Individuals do not need an attorney to file a complaint with DHR, and there is no cost to file with DHR.

DHR will investigate the complaint and determine whether there is probable cause to believe that sexual harassment has occurred. Probable cause cases are forwarded to a public hearing before an administrative law judge. If sexual harassment is found after a hearing, DHR has the power to award relief, which varies but may include requiring the Authority to take action to stop the harassment or redress the damage caused, including paying of monetary damages, attorney's fees and civil fines.

Contact DHR at (888) 392-3644 or visit www.dhr.ny.gov/complaint for more information about filing a complaint. The website has a complaint form that can be downloaded, filled out, notarized and mailed to DHR. The website also contains contact information for DHR's regional offices across New York State.

## XIII. CIVIL RIGHTS ACT OF 1964

The United States Equal Employment Opportunity Commission (EEOC) enforces federal anti-discrimination laws, including Title VII of the federal Civil Rights Act of 1964 (codified as 42 U.S.C. § 2000e et seq.). An individual can file a complaint with EEOC anytime within 300 days of the harassment. There is no cost to file a complaint with EEOC. EEOC will investigate the complaint and determine whether there is reasonable cause to believe that discrimination has occurred, at which point EEOC will issue a Right to Sue letter permitting the individual to file a complaint in federal court.

EEOC does not hold hearings or award relief, but may take other action including pursuing cases in federal court on behalf of complaining parties. Federal courts may award remedies if discrimination is found to have occurred. In general, private employers must have at least 15 employees to come within the jurisdiction of EEOC. An employee alleging discrimination at work can file a "Charge of Discrimination." EEOC has district,

area and field offices where complaints can be filed. Contact EEOC by calling (800) 669-4000 (TTY: (800) 669-6820), visiting www.eeoc.gov or emailing info@eeoc.gov.

If an individual filed an administrative complaint with DHR, DHR will file the complaint with EEOC to preserve the right to proceed in federal court.

## XIV. LOCAL PROTECTIONS

Many localities enforce laws protecting individuals from sexual harassment and discrimination. An individual should contact the county, city or town in which they live to find out if such a law exists.

## XV. CONTACT THE LOCAL POLICE DEPARTMENT

If the harassment involves unwanted physical touching, coerced physical confinement or coerced sex acts, the conduct may constitute a crime. To report a possible crime, individuals should contact their local police department.

## XVI. QUESTIONS REGARDING POLICY

Any questions regarding this Policy should be directed to EEODD at (518) 471-4321.

## XVII. ADMINISTRATION OF POLICY

The Executive Director shall be responsible for interpreting, implementing and administering this Policy. Such responsibility may include developing any operational and/or administrative policies and procedures necessary to carry out the intent of the Policy.