UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM PAUL BENNETT,

                    Plaintiff,

          -v-                              6:22-CV-337

NEW YORK STATE THRUWAY
AUTHORITY, JOANNE M.
MAHONEY, MAYOR MATTHEW
DRISCOLL, JAMES KONSTALID,
JOHN BARR, FRANK MULTARI,
MARY BOEHM, CARLOS MILLAN,
PATRICK HOEHN, KEVIN POST,
ROBERT DRESSING, BARRY
OAKSFORD, MICHAEL BLAIS,
TODD SUMMERSON, and
DAVID NAPLES,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

WILLIAM PAUL BENNETT
Plaintiff, Pro Se
1610 North George Street
Rome, NY 13440

HON. LETITIA A. JAMES          ERIN P. MEAD, ESQ.
New York State Attorney General  STACEY A. HAMILTON, ESQ.
Attorneys for Defendants       Ass't Attorneys General
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

**DECISION and ORDER**

## I. INTRODUCTION

On April 8, 2022, *pro se* plaintiff William Paul Bennett ("plaintiff"), a New York State Thruway Authority ("NYSTA") employee, filed this action alleging that his employer and fourteen high-ranking or supervisory NYSTA officials violated his civil rights by, *inter alia*, disciplining him under policies and directives related to the COVID-19 pandemic. Dkt. No. 1. Along with his initial complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 2, and to have counsel appointed to assist him, Dkt. No. 4. Thereafter, plaintiff also filed an amended complaint. Dkt. No. 5.

Plaintiff's amended complaint clocks in at 142 pages. It asserts federal claims under various provisions of the U.S. Constitution, the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983, 18 U.S.C. §§ 241, 242, 351(e), 28 U.S.C. § 4101, and related state law. Plaintiff seeks a total of $39,312,655.65 in damages as well as declaratory and injunctive relief.

On June 10, 2022, U.S. Magistrate Judge Miroslav Lovric conducted a review of plaintiff's IFP Application. Dkt. No. 6. There, Judge Lovric noted that plaintiff was still employed by the NYSTA and receiving his regular, bi-weekly wages. *Id.* Plaintiff also co-owned some real estate with a non-zero fair market value. *Id.* Because his earnings and holdings put him well above

the poverty line, Judge Lovric denied plaintiff's IFP Application.  *Id*.  Judge

Lovric also denied plaintiff's motion for counsel.  *Id*.  However, Judge Lovric

gave plaintiff thirty days in which to pay the filing fee.  *Id*.  Plaintiff promptly

did so.  Thereafter, summonses were issued, Dkt. No. 10, and all of the

named defendants appeared in this action on July 25, 2022, Dkt. No. 20.

On October 31, 2022, defendants moved under Federal Rule of Civil

Procedure ("Rule") 12(b)(1) and 12(b)(6) to dismiss plaintiff's amended

complaint.  Dkt. Nos. 32, 33.  Plaintiff opposed.  Dkt. No. 39.  The matter was

reassigned to this Court on February 16, 2024.  Dkt. No. 56.

The motion has been fully briefed and will be considered on the basis of

the submissions without oral argument.[1]

## II. <u>BACKGROUND</u>

The following facts are taken from plaintiff's amended complaint and its

attached exhibits, Dkt. No. 5, and are assumed true for the purpose of

assessing defendants' motion to dismiss.

---

[1]  Plaintiff has also filed a number of his own motions: he moved for summary judgment against defendant Boehm, Dkt. No. 40, a declaratory judgment, Dkt. No. 41, summary judgment against defendant Post, Dkt. No. 42, filed a letter motion requesting that defendants' motion to dismiss be rejected, Dkt. No. 47, summary judgment against defendants Naples, Oaksford, and Millan, Dkt. No. 48, and declaratory judgment, Dkt. No. 49.  Those motions have been held in abeyance pending a decision on this motion to dismiss.  Dkt. No. 46.

On February 11, 2016, the NYSTA hired plaintiff in the title of General Mechanic / HVAC worker.  Am. Compl. at 14.[2]  Plaintiff's interview was conducted by defendant Oaksford and non-party Chandler.  *Id*.  During the interview, plaintiff had "a full beard and mustache."  *Id*.  Although neither Oaksford nor Chandler mentioned it at the interview, plaintiff was later told by Oaksford that he "would be required to shave for a mandatory respirator fit test."  *Id*.  Plaintiff alleges that that no maintenance employees besides Chandler "had used a respirator during the preceding ten (10) years."  *Id*.

Plaintiff submitted a "Request for Reasonable Accommodation," in which he requested that he "be permitted to be excused from shaving and the subsequent fit test as respirators are not typically used by anyone in [his] job description."  Am. Compl. at 14.  According to plaintiff, "the presence of [his] facial hair was part of [his] firmly held religious beliefs and practices."  *Id*.  The NYSTA asked for "additional documentation."  *Id*.  Thereafter, plaintiff's request for a Reasonable Accommodation was granted.  *Id*. at 14–15.

A year later, plaintiff received a notice informing him that he would need to re-apply for this Reasonable Accommodation.  Am. Compl. at 15.  When he asked why this was required, plaintiff "was informed by various NYSTA management and EEOC [Equal Employment Opportunity Commission]

---

[2]  The amended complaint includes numbered paragraphs, but only as to certain allegations on certain pages.  Citations to unnumbered facts are found on the pages corresponding to the CM/ECF header.

personnel that such re-application is to make sure that no change in status existed." *Id.* "NYSTA EEOC personnel instructed [plaintiff] to fill out the appropriate form and to put wording to the effect that there were no changes to the previous annual application." *Id.* Thereafter, plaintiff forwarded the re-application to EEOC. *Id.*

Shortly after mailing away his re-application, plaintiff and his co-workers "were assigned to a training class which was held in the break area" of the maintenance facility. Am. Compl. at 15. Defendant Post was the training class instructor. *Id.* At the end of the training, Post approached plaintiff "to tell [him] that he had seen [plaintiff's] second application for Reasonable Accommodation and that it was incomplete." *Id.* Post told plaintiff he "had to submit new documentation, specifically referring to a letter on Church letterhead from the parish priest." *Id.* Plaintiff responded that he had already followed the EEOC's instructions. *Id.*

At that time, Post "proceeded to raise his voice and chastise [plaintiff] in front of his [fellow co-workers] with words that included 'This isn't a fight you want to take on.'" Am. Compl. at 15. Plaintiff walked away. *Id.* But he did not file a grievance against Post. *Id.* Soon thereafter, plaintiff learned that an NYSTA employee named Chris Dulong "was also involved in disciplinary issues regarding facial hair and fit testing requirements" and was later terminated. *Id.* at 15–16.

Thereafter, plaintiff and non-parties Chandler and Bentley were assigned to a NYSTA facility in Utica.  Am. Compl. at 16.  At some point, Bentley was injured and unable to work.  *Id*.  So plaintiff took a "two[-]week period of employment known as 'Out of Title.'"  *Id*.  During that period, plaintiff learned and performed the duties of a "Maintenance Supervisor I," which is the job title that Bentley held.  *Id*.

While performing in that position, plaintiff attempted to complete a job at a NYSTA facility in Herkimer.  Am. Compl. at 16.  But there was an issue with scheduling, so plaintiff told defendant Blais that the job would have to be rescheduled.  *Id*.  Blais "lost his temper" and "started yelling at [plaintiff]," including shouting that plaintiff didn't "care about taking care of matters at his facility."  *Id*.  Plaintiff "called" Blais on his "demeanor" and Blais "apologize[d] and revert[ed] to a civil tone."  *Id*

On April 17, 2020, NYSTA, with the approval of defendants Mahoney, Driscoll, Konstalid, Barr, Multari, Boehm, and Millan, published and distributed a document called "Safety Gram #192."  Am. Compl. ¶ 1.  This document "is the first official mention of [a] requirement of use of masks or facial coverings and the proper use thereof."  *Id*.  According to plaintiff, this Safety Gram is a breach of a collective bargaining agreement that applies to him.  *Id*. ¶ ¶ 1, 5, 18.  According to plaintiff, one or more of the named

defendants violated his civil rights by wrongfully applying this Safety Gram against him.  *Id*. ¶¶ 2–4.

On or about June of 2020, defendants "established a policy regarding a requirement that all YSTA employees complete a 'Wellness Survey.'"  Am. Compl. ¶ 11.  Plaintiff alleges that this policy is also a breach of the collective bargaining agreement.  *Id*.  Plaintiff further alleges that he suffered from an unidentified medical condition that made it difficult for him to complete this survey.  *Id*. ¶ 13.  Plaintiff alleges that defendant Post knew this.  *Id*.

On or about July 21, 2020, plaintiff attended a training session at an NYSTA facility in Herkimer.  Am. Compl. ¶ 15.  The training was conducted by defendant Naples.  *Id*.  Plaintiff had previously talked with Naples about his Reasonable Accommodation related to his beard, so plaintiff approached Naples to tell him that he believed that Safety Gram #192 violated the collective bargaining agreement and his civil rights.  *Id*.  Plaintiff alleges that Naples "failed to act" on this verbal; *i.e.*, "non-written" request for a Reasonable Accommodation.  *Id*.

On September 30, 2020, defendant Post issued a Memorandum to NYSTA employees about the then-ongoing COVID-19 pandemic.  Ex. 7 to Am. Compl. at 88; Am. Compl. ¶ 51.  Among other things, this Memorandum required all employees to wear masks indoors in "all public / common areas."  *Id*.  This

Memorandum cautioned that "blatant disregard for the protocols will be addressed appropriately." *Id.*

On October 1, 2020, plaintiff was using a urinal in the men's bathroom when defendant Blais entered the room and ordered plaintiff "to put a mask on." Am. Compl. ¶ 17. Plaintiff responded to Blais that he had two doctor's notes that allowed him "to not wear a mask as long as [he] was social distancing." *Id.* Defendant Blais reported this interaction to his supervisor, who in turn reported it to defendant Post. *Id.* ¶¶ 27, 31.

Several hours later, the NYSTA issued to plaintiff a Job Counseling Memo ("JCM") based on his failure to comply with the NYSTA safety policies and his failure to follow supervisory directives. Ex. 4 to Am. Compl. at 77; Am. Compl. ¶¶ 35, 37. The JCM warned plaintiff that "[s]imilar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action." *Id.*

Later that day, plaintiff contacted defendant Naples, the EEOC official at the NYSTA, to tell him about what had happened in the bathroom and the JCM he had received. Am. Compl. ¶ 57. Naples "conceded that he should have done something with the information he received [from plaintiff] in July" and "instructed [plaintiff] to file a written request for a Reasonable Accommodation." *Id.*

On October 2, 2020, plaintiff submitted to the NYSTA a Request for a Reasonable Accommodation.  Ex. 2 to Defs.' Mem., Dkt. No. 33-2.[3]  This request sought to "not be required to wear a face covering when working alone or in areas where social distancing can be maintained."  *Id*.

Plaintiff supported this request with a doctor's note that says he "has difficulty wearing the mask all the time" and "it is okay not to wear the mask if he is alone or working separately while adhering to social distancing and CDC guidelines."  Ex. 3 to Defs.' Mem., Dkt. No. 33-3.  A few days later, plaintiff sent to various named defendants an e-mail complaint about the October 1 JCM.  Am. Compl. ¶ 59.

On October 15, 2020, the NYSTA responded to plaintiff's Request for a Reasonable Accommodation.  Compl. at 95.  The letter explained that NYSTA would provide him with the following accommodations:

> -You will be issued extra facemasks at the start of your day.  You should adhere to the directive on face coverings as follows: "a face covering must be carried on your person at all times while on Authority property and worn when social distancing (i.e., less than 6 feet distance cannot be achieved."  You are permitted to remove your facemask as needed for medical reasons provided that you adhere to the above referenced policy and/or supervisor's directive.  Please not that when in common areas (such as rest rooms, hallways, etc.) or approaching areas where employees may be gathered, masks are required to be worn.

---

[3]  The Court is reluctant to consider this kind of extraneous material on a motion to dismiss, but the cited material—in particular, the date and content of this document—are integral to plaintiff's claims.  Notably, the substance of this document appears in the pleading, too.  Am. Compl. ¶ 17.

Am. Compl. at 95.

On October 29, 2020, plaintiff received another JCM based on a "pattern of insubordination and disregard for safety procedures." Am. Compl. at 90; Am. Compl. ¶ 61. According to this  JCM, plaintiff had violated COVID-19 safety directives on October 15 and again on October 29. *Id.* During the job counseling meeting on this second JCM, plaintiff alleges that defendant Oaksford told him that he "did not care if" plaintiff "had a Reasonable Accommodation," and that if he was unhappy about following orders he could grieve it through the union later. Am. Compl. ¶ 63. Various defendants signed the second JCM on November 16, 2020. *Id.* ¶¶ 67, 69, 71, 73, 75.

On December 7, 2020, plaintiff received a third JCM. Am. Compl. at 97. This disciplinary memo was issued for plaintiff's "pattern of failure to follow directives and disregard for safety protocols and procedures." *Id.* ¶ 77. This JCM stated that plaintiff continued to ignore the COVID-19 safety directives that required him to wear a mask in common areas. *Id.* at 97. As before, this JCM warned plaintiff that "[s]imilar problems in the future may lead to an Unsatisfactory Performance Rating and/or disciplinary action." *Id.*

On January 20, 2021, defendant Millan notified plaintiff that he was being charged with misconduct for his repeated violations of the COVID-19 safety policies. Am. Compl. at 103; Am. Compl. ¶ 87. This letter explained that a

hearing would be conducted on the charge.  *Id.*  Thereafter, plaintiff, after consulting with a union representative and hiring his own lawyer, entered into a stipulation in which he agreed to plead guilty to the charges in the January 20, 2021 letter and pay a $610.80 fine.  Am. Compl. at 101–102; Am. Compl. ¶¶ 87–94.

On February 8, 2021, defendant Hoehn notified plaintiff that he had received a "Report of Unsatisfactory Performance" for the rating period between February 11, 2020 through February 11, 2021."  Am. Compl. at 107.  This performance rating was based on the fact that plaintiff had received three JCMs; *i.e.*, he had been repeatedly counseled for his failure to follow the NYSTA's COVID-19 directives.  *Id.*  As a result of this rating, plaintiff missed out a scheduled pay raise.  Am. Compl. ¶ 95.  He appealed the determination but the NYSTA affirmed the unsatisfactory rating.  Compl. at 112.

On July 29, 2021, plaintiff filed a civil rights complaint with the New York State Division of Human Rights ("DHR") alleging that the NYSTA's denial of his pay raise was the result of sexual harassment, non-compliance with his reasonable accommodation, and retaliation.  Ex. 6, Dkt. No. 33-6.  The DHR conducted an investigation.  *See* Am. Compl. at 12–13.

On January 11, 2022, the DHR determined that there was no probable cause to believe that a violation occurred.  Ex. 9, Dkt. No. 33-9.  Thereafter,

the EEOC adopted the DHR's findings and issued plaintiff a so-called "right-to-sue" letter on March 8, 2022.  Ex. 10, Dkt. No. 33-10; Am. Compl. at 13.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 297–98 (N.D.N.Y. 2019) (cleaned up).  "The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions." *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based.").

"A facial Rule 12(b)(1) motion is one based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Nicholas*, 433 F. Supp. 3d at 586 (cleaned up).  "A plaintiff opposing such a motion bears no evidentiary burden." *Id*.  "Instead, to resolve a facial Rule 12(b)(1) motion, a district court must determine whether the complaint and its exhibits allege facts that establish subject matter jurisdiction." *Id*.  "And to make that determination, a court must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id*.

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Nicholas*, 433 F. Supp. 3d at 586 (quoting *Carter*, 822 F.3d at 57).  "In opposition to such a motion, a plaintiff must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id*. (cleaned up).  "If a defendant supports his fact-based Rule 12(b)(1) motion with material and controverted extrinsic evidence, a district court will need to make findings of fact in aid of its decision as to the subject matter jurisdiction." *Id*.

## B.  <u>Rule 12(b)(6)</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable

inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV.  <u>DISCUSSION</u>

As an initial matter, plaintiff is *pro se*. So his filings must be held to less stringent standards. *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly warned, documents filed *pro se* "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that [they] suggest[ ]." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).

Broadly construed, plaintiff's amended complaint alleges that the NYSTA (and the named defendants) violated his civil rights by writing him up in a series of three job counseling memos (called JCMs) that led to formal charges of discipline and, eventually, an unsatisfactory job performance rating.

The amended complaint and a review of the supporting documentation establishes that plaintiff was issued the JCMs for repeatedly failing to wear a cloth face mask or other face covering inside certain NYSTA facilities and designated common areas in violation of the NYSTA's COVID-19 policies.

Plaintiff contends the JCMs were issued in an irregular and/or improper manner and violated a reasonable accommodation he had received based on his medical condition.  According to plaintiff's amended complaint, these and other, related actions amounted to discrimination based on his disability, sex, and/or retaliation.

Notably, plaintiff's amended complaint describes two different reasonable accommodations: a medical accommodation he received vis-à-vis the COVID-19 protocols and an earlier, religious accommodation he received shortly after beginning his employment at NYSTA.

In particular, plaintiff alleges that he has a sincere religious belief that requires him to maintain facial hair and/or a beard.  Am. Compl. at 14.  The pleading alleges that when a supervisor told him he would need to shave his facial hair for a respirator fit test, he sought and received an accommodation that excused him from shaving or from taking the respirator fit test.[4]  *Id*.

Importantly, however, there is no indication that the events described in the rest of plaintiff's complaint have anything to do with the accommodation that excused him from the facial-hair / fit-test requirements.  Even broadly construed, the allegations about this religious accommodation are entirely

---

[4] Plaintiff alleges that an NYSTA employee named Chris Dulong "was also involved in disciplinary issues regarding facial hair and fit testing requirements" and was later terminated.  Am. Compl. at 15–16.  Plaintiff does not allege that he was terminated or disciplined for his facial hair or for the fit testing requirement.

distinct from the COVID-19 policy requirement to wear non-fitted disposable masks or other cloth face coverings while still maintaining his facial hair.

Wearing a non-fitted, disposable mask—not shaving his facial hair or fit-testing a respirator—is the requirement imposed by the COVID-19 protocol(s) about which plaintiff complains. Thus, because there is no possible religious-liberty claim that might attach to this fact pattern, the Court will not address this issue further. Instead, the rest of this opinion focuses on the reasonable accommodation plaintiff received vis-à-vis the COVID-19 protocols.[5]

Plaintiff's amended complaint purports to assert federal claims under the ADA, Title VII, the U.S. Constitution, 42 U.S.C. § 1983, 18 U.S.C. §§ 241, 242, 351(e), and 28 U.S.C. § 4101.

## A.  **The ADA**

The ADA is divided into five separate titles: Employment (Title I), Public Services (Title II), Public Accommodations (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V). *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 169 (2d Cir. 2013).

The first three titles are the big ones. Together, they work to "forbid[ ] discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I . . . ; public services, programs,

---

[5]  Even assuming plaintiff intended to assert this kind of claim, any such claim would fail. *See, e.g., Vanwyckhouse v. Tessy Plastics*, 2023 WL 5452819, at *4 (N.D.N.Y. Aug. 24, 2023) (D'Agostino, J.) (rejecting religious discrimination claim based on COVID-19 workplace masking policy).

and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 508, 516–17 (2004). But Title V often comes up in litigation, too, since it protects people from retaliation, interference, coercion, or intimidation for engaging in any of the activities protected by the statute itself. 42 U.S.C. § 12203(a)–(b).

Plaintiff's allegations relate to his employment with the NYSTA, a New York State agency. ADA claims against a public employer implicate Title I and Title V. *See, e.g.*, *Mary Jo C.*, 707 F.3d at 171 (limiting discrimination claims by public employees to Title I); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 410 (E.D.N.Y. 2010) (noting that Title V concerns retaliation).

The problem for plaintiff is that the Eleventh Amendment shields New York State (and its constituent agencies, such as the NYSTA) from suit under these provisions of the ADA.

This is because "state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." *Jackson v. Battaglia*, 63 F. Supp. 2d 214, 219–20 (N.D.N.Y. 2014) (citation omitted).

With respect to these ADA claims in particular, "Congress has never abrogated New York's sovereign immunity from claims under Title I and V of the ADA and New York has never waived it." *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014).

This immunity extends to "state officials at those agencies working on behalf of the state (*i.e.*, in their official capacities), *Emmons*, 715 F. Supp. 2d at 406, and will bar a plaintiff's claim "regardless of the type of relief sought," *Morales v. New York*, 22 F. Supp. 3d 256, 258 (S.D.N.Y. 2014). Consequently, ADA claims asserted against New York State, its agencies, or its officials under Title I or Title V are barred by the Eleventh Amendment. *Davis v. Vt., Dep't of Corr.*, 868 F. Supp. 2d 313, 322 (D. Vt. 2012).

Plaintiff's amended complaint also asserts these claims against high-ranking and/or supervisory NYSTA officials in their personal and official capacities. To the extent that plaintiff alleges these ADA claims against the individual defendants in their *personal* capacities, those claims must be dismissed because neither Title I nor Title V provide for individual liability in the employment context. *See, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 79–80 (2d Cir. 2010) (per curiam).

Plaintiff's amended complaint also names these individual defendants in their *official* capacities. Under limited circumstances, a plaintiff can pursue an "official-capacity" claim against a public official using a doctrine called *Ex parte Young*, which evades the Eleventh Amendment's bar to suit. *Frantti v. New York*, 2017 WL 922062, at *5 (N.D.N.Y. Mar. 8, 2017). But the doctrine is a narrow one: the plaintiff must plausibly allege (1) an ongoing violation of federal law; and (2) seek relief that can properly be characterized as forward-

looking; *i.e.*, prospective.  *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 333 (E.D.N.Y. 2014).

The problem here is that even broadly construed, the amended complaint describes, at most, completed violations of the ADA.  Plaintiff filed this action in April of 2022, but the most recent significant event described with any detail in his amended complaint is the February 8, 2021 "unsatisfactory" rating that caused plaintiff to miss out on a promotion or pay raise.  *See, e.g.*, Am. Compl. ¶ 95.  And as of this writing, the State has rescinded the relevant COVID-19 protocols, so there is no existing NYTSA policy (that caused him these specific harms) which could be enjoined.

Thus, to the extent plaintiff has asserted claims under Title I or Title V of the ADA against NYSTA or against the named individual defendants in either their official or personal capacities, those claims must be dismissed as barred by sovereign immunity.[6]

## B.  <u>The Rehabilitation Act</u>[7]

The Rehabilitation Act is a body of federal disability law that is available to plaintiff.  Although the amended complaint does not reference this statute,

---

[6] This is a Rule 12(b)(1) dismissal.  *Morales*, 22 F. Supp. 3d at 268 ("A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction.").

[7] If one or more of plaintiff's ADA claims might have proved viable under *Ex parte Young*, they would still fail for the reasons explained in this discussion of the Rehabilitation Act.

the Rehabilitation Act of 1973 provides an avenue for possible relief against a state employer. *Quadir*, 39 F. Supp. 3d at 537 (construing *pro se* complaint as raising disability-related claims under the Rehabilitation Act).

New York has waived sovereign immunity on these claims. *Quadir*, 39 F. Supp. 3d at 537. "Like the ADA, the Rehabilitation Act prohibits disability-based discrimination, but it applies specifically to government agencies and other recipients of federal funds." *Frantti v. New York*, 414 F. Supp. 3d 257, 285 (N.D.N.Y. 2019) (citation omitted).

"[T]he Rehabilitation Act imports the discrimination standards of Title I of the ADA and the retaliation standards of Title V." *Quadir*, 39 F. Supp. 3d at 537; *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) ("Although its terms are broadly drawn, the Rehabilitation Act incorporates the standards of the [ADA].").

As an initial matter, however, any Rehabilitation Act claims against the individual defendants—whether in their personal capacities or their official ones—must be dismissed. *Frantti*, 2017 WL 922062, at *4 (collecting cases dismissing these claims as redundant where claims could proceed directly against the state entity-employer). Instead, these claims must be asserted directly against plaintiff's employer: the NYSTA.

## 1. **Discrimination & Accommodation**

To make out a *prima facie* claim of employment discrimination against the NYSTA under the Rehabilitation Act, a plaintiff must allege (1) his employer is subject to the Act; (2) he was disabled within the meaning of the Act; (3) he was qualified to perform the essential functions of his job, with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Larnard v. McDonough*, 578 F. Supp. 3d 371, 382 (W.D.N.Y. 2022). A failure-to-accommodate claim works much the same way, but just substitutes the fourth element with the question of whether the employer has refused to make a reasonable accommodation. *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

The Act borrows its definition of "disability" from the ADA. *Larnard*, 578 F. Supp. 3d at 383. The ADA defines a "disability" as any "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).[8] Still, though, "[n]ot every impairment is a 'disability' within the meaning of the ADA." *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005). Instead, there are two requirements: (1) the impairment must limit a "major life activity" and (2) the limitation must be "substantial." *Id.*

---

[8] An alternative way to satisfy the ADA's definition of "disability" is with a showing that the plaintiff was "regarded as" having a disability. 42 U.S.C. § 12102(1)(C). This provision sweeps more broadly than the principal definition of a disability: it extends to conduct related to any "actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." § 12102(3)(A).

As to the first requirement, major life activities include core physical functions like walking, standing, lifting, and other common activities such as reading, concentrating, and working.  42 U.S.C. § 12102(2)(A).  As to the second, an impairment qualifies as a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(ii).

In 2008, Congress amended the ADA "to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Woolf*, 949 F.3d at 94.  Even so, "[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment." *B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (cleaned up).  As the Circuit has explained, "in assessing whether a plaintiff has a disability, [courts] have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Id*.

Upon review, plaintiff has not plausibly alleged that he suffered from any disability, or was regarded as having or suffering from a disability, under the Rehabilitation Act.  In fact, a liberal reading of plaintiff's amended complaint does not even permit the inference that he was "disabled" at all.

Plaintiff repeatedly points out that he received doctor's notes from "two licensed physicians," but these notes do not relieve a plaintiff, even a *pro se* one, from the need to plausibly allege facts tending to establish a qualifying

disability.  That is especially so where, as here, the doctor's notes do not identify any particular disability.

Instead, these notes only say that plaintiff was allowed "to not wear a mask as long as [he] was social distancing."  Am. Compl. ¶ 17; *see also* Pl.'s Opp'n, Dkt. No. 39 at 3.  In his opposition, plaintiff contends that he also suffers from high blood pressure.  Pl.'s Opp'n at 11.  But the mere fact of a diagnosis is not enough to establish a qualifying disability, either.  *Weiss v. Cnty. of Suffolk*, 416 F. Supp. 3d 208, 214 (E.D.N.Y. 2018) ("[N]ot every impairment is a disability.").

To plausibly allege a disability-discrimination claim, the plaintiff needs to allege facts tending to show that he was substantially limited in his ability to perform a major life activity, or that his employer mistakenly regarded him as being so limited in one or more of those areas.  *See, e.g.*, *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999) (explaining contours of the "regarded as" provision).[9]

Plaintiff has not done so.  Other than noting that his accommodation request involved the provision of extra personal protective equipment ("PPE") because he suffers from a "sporadic runny nose," plaintiff has not alleged that

---

[9] On a motion to dismiss, the elements of a plaintiff's *prima facie* case are not treated as an evidentiary burden but are useful as "an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible."  *Sosa v. N.Y. City Dep't of Educ.*, 368 F. Supp. 3d 489, 495 (E.D.N.Y. 2019) (citation omitted).

he suffered limitations in his ability to work his job at the NYSTA at all.  Pl.'s Opp'n at 3.

Notably, plaintiff's claim(s) hinge upon the allegation he was subjected to COVID-19 workplace protocols that, both on its face and as applied, affected the other employees in his workplace, too.  This is true of both the Safety Gram and the Wellness Survey requirements.

This kind of fact pattern; *i.e.*, mistreatment based on a broadly applicable policy, is ordinarily insufficient to raise a plausible discrimination claim.  *See, e.g.*, *Niles v. N.Y. City Human Res. Admin.*, 2024 WL 496345, at *6 (E.D.N.Y. Feb. 8, 2024); (finding same); *Newell v. State Univ. of N.Y. Westchester Cmty. Coll.*, 2023 WL 4082030, at *4 (S.D.N.Y. June 20, 2023) (same).

In short, plaintiff has not plausibly alleged a disability-discrimination claim under the Act.  *Kosiba v. Catholic Health Sys.*, 2022 WL 21784010, at *7 (E.D.N.Y. Nov. 18, 2022) (Report & Recommendation) (finding same where plaintiff's ADA claims were based on an objection to workplace masking policy imposed during COVID-19 pandemic).

## 2.  <u>Hostile Work Environment</u>

"Because the ADA echoes and expressly refer to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—it follows that disabled Americans should be able to assert hostile work environment claims under the ADA."  *Fox v. Costco Wholesale*

*Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (cleaned up); *Kelly*, 200 F. Supp. 3d at 399 (assuming that a hostile work environment was actionable under the Rehabilitation Act).

To make out a hostile work environment claim, a plaintiff must plausibly allege that (1) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (2) a specific basis exists for imputing the objectionable conduct to the employer." *Fox*, 918 F.3d at 74. "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.* (cleaned up).

"A plaintiff alleging a hostile work environment claim, therefore, must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Fox*, 918 F.3d at 74.

Upon review, this claim fails because plaintiff has not plausibly alleged that he suffered from a disability, which is a prerequisite to stating a hostile-work-environment claim in the disability context. *Kelly*, 200 F. Supp. 3d at 399–400. Even assuming otherwise, this claim would still fail. To be sure, plaintiff *subjectively* believed his working conditions to be hostile. *See, e.g.*, Dkt. No. 39 at 12 ("The assault took place while the Plaintiff was actively using the urinal, which, in the mind of the Plaintiff, makes the assault sexual

in nature."). But subjective beliefs are not enough. In short, plaintiff has not plausibly alleged that, individually or collectively, the conditions described in the amended complaint might be considered *objectively* severe or pervasive.

### 3. **Retaliation**

The Rehabilitation Act prohibits retaliation against employees for their opposition to practices made unlawful by the Act. *Kelly*, 200 F. Supp. 3d at 402. To make out a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in an activity protected by the Act; (2) the employer was aware of this activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 438 (E.D.N.Y. 2015); *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 126 (D. Conn. 2020).

Upon review, plaintiff's retaliation claim or claims must be dismissed. "It is well established that seeking a reasonable accommodation for a disability constitutes protected activity." *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 129 (E.D.N.Y. 2018) (cleaned up). And even if the disability at issue is not one within the meaning of the Rehabilitation Act, an employee's request for an accommodation can still qualify as protected activity if it is made in good faith. *Id.*

In addition, the three JCMs, the formal disciplinary charges, and the unsatisfactory job performance rating (that caused plaintiff to miss out on a regularly scheduled promotion) qualify as "adverse actions," at least for the purpose of a motion to dismiss.[10]

Even so, plaintiff has not plausibly alleged causation between any of his conduct and one or more of these events.  "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Natofsky*, 921 F.3d at 353 (cleaned up).

There are two, related reasons that plaintiff has not plausibly established causation.  First, plaintiff's amended complaint alleges that the mask policy and the wellness survey implemented by the NYSTA applied equally to his co-workers.  Second, the accommodation that plaintiff received on this topic did not exempt him from mask wearing.

---

[10]  However, the myriad other slights identified by plaintiff do not qualify.  *See, e.g.*, *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 f.3d 556, 568–72 (2d Cir. 2011) (holding that investigatory sessions, counseling, threats of termination, hostile behavior during meetings, being made to come to work on a day off under false pretenses, and being switched to a night shift did not qualify).

Instead, the NYSTA provisioned him extra masks, required them to be carried on his person at all times, and stated that they must be *worn* in common areas and when social distancing could not be achieved.  This accommodation language even lines up with the language from plaintiff's doctor's notes.  The amended complaint's allegations, taken at face value, indicate that plaintiff received the three JCMs for repeatedly violating this accommodation language and the COVID-19 policy, not for engaging in "protected activity" under the Rehabilitation Act.

Although plaintiff characterizes the incidents in the complaint as *not* actually violating the policy (*e.g.*, when defendant Blais caught him without a mask in the men's bathroom, or when he was written up for not wearing a mask inside a larger garage space), the question of whether employee conduct violated a policy is separate from the question of whether an employee has engaged in any "protected activity" for a retaliation claim.  *Cf. Johnson v. Maximus Servs., LLC*, 2023 WL 5612826, at *4 (E.D.N.Y. Aug. 30, 2023) (concluding *pro se* plaintiff could not plausibly allege causation "because she refused to comply with the COVID-19 policy, not because she opposed it").

As other district courts considering similar fact patterns have noted, a plaintiff who is "demonstrably at risk" of being disciplined for legitimate reasons prior to engaging in protected activity cannot "rely solely on temporal proximity" to establish retaliation.  *Evans v. N.Y. City Dep't of Educ.*, 2023

WL 8034449, at *8 (S.D.N.Y. Nov. 20, 2023) (concluding same where plaintiff opposed workplace COVID-19 mandates).

### C. **Title VII**

Title VII "prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination." *Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022) (citation omitted); *see also Bostock v. Clayton County*, 590 U.S. 644, 649 (2020).

Upon review, plaintiff's amended complaint does not plausibly allege that NYSTA's workplace mask requirement, wellness survey requirement, or its enforcement of those COVID-19 policies against him, made any distinction based on one or more of the immutable or other characteristics protected by the statute; *e.g.*, his sex, race, or religion. Nor has plaintiff plausibly alleged that similarly situated individuals outside of one of these protected classes were treated better than him vis-à-vis these COVID-19 policies.

To the extent that plaintiff has attempted to allege a sexual harassment or "assault" claim based on his alleged interaction with defendant Blais, who observed plaintiff not wearing a mask in the men's bathroom and then reported it to a supervisor, that allegation is insufficient to plausibly allege this—or any other—kind of Title VII claim as a matter of law. Dkt. No. 39 at

12 ("The assault took place while the Plaintiff was actively using the urinal, which, in the mind of the Plaintiff, makes the assault sexual in nature.").

### D.  U.S. Constitution & 42 U.S.C. § 1983

Plaintiff's amended complaint also asserts claims under several provisions of the U.S. Constitution and 42 U.S.C. § 1983.  Am. Compl. at 7.  Notably, however, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  In other words, § 1983 is just the procedural mechanism used by a plaintiff to maintain a lawsuit based on a violation of a constitutional right.  *Id.*  Accordingly, plaintiff's allegations under § 1983 and the U.S. Constitution must be considered together.[11]

### 1.  Fourth Amendment

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  These restrictions have been incorporated against the States through the Due Process Clause of the Fourteenth Amendment.  *City of Ontario v. Quon*, 60 U.S. 746, 750 (2010); *Mapp v. Ohio*, 367 U.S. 643 (1961).

---

[11]  Section 1983 claims asserted directly against New York State, the NYSTA, or the individual defendants in their official capacities are subject to dismissal on the basis of Eleventh Amendment immunity for essentially the same reasons explained *supra*.  But a § 1983 individual-capacity claim is still available against a state actor for his "personal involvement" in a constitutional harm.  So these claims are construed against the individual defendants in their personal capacities.

Upon review, any § 1983 claim based on this general body of law must be dismissed.  Broadly construed, plaintiff has attempted to assert a § 1983 false imprisonment claim, or perhaps a § 1983 excessive force claim, against Blais, the defendant identified by plaintiff as "confining" him or "assaulting" him.

Plaintiff alleges that on October 1, 2020, he was at a urinal in the men's bathroom when defendant Blais entered the room and ordered plaintiff "to put a mask on." Am. Compl. ¶ 17.  Plaintiff responded to Blais that he had two doctor's notes that allowed him "to not wear a mask as long as [he] was social distancing." *Id.*  Blais reported this to his supervisor. *Id.* ¶¶ 27, 31.

These allegations do not plausibly establish the kind of "confinement" that would state a § 1983 false imprisonment claim.  Elsewhere, plaintiff makes reference to the fact that defendant Blais "assaulted" him by, among other things, "puffing his chest," "rushing" plaintiff, and "raising his voice in an aggressive manner," Am. Compl. ¶ 23, but a review of those allegations lead to the conclusion that they do not state a plausible claim for relief under this general body of federal law, either.

Putting a plaintiff in imminent fear of harm might give rise to one or more state-law claims, which plaintiff may re-file in state court.

## 2. <u>Sixth Amendment</u>

The Sixth Amendment provides in relevant part that: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him." U.S. Const. amend. XI.  This restriction has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400 (1965).

Upon review, any § 1983 claim based on this general body of law must be dismissed.  Broadly construed, plaintiff alleges that defendants violated this right by generating false or inaccurate JCMs and enforcing discipline against him based on testimony for which he was not present and did not receive an opportunity to challenge in a meaningful way.  Pl.'s Opp'n at 15.

The problem with this argument is that, at best, the JCMs are entirely *civil* or *administrative* in nature.  The right to confront a witness "face-to-face," *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988), the right to a "meaningful" cross-examination, *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014), and the other rights emanating from the Sixth Amendment's Confrontation Clause do not protect *civil* litigants or those facing purely administrative discipline, even from a public employer.  *Turner v. Rogers*, 564 U.S. 431, 441 (2011) ("[T]he Sixth Amendment does not govern civil cases.").

In a civil or administrative setting, the Due Process Clause does protect a much more limited version of these rights, which will be discussed below.

### 3.  **Bills of Attainder & Ex Post Facto Laws**

Plaintiff's amended complaint also references Article I, Section 9, Clause 3 of the U.S. Constitution, which states that "[n]o Bill of Attainder or ex post facto Law shall be passed."

A "bill of attainder" is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Reynolds v. Quiros*, 990 F.3d 286, 295 (2d Cir. 2021) (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 468 (1977)).

But plaintiff has not identified a particular statute or provision that would offend this constitutional provision.  Broadly construed, plaintiff appears to allege that the JCMs and the statutory basis on which he received the bad job performance rating violate this restriction.

However, those provisions do not operate as a bill of attainder because, among other things, they preserve the right to administratively appeal (which plaintiff did) and can be challenged in other settings, such as in a state-court petition.  In short, there is no indication that the JCMs, the Safety Gram about masking, the Wellness Survey, the formal discipline, or the unsatisfactory rating "fall[ ] within the historical meaning of legislative punishment." *ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010).

The Ex Post Facto Clause applies to government actions that "make[ ] more burdensome the punishment for a crime, after its commission." *Barna*

*v. Travis*, 239 F.3d 169, 171 (2d Cir. 2001).  "A criminal or penal law is ex post facto when it is: (1) retrospective, and (2) more onerous than the law in effect on the date of the offense."  *United States v. Ramirez*, 846 F.3d 615, 619 (2d Cir. 2017).  But any claim based on this constitutional provision would fail for the same basic reasons that plaintiff's Sixth Amendment challenge has failed: he was not subjected to any *criminal* process.

### 4. **Due Process**

Plaintiff's amended complaint has not identified the Due Process Clause of the Fourteenth Amendment, but his complaints about improper procedures and/or discipline might fit under this constitutional rubric.

The Due Process Clause protects procedural and substantive rights.  *Page v. Cuomo*, 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020).  Procedural due process requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

"To assert a violation of procedural due process rights, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process."  *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014) (citation omitted).  "Notice and an opportunity to be heard are the hallmarks of due process."  *Id.*

Upon review, any procedural due process claim would fail.  Assuming that plaintiff enjoyed a state-created interest (whether it is a property right in the pay raise or in a positive performance rating or perhaps a more generalized liberty interest in his good workplace reputation), the amended complaint indicates that he received constitutionally adequate pre-deprivation process.

In particular, plaintiff alleges that he received a written notice that he was being charged with misconduct for repeatedly violating the COVID-19 policies in accordance with the terms of the parties' collective bargaining agreement.  Am. Compl. at 103; Am. Compl. ¶ 87.  This letter explained that a hearing would be conducted on the charge.  *Id.*  Thereafter, plaintiff, after consulting with a union representative and hiring his own lawyer, entered into a stipulation in which he agreed to plead guilty to the charges and pay a fine.  Am. Compl. at 101–102; Am. Compl. ¶¶ 87–94.

The Second Circuit has repeatedly held that this kind of pre-deprivation notice, combined with a grievance process set forth in a collective bargaining agreement, satisfies the demands of procedural due process.  *See, e.g., Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008).  Under those circumstances, a plaintiff can still seek relief in a § 1983 procedural due process claim, but only if he can plausibly "establish that the grievance procedures in a collective bargaining agreement are an inadequate remedy."  *Id.* at 129.

Plaintiff has not done so.  He has not identified any shortcoming in this contractually defined grievance process that might raise constitutional concerns.  Notably, the unsatisfactory job rating that plaintiff received was issued for the one-year period during which he pleaded guilty to these misconduct charges.

To the extent that plaintiff sought to challenge that determination directly, the amended complaint alleges that he *also* had an opportunity to appeal that determination.  In fact, his pleading alleges that he pursued an administrative appeal of that bad job rating to the NYSTA.

Where, as here, the deprivation occurred pursuant to an established state procedure, the state can foresee when the deprivation will occur and is in a position to provide a pre-deprivation hearing.  *King v. N.Y. City Emp. Ret. Sys.*, 212 F. Supp. 3d 371, 401 (E.D.N.Y. 2016).  Under those circumstances, the mere availability of post-deprivation process will not *necessarily* satisfy due process.  *See id*.

Importantly, however, a pre-deprivation hearing is not *always* necessary to pass constitutional muster.  There is no indication that this rating system causes the kind of serious or significant deprivation of a state-created interest (*e.g.*, a termination of employment) that would necessarily *require* a further

pre-deprivation hearing beyond the notice-and-hearing process that already occurred on the underlying charges of misconduct.[12]

In sum, plaintiff has not plausibly alleged a violation of his procedural due process rights in light of the alleged fact that he (1) received written notice of impending discipline based on the three JCMs; (2) participated in a counseled hearing process on those accusations; (3) did not contest the validity of the JCMs in that setting but rather pleaded guilty; and, as a result (4) later received an unsatisfactory job rating for that time period, which he (5) also administratively appealed. *Cf. Kieffer v. N.Y. State Thruway Auth.*, 522 N.Y.S.2d 747, 749 (3d Dep't 1987) (rejecting due process claim based on unsatisfactory rating).

To the extent plaintiff's amended complaint might be understood to raise a substantive due process claim, it must also be dismissed. Substantive due process protects against government action that is "arbitrary, conscience shocking, or oppressive in a constitutional sense," but not against official conduct that is merely "incorrect or ill-advised." *Page*, 478 F. Supp. 3d at 371 (citation omitted). In other words, "substantive due process rights are

---

[12] Under these circumstances, the availability of a post-deprivation procedure, with an Article 78 proceeding in state court being the big one, would be more than sufficient. "Article 78 of the New York Civil Practice law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 811 (2d Cir. 1996), "provides the mechanism for challenging a specific decision of a state administrative agency," *Campo v. N.Y. City Emp. Ret. Sys.*, 843 F.2d 96, 101 (2d Cir. 1988).

violated only by conduct 'so outrageously arbitrary as to constitute a gross abuse of governmental authority.'" *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 237 (E.D.N.Y. 2009) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)).  There is no such outrageous conduct alleged here.

### 5.  **Equal Protection**

Plaintiff's amended complaint has not identified the Equal Protection Clause of the Fourteenth Amendment, either.  But again, his complaints about improper discipline imposed upon him by his public employer might fit under this constitutional rubric.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This constitutional provision is "essentially a direction that all persons similarly situated be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  "There are a number of common methods for pleading an equal protection claim."  *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018).

First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'"  *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999)).

Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *City of Oneonta*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).

Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Floyd*, 959 F. Supp. 2d at 570 (citation omitted).

Under any one of these three theories, a plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (cleaned up); *see also Keles v. Davalos*, 642 F. Supp. 3d 339, 366–67 (E.D.N.Y. 2022).

Plaintiff has not done any of that.  However, even "[w]here there is no allegation of membership in a protected class, the plaintiff may still prevail on either a 'class of one' or 'selective enforcement' theory." *Brown v. Griffin*, 2019 WL 4688641, at *4 (S.D.N.Y. Sept. 25, 2019).

Pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff may assert a "class of one" claim by alleging that "they were intentionally treated different from others similarly situated and that there was no rational basis for this difference in treatment." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).

Alternatively, pursuant to *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing that

they were treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citations omitted).

Measured against these theories, there is no indication that plaintiff has a viable § 1983 Equal Protection claim. There is not even a whiff of any class-based animus from any of the named defendants. Nor is there any hint that any of the defendants treated plaintiff differently than his peers based on any constitutionally impermissible criteria.

### E.  Other Federal Statutes

Plaintiff's amended complaint also purports to assert claims under 18 U.S.C. §§ 241, 242, 351(e) and 28 U.S.C. § 4101. Am. Compl. at 7. But plaintiff cannot bring claims under those federal statutes because they do not create any causes of action that can be pursued by private plaintiffs.

First, a private plaintiff cannot pursue a claim under the criminal statutes found in Title 18 of the United States Code. "It is a truism, and has been for many decades, that in our federal system crimes are always prosecuted by the Federal Government, not . . . by private complaints." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86–87 (2d Cir. 1972). Consequently, the Second Circuit has repeatedly held that there is no private right of action

under Title 18 of the U.S. Code.  *See, e.g.*, *Storm-Eggink v. Gottfried*, 409 F. App'x 426, 427 (2d Cir. 2011) (summary order) (collecting cases).

Second, 28 U.S.C. § 4101 does not create a cause of action, either.  This provision contains definitions, including a definition of "defamation," in the context of a statute that allows actions recognizing foreign defamation judgments.  "Although the tort of defamation is a well-recognized cause of action under state common law, federal law does not create a general cause of action or provide a basis for federal question jurisdiction for defamation." *Thomas v. Brasher-Cunning ham*, 2020 WL 4284564, at *10 (D. Conn. July 27, 2020) (collecting cases).

## F. **State-Law Claims**

Broadly construed, plaintiff's amended complaint also asserts various common law tort claims, or perhaps breach of contract claims.  Those claims arise under state law.  But the basis for jurisdiction in this forum is federal question, since all the parties are from New York.

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016).  There are no exceptional circumstances presented in this case.  Accordingly, plaintiff's state law claims will be dismissed without prejudice.

## G.  Leave to Amend

The final question is whether plaintiff should be given leave to amend his pleading, which he has already amended once as of right.  "Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim."  *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up).  Even so, "it is well established that leave to amend a complaint need not be granted where amendment would be futile."  *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

After considering the matter, plaintiff will not be given further leave to amend because the problems with his claims are substantive—they involve an objection to progressive discipline arising from his non-compliance with COVID-19 policies that applied generally to NYSTA employees.

Plaintiff has not plausibly alleged that the discipline he received—which came after notice and a hearing in accordance with his collective bargaining agreement—was incompatible with the reasonable accommodation he received regarding the COVID-19 face mask policy (as opposed to the facial hair or respirator fit test accommodation he had previously received).

Notably, plaintiff might well have a viable state-law claim based on these facts, perhaps for some violation of the collective bargaining agreement or for a breach of some other contractual relationship with his employer.  But those

are questions for state court.  Because plaintiff cannot sustain any cognizable *federal* claims based on this fact pattern, leave to amend those claims would be futile.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Accordingly, leave to amend must be denied.

## V.  <u>CONCLUSION</u>

Plaintiff's amended complaint must be dismissed.  Liberally construed, he has failed to plausibly allege any cognizable federal claims against any of the named defendants.  The Court's decision today does not preclude plaintiff from re-filing his state-law claims in state court.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss (Dkt. No. 32) is GRANTED;

2.  Plaintiff's amended complaint is DISMISSED <u>without</u> leave to amend;

3.  Plaintiff's federal-law claims are DISMISSED <u>with</u> prejudice; and

4.  Plaintiff's state-law claims are DISMISSED <u>without</u> prejudice.

The Clerk of the Court is directed to terminate the remaining motions as moot, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 11, 2024
        Utica, New York.